ACCEPTED
01-14-00762-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
4/20/2015 8:35:26 PM
CHRISTOPHER PRINE
CLERK

**NO. 01-14-00762-CV**

FILED IN
1st COURT OF APPEALS
HOUSTON, TX
April 20, 2015
CHRISTOPHER A. PRINE,
CLERK

## IN THE COURT OF APPEALS

## FOR THE FIRST DISTRICT

## OF TEXAS AT HOUSTON, TEXAS

## IN THE MATTER OF B.D.S., RESPONDENT

## B.D.S., APPELLANT
v.
## STATE OF TEXAS, APPELLEE

ON APPEAL FROM
THE 313TH DISTRICT COURT OF
HARRIS COUNTY, TEXAS
TRIAL COURT CAUSE NO. 2013-06337J

## ORIGINAL APPELLANT'S BRIEF

DONALD M. CRANE
DONALD M. CRANE (SBN 05005900)
Attorney at Law
810 South Mason Road, #350
Katy, Texas 77450
Telephone: (281) 392-6611
Facsimile: (281) 392-5383
donmcrane@gmail.com
ATTORNEY FOR APPELLANT B.D.S.

**NO ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

**Appellant:**
**B.D.S**

**Trial Counsel:**
Joseph Wade Prasifka
P.O. Box 658
Houston, Texas 77001-0658
Fax:  (281) 392-5383

**Appellate Counsel:**
Donald M. Crane
810 South Mason Road, Suite 350
Katy, Texas 77450
Telephone:  (281) 392-6611
Fax:  (281) 392-5383

**Petitioner/Appellee:**
**State of Texas**

**Trial Counsel:**
Courtney Rosen
Assistant District Attorney
1201 Franklin Street, Suite 600
Houston, Texas 77002
Telephone:  (713) 755-5874

**Appellate Counsel:**
Jessica Caird/Dan McCrory
Harris County District Attorney
Attn.: Appellate Division
1201 Franklin Street, 5th Floor
Houston, Texas 77002
Telephone:  (713) 755-5800

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL          1

TABLE OF CONTENTS          2

INDEX OF AUTHORITIES (Cases)          3

INDEX OF AUTHORITIES (Statutes and Rules)          3

NO ORAL ARGUMENT REQUESTED          4

RECORD REFERENCES          4

PARTY/PARTICIPANT REFERENCES          5

STATEMENT OF THE CASE          6

ISSUE PRESENTED          7

APPELLANT'S BRIEF          8

STATEMENT OF FACTS          9

APPLICABLE LEGAL STANDARD          18

APPLICABLE STATUTE          20

ANALYSIS          21

CONCLUSION AND PRAYER          24

CERTIFICATE OF COMPLIANCE          25

CERTIFICATE OF SERVICE          26

# INDEX OF AUTHORITIES

**CASES**      **PAGE**

*Brooks v. State,* 323 S.W.3d 893 (Tex. Crim. App. 2010)     18

*Hooper v. State,* 214 S.W.3d 9 (Tex. Crim. App. 2007)     19

*In re M.S.,* _____ 373 S.W.3d _____ 730
(Tex. App. – Ft. Worth
[2nd Dist.], 2012, pet. filed)     18

*In re R.R.,* 373 S.W.3d 730 (Tex. App. – Houston
[14th Dist.], 2012, pet. filed)     18

*Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781 (1979)     18

*Wise v. State,* 364 S.W.3d 900 (Tex. Crim. App. 2012)     18


**STATUTES AND RULES**      **PAGE**

Tex. Penal Code Ann. § 28.08 (West 2011)     20

## NO ORAL ARGUMENT REQUESTED

Appellant, B.D.S., does not request oral argument.

## RECORD REFERENCES

### TRANSCRIPT

The pleading record <u>consists</u> of the Transcript (Clerk's Record) and the Supplemental Clerk's Record. The Transcript is referenced to herein as [CR_____] or [SUPPCR _____] followed by a page and line reference.

Both the Transcript and the Statement of Facts (Reporter's Record) may contain copies of the Exhibits and, if so, will be referenced accordingly.

### STATEMENT OF FACTS

The Statement of Facts (Reporter's Record) consists of three (3) volumes (including Exhibits) prepared by Ms. Rachel L. Gamez, CSR, Texas CSR 9222, Deputy Court Reporter, 313th District Court, 1200 Congress, 5th Floor, Houston, Texas 77002, (832) 373-6772, and is referred to herein as [RR Vol._____, at p._____ , at l. _____].

Ms. Gamez's Reporter's Record, Volume 1 of 3, is entitled "Master Index," and references the 14th day of August, 2014.

Ms. Gamez's Reporter's Record, Volume 2 of 3, is entitled "Trial," and references the 14th day of August, 2014.

Ms. Gamez's Reporter's Record, Volume 3 of 3, is entitled "Trial," and references the 14th day of August, 2014.

## PARTY/PARTICIPANT REFERENCES

Appellant, B.D.S., may be referred to as: "Appellant," "juvenile," or the "respondent."

Further, Appellee refers to the State of Texas and may be referred to as: "Petitioner," "the State," or the "Appellee."

**TO THE HONORABLE JUSTICES OF THE FIRST COURT OF APPEALS:**

Appellant, B.D.S., respectfully submits her brief in the above styled and numbered appeal.

## STATEMENT OF THE CASE

On November 15, 2013, the State of Texas ("State") filed a petition alleging B.D.S. committed the offence of graffiti at an educational institute. **CR 3; RR. Vol. 1, p. 6, l. 5-7.** After a bench trial on August 14, 2014, she was found to have engaged in delinquent conduct. **RR. Vol. 1, p. 67, l. 10-14**. The court placed B.D.S. on probation for one year and in the custody of her mother. **CR 5-7; RR. Vol 1, p. 67, l. 12-13.**

A motion for new trial was filed September 11, 2014.[1] The court denied this motion September 25, 2014.[2]

A request for findings of fact and conclusions of law also was filed September 11, 2014.[3]

B.D.S timely filed her notice of appeal on September 11, 2014. **CR 11-12**.

6

---

[1] Not included in Clerk's Record.
[2] Order denying motion for new trial also not included in Clerk's Record.
[3] Not included in Clerk's Record; further, the request was never fulfilled.

# ISSUE PRESENTED

**Issue Presented:** The evidence was insufficient to support the trial court's judgment that Appellant engaged in delinquent conduct constituting a penal offense.

IN THE COURT OF APPEALS

FOR THE FIRST DISTRICT

OF TEXAS AT HOUSTON, TEXAS

**IN THE MATTER OF B.D.S., RESPONDENT**

**B.D.S., APPELLANT**
**v.**
**STATE OF TEXAS, APPELLEE**

ON APPEAL FROM
THE 313TH DISTRICT COURT OF
HARRIS COUNTY, TEXAS
TRIAL COURT CAUSE NO. 2013-06337J

**APPELLANT'S BRIEF**

TO THE HONORABLE JUSTICES OF THE FIRST COURT OF APPEALS:

COMES NOW DONALD M. CRANE ("appellate counsel"),

appointed attorney ad litem on appeal for Appellant, B.D.S., juvenile

respondent, and respectfully submits this Appellant's Brief.

Appellant, B.D.S., may be referred to as: "Appellant," "juvenile," or

the "respondent."

# STATEMENT OF FACTS

On August 14th, 2014, a bench trial was held to determine whether B.D.S. engaged in delinquent conduct. The following witnesses spoke during the trial: J.E., S.Y., A.R., and Officer Jennifer Richards.

## J.E.

*(Direct Examination of J.E. by Prosecution)*

J.E. testified that she is 13 years old and going into 9th grade. **RR Vol. 1, p. 8, l. 14-17**. She testified that she attended Kahla Middle School on November 11th, 2013. **RR Vol. 1, p. 8-9, l. 22-23**. She testified that she, B.D.S., and S.Y. went to the restroom to fix their makeup. **RR Vol. 1, p. 10, l. 2-3**. When they entered the bathroom, B.D.S. brought up the idea to write on the wall. **RR Vol. 1, p. 10, l. 6-7.** She testified that B.D.S. wrote on the wall first and then S.Y. wrote on the wall. **RR Vol. 1, p. 10, l. 8-9**. The court admitted a depiction of the writing on the bathroom wall, which is classified as Petitioner's Exhibit No. 2 ("P2".) **RR Vol. 1, p. 10, l. 24-25; Vol. 3, p. 5-6.** J.E. testified that B.D.S. wrote the writing on the right and the writing at the center on P2. **RR Vol. 1, p. 11, l. 7**. J.E. testified that S.Y. wrote the writing on left side of P2. **RR. Vol. 1, p. 12, l.**

9

**15-17**.

J.E. testified that she did not write anything and was not asked to write anything. **RR Vol. 1, p. 12, l. 23-25 – p. 13, l. 1**. She further stated that B.D.S. and S.Y. used a sharpie. **RR Vol. 1, p. 13, l. 2-4**. After they were done they tossed the sharpie. **RR Vol. 1, p. 5-6**. J.E. testified that the sharpie was provided by A.R. **RR Vol. 1, p. 13, l. 12**. Once the girls were done writing on the wall, a teacher walked in and called the girls out of the restroom. **RR Vol. 1, p. 13, l. 13-15**. The girls were sent to the principal's office, separated into separate rooms, and made statements. **RR Vol. 1, p. 13, l. 17-25 – p. 14, 1-6**.

J.E. received her statement to refresh her memory. **RR Vol. 1, p. 14, l. 9-11**. She testified, "We went upstairs to the restroom to fix our makeup and Ashley had a sharpie and Brianna came up with the idea that we should write on the wall. So, Ashley gave her the Sharpie, she wrote on the wall, and then Staphany wrote on the wall. And some girls in the restroom left and I heard a girl say that the teacher was coming. So, we tried to get out really fast but the teacher told us to stay outside and she

was going to call the principal." **RR Vol. 1, p. 14, l. 18-25 – p. 15, l. 1**.

J.E. testified that she did not have a falling out with B.D.S. **RR Vol. 1, p. 15, l. 2-3**. She also testified that she has no reason to dislike B.D.S. **RR Vol. 1, p. 15, l. 4-5**.

J.E. testified that an officer and Ms. Dilworth were in the room when she wrote the statement. **RR Vol. 1, p. 15, l. 21-23**. They told her to write down what happened and she did not feel threatened. **RR Vol. 1, p. 16, l. 5-6**.

*(Direct Examination of J.E. by Defendant)*

J.E. testified to the court that she put in her written statement S.Y. wrote on the wall. **RR Vol. 1, p. 58, l. 1**. But when asked to review her statement in court, she testified that she did not mention S.Y. writing anything. **RR Vol. 1, p. 58, l. 6-8**.[4]

**S.Y.**

S.Y. testified that she is 14 years old and going into the 9th grade. **RR**

11

---

[4] The Defendant caught J.E. in a conundrum. The Court asked J.E. if she was lying to protect her friend. RR Vol. 1, p. 58, l. 20-21. J.E. testified that she did not know and that she forgot. RR Vol. 1, p. 58, l. 24-25. The Court continues by stating that J.E. pointed the finger at B.D.S. when, in fact, J.E. knew that S.Y also wrote on the wall because J.E. witnessed S.Y write on the wall. RR Vol. 1, p. 61, l. 24-25 – p. 62, l. 1-3. The

**Vol. 1, p. 19, l. 11**-14. S.Y. testified that she attended school at Kahla Middle School on November 11th, 2013. **RR Vol. 1, p. 20, l. 11**-15. On the day of the incident, she testified that she went into the restroom with J.E. **RR Vol. 1, p. 20, l. 23**-25. S.Y. testified that B.D.S. was never in the restroom with her. **RR Vol. 1, p. 21, l. 2**-4. She testified that B.D.S, J.E., A.R., and she were all sent to the principal's office. **RR Vol. 1, p. 22, l. 10**-12.

S.Y. admitted to writing on the wall. **RR Vol. 1, p. 22, l. 16**-23. She wrote, "Flacah estaba aqui and F y'all hoes." **RR Vol. 1, p. 23, l. 9**. She testified that she did not write the top right in the center on P2. **RR Vol. 1, p. 23, l. 21**-23. S.Y. stated that she could not say whether B.D.S. did or did not write the other writings on the wall because she was not there when they were written. **RR Vol. 1, p. 24, l. 19**-22. She testified that she did see the other writings when she came back into the restroom. **RR Vol. 1, p. 24, l. 23**-25.

At the principal's office, everyone was separated in separate rooms. **RR Vol. 1, p. 25, l. 6**-7. In the room, she made a written statement. **RR**

---

Court stated that J.E. decided to finger B.D.S. but not finger S.Y. RR Vol. 1, p. 62, l. 4-7.The Court stated that J.E. lied in her statement. RR Vol. 1, p. 64, l. 5-6.

**Vol. 1, p. 25, l. 8-9**. She testified, "I had to put that I came into the restroom. I had wrote on the wall and then when I was about to leave, she stopped every girl that was in there. She didn't ask where we was coming from or anything like that and she told us we was all going to get suspended because she was tired of all this. And she took us all down to the thing and the only ones that she kept in the office was me and B.D.S. and she let the rest go." **RR Vol. 1, p. 26, l. 4-11**.

In regards to her written statement, S.Y. testified that at first she did not know who else wrote on the wall, but after turning in her statement the principal told S.Y. that she knew, she was wrong and kept nodding to S.Y. **RR Vol. 1, p. 27, l. 2-4**. S.Y. further testifies that after the encounter with the principal, S.Y. added that B.D.S had written on the wall. **RR Vol. 1, p. 28, l. 5-10**. S.Y. testified that she added the statement after being alone for 30-45 minutes, while the principal was speaking with another girl. **RR Vol. 1, p. 29, l. 7-20**. S.Y. stated that the principal came in and "told me." **RR Vol. 1, p. 29, l. 9**.

She testified that she was thinking that she had already got in trouble for something else and thought she was going to get in trouble for

this. **RR Vol. 1, p. 29, l. 22-24**. S.Y. testified that she felt threatened by the principal. **RR Vol. 1, p. 30, l. 6-7**. She agreed that she felt pressure to say something because she might get more in trouble. **RR Vol. 1, p. 30, l. 11-13**.

S.Y. testified that she was charged with a felony for the graffiti and she was given probation for six months. **RR Vol. 1, p. 31, l. 7-15**.

**A.R.**

A.R. testified that she is 14 years old and going into the 9th grade. **RR Vol. 1, p. 33, l. 16-19**. She testified that she attended Kahla Middle School on November 11th, 2013. **RR Vol. 1, p. 33-34, l. 24-1**. She testified that all the girls were together in the restroom doing makeup, hair, going to the mirrors, and talking. **RR Vol. 1, p. 36, l. 1-2**. She testified that she brought the sharpie that she received from her teacher and accidentally placed it on the bathroom sink. **RR Vol. 1, p. 36, l. 5-22; RR Vol. 1, p. 37, l. 14-15**.

A.R. testified that she saw P2 but did not know who drew it. **RR Vol. 1, p. 36, l. 25**. She stated that the teacher had stopped all the girls and told them to go back into the bathroom and questioned the girls as to who created the writing on the wall. **RR Vol. 1, p. 37, l. 8-11**. She testify

14

that she did not see B.D.S. write on the wall. **RR Vol. 1, p. 37, l. 18-20**.

A.R. testified that J.E., S.Y., B.D.S., she and a few other girls were sent to the principal's office. **RR Vol. 1, p. 39, l. 7-10**. She was placed in a separate room and gave her statement. She testified, "I wrote down that we were in the restroom just minding our own business and then we had came out of the restroom and that's when the teacher told us to write down our names and everything." **RR Vol. 1, p. 40, l. 4-7**.

A.R. then testified that, "And then she made us add who wrote it and who did it because she had told me…" **RR Vol. 1, p. 40, l. 9-10**. A.R. further testified that her statement stated that B.D.S., J.E., and S.Y wrote on the wall. **RR Vol. 1, p. 40, l. 24-25**. She testified that Ms. Dilworth was coming back and forth in her room when she was writing here statement. **RR Vol. 1, p. 42, l. 18-20**. She testified that Ms. Dilworth made her feel scared and that something bad was going to happen to her if she didn't say something. **RR Vol. 1, p. 42, l. 21-25 - p.43, l. 1-6**. A.R. testifies later that Ms. Dilworth threatened her. **RR Vol. 1, p. 45, l. 10-11**.

A.R. testified that she had to name names and the names she named

15

were the only ones she saw in the office. **RR Vol. 1, p. 43, l. 12-13**. A.R. testified that she did not write anything. **RR Vol. 1, p. 43, l. 14-15**.

**Officer Jennifer Richards**

Officer Jennifer Richards ("Richards") testified that she works for Cypress Fairbanks ISD Police Department and assigned to the Kahla Middle School. **RR Vol. 1, p. 47, l. 1-6**. She testified that she was at school on November 11th, 2013. **RR Vol. 1, p. 47, l. 23-25 – p. 48, l. 1-2**.

Richards testified that she received a call that day to the principal's office for graffiti in the upstairs girl's restroom. **RR Vol. 1, p. 48, l. 19-24**. She testified that four girls were in separate rooms and writing their statements. **RR Vol. 1, p. 49, l. 2-17**.

Richards testified that the cleanup of the graffiti took approximately 15 to 20 minutes and was completed by the custodian. **RR Vol. 1, p. 51, l. 16-18**. Richards testified that there was no permanent damage. **RR Vol. 1, p. 51, l. 19-20**.

Richards testified that the District Attorney's office accepted charges for B.D.S. and S.Y. **RR Vol. 1, p. 50, l. 4-8**. She testified that she

16

explained the situation and every statement to the office. **RR Vol. 1, p. 52, l. 4-6**.

Richards testified that she did not see the principal threaten or force the girls to write their statements. **RR Vol. 1, p. 52, l. 4-9.** She further testified that while these statements were being written she was in the common area or walking around the campus. **RR Vol. 1, p. 53, l. 18-22**. Richards waited outside until the statements were written. **RR Vol. 1, p. 54, l. 15-17**.

## Court's Findings:

The Court found that B.D.S. did engage in delinquent conduct. **RR Vol. 1, p. 67, l. 10-12**.

## Court's Ruling:

The court ruled in favor of the State of Texas and gave B.D.S. one year of probation and placed B.D.S. in the custody of her mother. **CR 5; RR Vol. 1, p. 67, l. 12-13**.

## APPLICABLE LEGAL STANDARD

Although juvenile proceedings are civil in nature, intermediate appellate courts have applied the criminal sufficiency standard to juvenile adjudication proceedings. *In re R.R.,* 373 S.W.3d 730, 734 (Tex. App. – Houston [14th Dist.], 2012, pet. filed)

The sole standard to be used to assess the sufficiency in criminal cases is that legal sufficiency standard articulated in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979), according to the Court of Criminal Appeals in *Brooks v. State,* 323 S.W.3d 893, 895, 912 (Tex. Crim. App. 2010). *In re M.S.,* _____ S.W.3d _____, (Tex. App. - ____ _____, 2012)

In a due process review of the sufficiency of the evidence to support a conviction, the reviewing court considers all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Wise v. State,* 364 S.W.3d 900, 903 (Tex. Crim. App. 2012)

The fact finder is the exclusive judge of the credibility of the

18

witnesses and the weight to be given to the evidence.  It is permissible to draw multiple reasonable inferences from the facts as long as each finds support in the evidence presented at trial.  Courts of appeals should determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.  Therefore ("under the Jackson test"), triers of fact are not permitted to draw conclusions based on speculation because doing so is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.  *Hooper v. State,* 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)

## APPLICABLE STATUTE

Texas Penal Code Section 28.08 states in part as follows:

"A person commits as offense under penal code section 28.08(a)(2) if, without the effective consent of the owner, the person intentionally or knowingly makes markings, including inscriptions, slogans, drawings, or paintings, on the tangible property of the owner with an indelible marker." Tex. Penal Code Ann. § 28.08(a)(2) (West 2011)

Further, an "indelible marker means a device that makes a mark with a paint or ink product that is specifically formulated to be more difficult to erase, wash out, or remove than ordinary paint or ink products." *Id.* § 28.08(e)(3)

Also, "an offense under this section is a state jail felony if the marking is made on a school, ... ." *Id.* § 28.08(d)(1)

Finally, "(i)n this section, ...school means a private or public elementary or secondary school." *Id.* § 28.08(e)(5)

## ANALYSIS

The legal sufficiency standard was not met in this case. B.D.S. was wrongly adjudicated and used as a scape goat for delinquent conduct that could have been conducted by any of the teen witnesses. The court took the written, coerced statement of J.E. and her partially perjured trial court testimony as the evidence used to adjudicate B.D.S.

J.E.'s story is consistently false with the story of the other testifying witnesses. For example, J.E. testified that an officer and Ms. Dilworth were in the room when she wrote the statement. **RR Vol. 1, p. 15, l. 21-23**. This statement does not coincide with Officer Jennifer Richards testimony because Richards testimony is that while the girls were writing their statements she was in the common area or walking around the campus and Richards waited outside until the statements were written. **RR Vol. 1, p. 53, l. 18-22**; **RR Vol. 1, p. 54, l. 15-17**.

Also, the story does not coincide with the stories of A.R. and S.Y. J.E. testified that she did not write anything on the wall, she was not asked to write anything on the wall and that B.D.S. and S.Y. used the sharpie. **RR Vol. 1, p. 12, l. 23-25 – p. 13, l. 1**; **RR Vol. 1, p. 13, l. 2-4**. Contrast

this with the statements of S.Y. who claimed that she could not say whether B.D.S. did or did not write the other writings on the wall because she was not there when they were written. **RR Vol. 1, p. 24, l. 19**-**22**. Also, A.R. testified that her written statement stated that B.D.S., J.E., and S.Y wrote on the wall. **RR Vol. 1, p. 40, l. 24**-**25**.

Lastly, there is a strong possibility that J.E.'s statement is coerced. J.E. testified that they told her to write down what happened and she did not feel threatened. **RR Vol. 1, p. 16, l. 5**-**6**. Even though J.E. did not "feel" threatened, a majority of the girls who testified felt differently. For example, A.R. testified that Ms. Dilworth made her feel scared and that something bad was going to happen to her if she didn't say something. **RR Vol. 1, p. 42, l. 21**-**25** - **p.43, l. 1**-**6**. A.R. also testified that Ms. Dilworth threatened her. **RR Vol. 1, p. 45, l. 10**-**11**. As to S.Y., she testified that she felt threatened by the principal and felt pressure to say something because she might get more in trouble. **RR Vol. 1, p. 30, l. 6**-**7**; **RR Vol. 1, p. 30, l. 11**-**13**. Also, S.Y. originally did not include B.D.S. in her written

statement until after the principal's coercion.[5]

The trial court's decision to adjudicate B.D.S was overwhelmingly based on inconsistent and inaccurate evidence. J.E.'s written statement and trial court testimony are the prime example of this inconsistency and inaccuracy. Due to the coercion, partial perjury, written and re-written statements, the trial court did not meet the legal sufficiency standard.

23

---

[5] In regards to her written statement, S.Y. testified that at first she did not know who else wrote on the wall, but after turning in her statement the principal told S.Y. that she knew, she was wrong and kept nodding to S.Y. **RR Vol. 1, p. 27, l. 2-4**. S.Y. further testifies that after the encounter with the principal, S.Y. added that B.D.S had written on the wall. **RR Vol. 1, p. 28, l. 5-10**. S.Y. testified that she added the statement after being alone for 30-45 minutes, while the principal was speaking with another girl. **RR Vol. 1, p. 29, l. 7-20**. S.Y. stated that the principal came in and "told me." **RR Vol. 1, p. 29, l. 9**.

## CONCLUSION AND PRAYER

Appellant prays that this Honorable Court of Appeals reverse the trial court's judgment finding that she engaged in delinquent conduct and render a judgment finding that the evidence is insufficient to support an adjudication that she committed the offense of graffiti. Alternatively, B.D.S. requests that this Court reverse the judgment of the trial court and remand the case for a new trial.

Appellant prays for general relief.

Respectfully submitted,


**/s/ Donald M. Crane**
Donald M. Crane
TBA 05005900
Attorney at Law
810 South Mason Road, #350
Katy, Texas 77450
Telephone: (281) 392-6611
Facsimile: (281) 392-5383
donmcrane@gmail.com

ATTORNEY ON APPEAL FOR
B.D.S.

24

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing computer generated brief complies with word limit requirements of TRAP 9.4 (3). Relying on the word count of the computer program used to prepare this document, the number of words is 3,947 excluding the caption, identity of parties and counsel, table of contents, index of authorities, statement of the case, statement of issues presented, statement of procedural history, signature, proof of service, certificate of compliance and appendix.

**/s/ Donald M. Crane**
Donald M. Crane

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2015, that a true and correct copy of the foregoing Original Appellant's Brief, was served in accordance with the TRAP to Jessica Caird/Dan McCrory, Assistant Harris County District Attorney, by electronically delivery through prodoc efiling, E-mail and fax.

Jessica Caird/Dan McCrory,
Harris County District Attorney
Attn.: Appellate Division
1201 Franklin Street, 5th Floor
Houston, Texas 77002
(713) 755-5800
(713) 755-5809 fax

**/s/ Donald M. Crane**
Donald M. Crane

26

323 S.W.3d 893

Kelvin Kianta BROOKS, Appellant,

v.

The STATE of Texas.

No. PD-0210-09.

Court of Criminal Appeals of Texas.

Oct. 6, 2010.

Rehearing Denied Nov. 17, 2010.

[323 S.W.3d 894]

Walter M. Reaves, Jr., West, for Appellant.

John R. Messinger, Asst. Crim. D.A., Waco, Jeffrey L. Van Horn, State's Attorney, Austin, for State.

OPINION

HERVEY, J., announced the judgment of the Court and delivered an opinion in which KELLER, P.J., KEASLER, and COCHRAN, JJ., joined.

We granted discretionary review in this case to address, among other things, whether there is any meaningful distinction between a legal-sufficiency standard under Jackson v. Virginia 1 and a factual-sufficiency standard under Clewis v. State and whether there is a need to retain both standards. 2 Under the Jackson v. Virginia legal-sufficiency standard, a reviewing court is required to defer to a jury's credibility and weight determinations. 3 In Clewis, this Court adopted a factual-sufficiency standard, which is supposed to be distinguished from a Jackson v. Virginia legal-sufficiency standard primarily by not requiring a reviewing court to defer to a jury's credibility and weight determinations. 4 But then Clewis contradicted itself by also requiring a reviewing court to apply this standard with deference to these jury determinations "so as to avoid an appellate court's substituting its judgment for that of the

jury." 5 After having made several attempts to "clarify" Clewis in part to resolve this fundamental contradiction, we eventually came to realize that the Clewis factual-sufficiency standard is "barely distinguishable" from the

[323 S.W.3d 895]

Jackson v. Virginia legal-sufficiency standard. 6 We now take the next small step in this progression and recognize that these two standards have become essentially the same standard and that there is no meaningful distinction between them that would justify retaining them both. We, therefore, overrule Clewis and decide that the Jackson v. Virginia legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.

The record reflects that, in cause number 10-07-00309-CR, a jury convicted appellant of possessing with intent to deliver more than four but less than 200 grams of crack cocaine and sentenced him to 25 years in prison. Appellant claimed on direct appeal that the evidence is legally and factually insufficient to support the intent-to-deliver element of this offense.

The evidence shows that two police officers went into a bar to investigate a report that someone matching appellant's description was there with a gun. When the officers asked appellant to step outside, appellant ran and threw two baggies towards a pool table just before one of the officers tased him. One of the baggies contained a small amount (about 3 grams) of marijuana. The other baggie contained one baggie holding 4.72 grams of crack cocaine and another baggie holding six ecstasy tablets that weighed 1.29 grams. 7 Appellant also had a cell phone and, according to one of the officers, "a couple of dollars." 8 Appellant did not appear to be under the influence of narcotics, and he was not in possession of any drug paraphernalia that could have been used for smoking crack cocaine. The police did not find a gun. The police gave appellant's cell phone and money to an acquaintance of appellant's before they took appellant to jail.

An experienced Waco Police Department drug-enforcement investigator (Thompson) testified that the bag containing the 4.72 grams of crack cocaine contained "two larger size rocks and then maybe a smaller one" and a useable amount of "crumbs." He testified that each of the two large rocks weighed at least two grams and the other one weighed "a gram and a half or something like that." Thompson testified that "he would say" that 4.72 grams was a "dealer amount," which could have been cut up into 23 or 24 rocks. He testified that 4.72 grams of crack cocaine is worth about $470.

Thompson stated that a "typical quantity" that a dealer would have would be more than two rocks and that he "would think" that someone with more than a gram would be a dealer. Thompson testified

that it is not "typical" for drug users to be in possession of a large amount of drugs and that he has "not run across many people that are [crack cocaine] users that have more than one to two rocks" because they are going to "smoke it as soon as [they] can get it." He also testified that "most" crack cocaine users "typically"

[323 S.W.3d 896]

would have some type of paraphernalia "to smoke the crack with" and that "[t]ypically dealers don't have crack pipes because it's not really common for them to use their product that they are selling." For example, Thompson testified:

Q. [STATE]: Okay. So if somebody had approximately 4.72 grams and about three or four rocks and some crumbs, is that a dealer amount or user amount?A. [THOMPSON]: I would say that's dealer amount.

* * *

Q. So if he's got 4.72 grams-A. I would think they were a dealer.Q. Okay. I'm going to go-oh, you said that there are some other things that you would look for to see if somebody was dealing as opposed to using the drugs. What are some of those things that you would look for?A. In my experience, and we've come across people that are just possessing crack to use it. They usually have what is called a crack pipe or some type of heating element to heat the crack up with. Most of the people that we've come across out in the field that smoke crack have a crack pipe somewhere or have some brillo which you use inside of your crack pipe as a filter to keep from inhaling the whole piece of crack up when you're smoking it. Typically dealers don't have crack pipes because it's not really common for them to use their product that they are selling. You can't make any money if you're hooked on your own product. So typically a user is going to have some type of instrument to smoke the crack with, and, like I said before, they normally don't have more than one or two because they are smoking. You don't save crack. It's not like a rainy day type of deal. You want to smoke it as soon as possible. 9

On cross-examination, Thompson described other factors, none of which are present in the record in this case, indicating that a person could be a dealer: (1) possession of five, ten, or twenty dollar bills; (2) names in the person's cell phone; (3) possession of some document identifying who owes what; (4) possession of a weapon; or (5) others observed the person trying to sell drugs. Thompson also acknowledged that a person could possess 4.72 grams of crack cocaine for personal use.

Appellant testified that he possessed only the baggie containing the small amount of marijuana. He denied possessing the baggies containing the crack cocaine and the ecstasy pills. Appellant also admitted that he has two prior convictions for possession of cocaine and another prior conviction for

possession with intent to deliver cocaine. The jury was instructed in the charge that it could have considered these extraneous offenses "in determining the intent, motive, opportunity, preparation, plan, knowledge, identity, or absence of mistake or accident by the Defendant, if any, in connection with the offenses, if any, alleged against him in the indictment in this case, and for no other purpose."

During closing jury arguments, the State relied primarily on Thompson's testimony to argue that appellant possessed the crack cocaine with the intent to deliver it:

[STATE]: There is no evidence at all, none, that he was a user. What does that tell you? What does that tell the reasonable person? I'm going to go to

[323 S.W.3d 897]

Investigator Thompson right now because he kind of ties in with that. The dealer level back on the crack, and I'm bouncing back and forth because it's basically the same charge. Just with crack we have added the element of intent to deliver. But Investigator Thompson testified that a typical user, one, two rocks, max, because what do they do when they get it? They want to smoke it because they are craving this drug, because they have to use it. They don't hold it for a rainy day. They don't keep it for later. They use it then. And when they use it, they have paraphernalia on them. They don't carry a couple of rocks and then go home and find their stuff. They have it all on their person. No drug paraphernalia, no brillo pad, no push pipe, no push rod, no crack pipe, nothing. Again, because he's not a user. There is no evidence of that. In fact, the amount that he had is dealer amount. This is 23 to 25 crack rocks. It's way more than one or two for a user. 4.72 grams doesn't really seem like a lot in here. It's a lot on the street. He had 0, 0 worth of drugs on him that night.

* * *

About him being a user and not a dealer, he got on the stand. Did he tell you, "I'm a user, not a dealer"? He didn't say that. That would have been the perfect chance for him to say that. Does he look like a user? You know we had somebody in voir dire say, "I've seen crack users, and I can tell when I see them." Did he have a pipe on him? No. What else did he not have? You know, no pipe. He had some money on him, not a lot because he hadn't started selling yet. He still had his whole 25-rock stash. He hadn't started selling yet. He had the cell phone. Yeah, it would have been nice to get the names out of the cell phone and see if they match up with other drug dealers, you know, that we know. The police, they were being nice. They gave the phone to his sister and let her take it home. So are we going to blame the cops for being a little too nice that night, even after he had cussed at them and resisted, swung at them, kicked them? That's not reasonable either.

During its closing jury arguments, the defense relied on other factors to argue that the evidence did not show appellant's intent to deliver.

[DEFENSE]: I know Mr. Brooks has a past. He came up here and he testified that he has a juvenile conviction, that he has two possession convictions, he has a delivery conviction. And when you look at all that, it would be easy for you to go back there and say, "You know what? Because of all this, you know, he's not telling the truth and we shouldn't believe him." But I don't think that's what you're going to do. Yeah, he has had run-ins with the law, and as he stated, he panicked. He panicked because he had the marijuana on him. But as he testified to you, he didn't know anything about that cocaine, didn't know anything about that [ecstasy]. There was no evidence presented to you other than Officer Thompson who came up here yesterday and said, "Oh, it's four grams to 200 grams, but that 4.72, oh, yeah, easy, that's a delivery. Oh, yeah. It's worth 0, 0." But listen to his testimony carefully. He also said that he looks for other things, too, and they should have looked for other things too. They should have looked to determine whether or not Mr. Brooks was carrying a large amount of money, whether or not he had a gun, and we know that there was no gun found in that place now, whether or not he had

[323 S.W.3d 898]

any documents with him that would indicate, "These people owe me money" or "This is who I sold to." They should have gotten a cell phone to see if there were any callers in there that were potential buyers or users or anything of that nature. They should have asked people in the bar whether or not Mr. Brooks when he went in there, did anybody ever come up to him and say, "Do you have anything I can get from you tonight" or "Can you sell me something?" There was no testimony whatsoever on that. All you have is, ladies and gentlemen, as far as the delivery is what Allen Thompson said, but most importantly, as I indicated to you, you have to show that he was in possession of those items, and it's just not there.

The court of appeals decided that "[s]tanding alone, 4.72 grams is insufficient evidence of intent [to deliver because this amount is also consistent with personal use], additional evidence is required." See Brooks v. State, No. 10-07-00309-CR, slip op. at 8, 2008 WL 4427266 (Tex.App.-Waco, delivered October 1, 2008) (memorandum opinion not designated for publication). The court of appeals decided that the additional evidence is legally sufficient "to establish possession with intent to deliver," but that "viewing the evidence in a neutral light, it is not factually sufficient." See Brooks, slip op. at 9-10 ("Viewing the evidence in the light most favorable to the verdict, the evidence is legally sufficient to establish possession with intent to deliver. However, viewing the evidence in a neutral light, it is not factually sufficient. The record does not reflect that Brooks was arrested in a high crime or high drug area, the drugs were packaged in such a way to suggest that Brooks is a dealer, Brooks was in possession of any drug paraphernalia for the purpose of dealing, or Brooks possessed a large amount of cash.... Accordingly, we find the proof of guilt to be so weak as to render the jury's verdict clearly wrong and manifestly unjust.").

We granted review on both the appellant's and the State's petitions for discretionary review. Appellant's petition for discretionary review presents the following ground for review:

(1) The Court of Appeals erred in holding the evidence was legally sufficient to establish appellant had the intent to distribute cocaine, where the court found the same evidence was factually insufficient to establish the necessary intent. 10

The State's petition for discretionary review presents the following grounds for review:

(1) Is there any meaningful distinction between legal sufficiency review under Jackson v. Virginia and factually [sic] sufficiency review when that review is limited to the weakness of the evidence in the abstract and, if so, does it escape review in this Court?(2) Did the Tenth Court of Appeals ignore its duty to adequately explain why the evidence, though legally sufficient, is so weak as to render the jury's verdict clearly wrong and manifestly unjust?

I. Is There Any Meaningful Distinction Between Jackson v. Virginia Legal-Sufficiency Review and Clewis Factual-Sufficiency Review

We begin the discussion by noting that in Watson this Court recognized that a factual-sufficiency standard is "barely distinguishable" from a legal-sufficiency standard and that "the only apparent difference"

[323 S.W.3d 899]

between these two standards is that the appellate court views the evidence in a "neutral light" under a factual-sufficiency standard and "in the light most favorable to the verdict" under a legal-sufficiency standard. See Watson, 204 S.W.3d at 415 (emphasis supplied). It is fair to characterize the Jackson v. Virginia legal-sufficiency standard as:

Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt. 11

Compare this to the Clewis factual-sufficiency standard which may fairly be characterized as:

Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt. 12

Viewing the evidence "in the light most favorable to the verdict" under a legal-sufficiency standard means that the reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. 13 Viewing the evidence in a "neutral light" under a factual-sufficiency standard is supposed to mean that the reviewing court is not required to defer to the jury's credibility and weight

determinations and that the reviewing court may sit as a "thirteenth juror" and "disagree[ ] with a jury's resolution of conflicting evidence" and with a jury's "weighing of the evidence." See Tibbs v. Florida, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (internal quotes omitted) (describing appellate reversals of convictions based on evidentiary weight); Watson, 204 S.W.3d at 447 (Cochran, J., dissenting) (factual-sufficiency standard "explicitly makes the reviewing court a 'thirteenth juror' who makes an independent, de novo determination of credibility and the weight to be given the testimony and the inferences to be drawn from the base facts"). 14 Therefore, the difference between a factual-sufficiency standard and a legal-sufficiency standard is that the reviewing court is required to defer to the jury's credibility and weight determinations (i.e., it must view the evidence in the light most favorable to the verdict) under a legal-sufficiency standard while it is not

[323 S.W.3d 900]

required to defer to a jury's credibility and weight determinations (i.e., it must view the evidence in a "neutral light") under a factual-sufficiency standard. See id.; Johnson v. State, 23 S.W.3d 1, 13 (Tex.Cr.App.2000) (McCormick, P.J., dissenting) ("To defer or not to defer, that is the question.").

It is significant that Clewis purported to treat the evidentiary-weight standard described in Tibbs as a component of the Clewis factual-sufficiency standard that views the evidence in a "neutral light." See Clewis, 922 S.W.2d at 149 (Clinton, J., concurring) ("The reviewing court no longer 'views the evidence in the light most favorable to the prosecution;' rather it must consider and weigh the evidence to determine whether the jury's resolution of conflicting testimony was manifestly unjust" (citing Tibbs, 457 U.S. at 42, 102 S.Ct. 2211)). 15 This Court's decision in Johnson also recognized that "there appears to be no substantive differences" between the Clewis factual-sufficiency standard and the evidentiary-weight standard described in Tibbs. See Johnson, 23 S.W.3d at 8 n. 8 ("Elsewhere, the equivalent of determining legal sufficiency is often referred to as examining the 'sufficiency of the evidence,' and the companion term to factual sufficiency is referenced as reviewing the 'weight of the evidence.' However, there appears to be no substantive differences between these terms, and this Court has treated them interchangeably."). It is also noteworthy that the evidentiary-weight standard described in Tibbs does not mention anything about the reviewing court being required to afford "appropriate deference" to the jury's credibility and weight determinations. But see Clewis, 922 S.W.2d at 133 (reviewing court must apply a factual-sufficiency standard in an "appropriately deferential" manner).

Therefore, if a reviewing court is required to defer in any manner to a jury's credibility and weight determinations, then it is not viewing the evidence in a "neutral light" and not applying the type of factual-sufficiency standard described in Tibbs and purportedly adopted in Clewis. And it is very clear that this Court's factual-sufficiency decisions have always required a reviewing court in a factual-sufficiency review to afford a great amount of deference (though this Court has never said precisely how much deference) to a jury's credibility and weight determinations. See Clewis, 922 S.W.2d at 133 (reviewing court may disagree with a jury's weighing of the evidence but in an "appropriately

deferential" manner "so as to avoid an appellate court's substituting its judgment for that of the jury"); see also Johnson, 23 S.W.3d at 7 (factual-sufficiency review "must employ appropriate deference to prevent an appellate court from substituting its judgment for that of the fact finder, and any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility given to witness testimony"). 16

[323 S.W.3d 901]

And in Watson this Court reiterated that it had never tolerated, "even in the 'factual sufficiency' context," an "appellate court simply opting to 'disagree' with the jury's verdict." See Watson, 204 S.W.3d at 416. This Court further stated in Watson:

It is in the very nature of a factual-sufficiency review that it authorizes an appellate court, albeit to a very limited degree, to act in the capacity of a so-called "thirteenth juror."

* * *

An appellate court judge cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, he would have voted to acquit had he been on the jury. Nor can an appellate judge declare that a conflict in the evidence justifies a new trial simply because he disagrees with the jury's resolution of that conflict.

See Watson, 204 S.W.3d at 416-17 (emphasis supplied).

This, however, is inconsistent with the evidentiary-weight standard described in Tibbs (and purportedly adopted in Clewis ) and with viewing the evidence in a "neutral light," which permit the reviewing court to show no deference at all to a jury's credibility and weight determinations and to sit as a "thirteenth juror" without any limitation and to declare that a conflict in the evidence justifies a new trial simply because the reviewing court disagrees with the jury's resolution of conflicting evidence. See Tibbs, 457 U.S. at 42, 102 S.Ct. 2211. This is what is supposed to distinguish the factual-sufficiency standard from the legal-sufficiency standard. See id. Thus the Clewis factual-sufficiency standard's requirement that the reviewing court view the evidence with "appropriate deference" to a jury's credibility and weight determinations is not only contradictory and inconsistent with the evidentiary-weight standard described in Tibbs, it also makes the Clewis factual-sufficiency standard even more "barely distinguishable" from a Jackson v. Virginia legal-sufficiency standard. 17

The final nail in the coffin that made a legal-sufficiency standard "indistinguishable" from a factual-sufficiency standard came in this Court's decision in Lancon v. State. 18 There this Court decided that the reviewing court cannot decide that the evidence is factually insufficient "solely because [it] would have

resolved the conflicting evidence in a different way" since "the jury is the sole judge of a witness's credibility,

[323 S.W.3d 902]

and the weight to be given the testimony." See Lancon, 253 S.W.3d at 707. Our current formulation of a factual-sufficiency standard in Lancon, recognizing that the jury is "the sole judge of a witness's credibility, and the weight to be given their testimony," entirely eliminates the viewing the evidence in a "neutral light" component of a factual-sufficiency standard and makes the current factual-sufficiency standard indistinguishable from the Jackson v. Virginia legal-sufficiency standard. See also Johnson, 23 S.W.3d at 8 (also recognizing that if "a reviewing court was to accord absolute deference to the fact finder's determinations, then a factual sufficiency determination would, no doubt, become the functional equivalent of a legal sufficiency review"). 19

This may be illustrated by considering the following formulation of the factual-sufficiency standard that Watson approved: "Considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt." See Watson, 204 S.W.3d at 415. Substituting "in the light most favorable to the jury's verdict" for the "a neutral light" component of this formulation of the standard, as our cases such as Lancon have done by recognizing that "the jury is the sole judge of a witness's credibility, and the weight to be given the testimony," 20 the factual-sufficiency standard from Watson may be reformulated as follows: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt." This is the Jackson v. Virginia legal-sufficiency standard. There is, therefore, no meaningful distinction between the Jackson v. Virginia legal-sufficiency standard and the Clewis factual-sufficiency standard, and these two standards have become indistinguishable.

II. Double-Jeopardy Considerations

The Clewis factual-sufficiency standard being "barely distinguishable" (and now indistinguishable) from a legal-sufficiency standard also raises some troubling double-jeopardy questions under the United States Supreme Court's decision in Tibbs. First, we find it necessary to discuss the proceedings involving Mr. Tibbs in the Florida courts.

In 1976, the Florida Supreme Court reversed Tibbs' convictions for rape of one person and first-degree murder of another person because of the "weakness and inadequacy" of the rape victim's testimony, which was the only testimony that directly connected Tibbs to these crimes. See

Tibbs v. Florida, 397 So.2d 1120, 1126 (Fla.1981) (several aspects of the rape victim's testimony "cast serious doubt on her believability"); Tibbs v. Florida, 337 So.2d 788, 791 (Fla.1976) and at 792 (Boyd, J., specially concurring). The Florida Supreme Court remanded the case to the trial court for a new trial, which at the time was the remedy provided by Florida law upon a finding that the evidence did not support a defendant's conviction. See id.

Before Tibbs could be retried, the United States Supreme Court decided that double-jeopardy principles prohibit the states from retrying a defendant whose conviction has been reversed on appeal on evidentiary-sufficiency (i.e., legal-sufficiency) grounds essentially because this has the same effect as an acquittal by a jury. 21 After the United States Supreme Court handed down these decisions, the Florida trial court granted Tibbs' motion to dismiss his indictment on the grounds that double-jeopardy principles prohibited his retrial. See Tibbs, 397 So.2d at 1121. A Florida Court of Appeals reversed this order and reinstated Tibbs' indictment upon deciding that the Florida Supreme Court's 1976 decision reversing Tibbs' convictions "was based on the weight, rather than the legal sufficiency, of the evidence." See id.; State v. Tibbs, 370 So.2d 386, 388-89 (Fla.Dist.Ct.App.1979).

In 1981, the Florida Supreme Court reviewed this decision noting at the outset "that the distinction between an appellate reversal based on evidentiary weight and one based on evidentiary sufficiency was never of any consequence until [the United State's Supreme Court's decision in] Burks," apparently because the remedy provided in both situations was a remand for a new trial. See Tibbs, 397 So.2d at 1122. The Florida Supreme Court examined several of its prior decisions that the Florida Court of Appeals had relied upon for deciding that there was a distinction in Florida law between convictions reversed for evidentiary weight (proper remedy is remand for new trial) and convictions reversed for evidentiary sufficiency (proper remedy is an appellate acquittal). See Tibbs, 397 So.2d at 1122-23 (Florida Court of Appeals "distinguished Burks by placing Tibbs' reversal in [evidentiary weight] category; appellate reversals where the evidence is technically sufficient but its weight so tenuous or insubstantial that a new trial is ordered"). The Florida Supreme Court, however, viewed "these ambiguous decisions as reversals which were based on [evidentiary] sufficiency; that is, as cases in which the state failed to prove the defendant's guilt beyond a reasonable doubt." See Tibbs, 397 So.2d at 1124-25.

The Florida Supreme Court, therefore, concluded that the Florida Court of Appeals' distinction between reversals based on evidentiary weight and reversals based on evidentiary sufficiency had a "questionable historical foundation." See Tibbs, 397 So.2d at 1125. Despite this questionable historical foundation, the Florida Supreme Court decided that its 1976 decision reversing Tibbs' convictions was "one of those rare instances in which reversal was based on evidentiary weight" and the Florida Supreme Court's "improper weighing of the evidence" and that double-jeopardy principles did not prohibit Tibb's retrial. See Tibbs, 397 So.2d at 1126-27. The Florida Supreme Court also decided that

appellate reversals based on evidentiary weight, "if ever valid in Florida, should ... be eliminated from Florida law." See Tibbs, 397 So.2d at 1125.

[323 S.W.3d 904]

On review of the Florida Supreme Court's 1981 decision that double-jeopardy principles did not bar Tibbs' retrial, the United States Supreme Court decided that double-jeopardy principles do not bar a retrial when an appellate court "sits as a 'thirteenth juror' " and "disagrees with the jury's resolution of the conflicting testimony." See Tibbs, 457 U.S. at 32, 42-43, 102 S.Ct. 2211. In reaching this decision, the United States Supreme Court noted that a reversal based on "insufficiency of the evidence" has the same effect as a jury acquittal "because it means that no rational factfinder could have voted to convict the defendant" and that "the prosecution has failed to produce sufficient evidence to prove its case." See Tibbs, 457 U.S. at 41, 102 S.Ct. 2211. The United States Supreme Court further stated that an appellate reversal based on evidentiary weight "no more signifies acquittal than does a disagreement among the jurors themselves" and that an "appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal." The Supreme Court wrote:

As we suggested just last Term, these policies do not have the same force when a judge disagrees with a jury's resolution of conflicting evidence and concludes that a guilty verdict is against the great weight of the evidence.... A reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that an acquittal was the only proper verdict. Instead, the appellate court sits as a "thirteenth juror" and disagrees with the jury's resolution of the conflicting testimony. This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves. A deadlocked jury, we consistently have recognized, does not result in an acquittal barring retrial under the Double Jeopardy Clause. Similarly, an appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal.

See Tibbs, 457 U.S. at 42, 102 S.Ct. 2211 (citation to authority and footnote omitted).

The United States Supreme Court also examined the Florida Supreme Court's 1976 decision reversing Tibbs' convictions and concluded that a "close reading" of that decision suggested "that the Florida Supreme Court overturned Tibbs' convictions because the evidence, although sufficient to support the jury's verdict, did not fully persuade the court of Tibbs' guilt." See Tibbs, 457 U.S. at 46, 102 S.Ct. 2211. The United States Supreme Court further noted that any ambiguity in this 1976 Florida Supreme Court decision was resolved in its 1981 decision when the Florida Supreme Court "unequivocally held" that its 1976 decision reversing Tibbs' convictions was "one of those rare instances in which reversal was based on evidentiary weight." See Tibbs, 457 U.S. at 47, 102 S.Ct. 2211. The United States Supreme Court concluded that under "these circumstances, the Double Jeopardy Clause [did] not bar retrial." See id.

We believe that the Clewis factual-sufficiency standard with its remedy of a new trial could very well violate double-jeopardy principles under Tibbs if factual-sufficiency review is "barely distinguishable" from legal-sufficiency review. 22 With our

[323 S.W.3d 905]

prior decisions requiring a great amount of appellate deference to a jury's credibility and weight determinations and not permitting appellate courts to sit as "thirteenth jurors" except perhaps to "a very limited degree," 23 it is questionable whether appellate reversals in Texas under such a factual-sufficiency standard are really reversals based on evidentiary weight (they may actually be reversals based on evidentiary sufficiency). Having decided in Part I of this opinion that the current Clewis factual-sufficiency standard is indistinguishable from a Jackson v. Virginia legal-sufficiency standard, the remedy of a new trial under this factual-sufficiency standard would violate double-jeopardy principles.

We also note that, were we to decide that reviewing courts must continue to apply a factual-sufficiency standard with its remedy of a new trial in criminal cases, then we must also be prepared to decide that they should apply this standard as "thirteenth jurors" with no deference at all to a jury's credibility and weight determinations in order to avoid these potential federal constitutional double-jeopardy issues. See also Tibbs, 457 U.S. at 42, 102 S.Ct. 2211. We must also keep in mind that such a nondeferential standard could violate the right to trial by jury under the Texas Constitution. See Roberts, 221 S.W.3d at 661-62 n. 7; Clewis, 922 S.W.2d at 133. Simply retaining and attempting to once again "clarify" the Clewis factual-sufficiency standard that is currently indistinguishable from a Jackson v. Virginia legal-sufficiency standard would not seem to be an option. Retaining any kind of factual-sufficiency standard in criminal cases would, therefore, still make it necessary for this Court to overrule Clewis and abandon its requirement, carried on by our subsequent decisions meant to "clarify" Clewis, that reviewing courts must be "appropriately deferential" to a jury's credibility and weight determinations. See Clewis, 922 S.W.2d at 133. Thus, the only way to retain a factual-sufficiency standard, which would be meaningfully distinct from a Jackson v. Virginia legal-sufficiency standard, would be to allow reviewing courts to sit as "thirteenth jurors." However, our factual-sufficiency decisions have consistently declined to do this. See, e.g., Watson, 204 S.W.3d at 416 (this Court has never tolerated "even in the 'factual sufficiency' context," an "appellate court simply opting to 'disagree' with the jury's verdict").

We believe that these and the reasons given by the Florida Supreme Court for abandoning its factual-sufficiency standard are good reasons for discarding the confusing and contradictory Clewis factual-sufficiency standard. We agree with the Florida Supreme Court that:

Considerations of policy support, if not dictate, this result. Elimination of [reversals based on evidentiary weight] accords Florida appellate courts their proper role in examining the sufficiency of the evidence, while leaving questions of weight for resolution only before the trier of fact. Eliminating reversals for evidentiary weight will avoid disparate appellate results, or alternatively our having to review appellate reversals based on evidentiary shortcomings to

[323 S.W.3d 906]

determine whether they were based on sufficiency or on weight. Finally, it will eliminate any temptation appellate tribunals might have to direct a retrial merely by styling reversals as based on "weight" when in fact there is a lack of competent substantial evidence to support the verdict or judgment and the double jeopardy clause should operate to bar retrial.

See Tibbs, 397 So.2d at 1125-26. 24

III. Is Clewis Necessary to Address Some Widespread Criminal Justice Problem That Jackson v. Virginia Is Inadequate To Address

We agree with the discussion in Judge Cochran's dissenting opinion in Watson that there are no jurisprudential systemic problems for which the Jackson v. Virginia legal-sufficiency standard is inadequate or that can be resolved more satisfactorily in other ways besides retaining Clewis ' "internally inconsistent" factual-sufficiency standard. See Watson, 204 S.W.3d at 448-50 (Cochran, J., dissenting) and at 450 ( Clewis "has not contributed to the integrity of the appellate review process; it has led to inconsistent results; and it has required numerous, but futile, attempts to clarify its content and application"). 25 It bears emphasizing that a rigorous and proper application of the Jackson v. Virginia legal-sufficiency standard is as exacting a standard as any factual-sufficiency standard (especially one that is "barely distinguishable" or indistinguishable from a Jackson v. Virginia legal-sufficiency standard). 26 A hypothetical

[323 S.W.3d 907]

that illustrates a proper application of the Jackson v. Virginia legal-sufficiency standard is robbery-at-a-convenience-store case:

The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's

prerogative to believe the convenience store clerk and disregard the video. But based on all the evidence the jury's finding of guilt is not a rational finding.

See Johnson, 23 S.W.3d at 15 (McCormick, P.J., dissenting).

IV. Texas Constitution, Texas Statutes And Case Law Revisited

Case law makes it fairly clear that, from the time that Texas was a republic in the 1830s and 1840s until the United States Supreme Court decided Jackson v. Virginia in 1979, this Court and its predecessors, under what are essentially the same constitutional and statutory provisions that currently exist and existed when Clewis was decided in 1996, applied a single and deferential evidentiary-sufficiency standard in criminal cases that essentially was the same standard as the Jackson v. Virginia standard. 27 And, until this Court decided Clewis in 1996, this Court applied only the Jackson v. Virginia evidentiary-sufficiency standard after the United States Supreme Court decided Jackson v. Virginia in 1979. 28 In 1996, however, Clewis decided that a civil factual-sufficiency standard is also constitutionally and statutorily mandated in criminal cases under state law. 29

There is very little to add to what this Court has already extensively written on a direct-appeal court's constitutional and statutory authority to apply this factual-

[323 S.W.3d 908]

sufficiency standard in criminal cases. 30 Our factual-sufficiency cases decided that Texas direct-appeal courts, which would include this Court in its role as a direct-appeal court in death-penalty cases, are required to apply a civil factual-sufficiency standard under their constitutional grant of general appellate jurisdiction to review "questions of fact," 31 as also codified in Article 44.25, Tex.Code Crim. Proc., which currently states that direct-appeal courts and this Court "may reverse the judgment in a criminal action, as well upon the law as upon the facts." 32 Our factual-sufficiency cases further noted that Articles 36.13 and 38.04, Tex.Code Crim. Proc., and their statutory predecessors, which "reserve the fact-finding function to the jury," 33 have "peacefully coexisted with that appellate authority for at least a hundred and twenty-three years" and were meant "merely to allocate the fact-finding function at the trial level and do not purport to affect appellate review." See Watson, 204 S.W.3d at 409. 34 Also, according to our factual-sufficiency decisions, the "factual conclusivity clause" in Article V, Section 6(a), makes "the resolution of factual issues" by direct-appeal courts conclusive on this Court in nondeath-penalty cases and also "seems to presuppose that [a direct-appeal] court already possesses the power to conduct factual [sufficiency] review." See

[323 S.W.3d 909]

Watson, 204 S.W.3d at 412, 413-14, Bigby, 892 S.W.2d at 872-73. 35

The dissenters in this Court's factual-sufficiency cases took the position that, even though direct-appeal courts may have the authority to apply this factual-sufficiency standard under their grant of general appellate jurisdiction, when the courts of appeals acquired criminal jurisdiction in 1981, the Legislature, pursuant to its constitutional authority in Article V, Sections 5(a) and 6(a), to regulate appellate jurisdiction, made significant changes to Article 44.25 that were carefully designed to ensure that direct-appeal courts defer to a jury's credibility and weight determinations. 36 The dissenters considered it significant that in 1981, when Article 44.25 was changed to its current version-permitting a case to be reversed only "upon the law as upon the facts"-its statutory predecessor provided that a case could be reversed "upon the law as upon the facts" and also "because the verdict is contrary to the evidence." 37 Before this, the statutory predecessor to Article 44.25 provided that a case could be reversed "upon the law as upon the facts" and also because "the verdict is contrary to the weight of the evidence." 38 The dissenters believed that the 1981 legislative changes to Article 44.25 indicated a legislative intent that direct-appeal courts should defer to a jury's credibility and weight determinations by expressly withdrawing the authority (that arguably had existed before 1981) of direct-appeal courts to reverse a judgment because the verdict is contrary to the weight of the evidence. 39

Our decision in Clewis to adopt a civil factual-sufficiency standard was meant to "harmonize[ ] the criminal and civil jurisprudence of this State with regard to appellate review of questions of factual sufficiency."

[323 S.W.3d 910]

See Clewis, 922 S.W.2d at 129. However, when Clewis was decided in 1996, the Texas Supreme Court had decided that direct-appeal courts were required to exercise a factual-sufficiency standard with "deferential standards of review." See Roberts, 221 S.W.3d at 664 n. 7; Cropper v. Caterpillar Tractor Co., 754 S.W.2d 646, 651 (Tex.1988). 40 With its requirement that all of the evidence must be viewed under deferential standards to determine whether a jury's verdict is "manifestly unjust and clearly wrong," this civil factual-sufficiency standard that Clewis adopted for criminal cases was essentially the Jackson v. Virginia standard.

Thus, when this Court decided Clewis in 1996, direct-appeal courts were already harmoniously applying essentially the same standard of factual sufficiency in civil and criminal cases. 41 Clewis ' main accomplishment, therefore, was to adopt for criminal cases another evidentiary-sufficiency standard that was essentially the Jackson v. Virginia standard and that direct-appeal courts had been applying for about 150 years. This, in large part, explains why it was inevitable that these two standards would

eventually be recognized as indistinguishable. See Part I of this Opinion. The Jackson v. Virginia standard is consistent with well-settled evidentiary-sufficiency practice in this State and with a direct-appeal court's constitutional and statutory mandates to review "questions of law" and "questions of fact." 42

[323 S.W.3d 911]

[3] The issue thus becomes whether direct-appeal courts' constitutional jurisdiction to review "questions of fact," as also codified in Article 44.25 authorizing direct-appeal courts to reverse a judgment "upon the facts," should now be construed for the first time to mandate direct-appeal courts to sit as "thirteenth jurors" in criminal cases contrary to 150 years of practice in civil and criminal cases. We decline to question over 150 years of criminal and civil jurisprudence in this State and construe constitutional and statutory mandates to review "questions of fact" to also require direct-appeal courts to sit as "thirteenth jurors" in criminal cases. See also Clewis, 876 S.W.2d at 431 ("Appellate fact jurisdiction ... should not be confused with the appellate standard of review required to exercise that fact jurisdiction. The state constitution, at most, says that an intermediate appellate court has conclusive fact jurisdiction in both civil and criminal cases. It does not purport to set out the standard of review required to exercise that fact jurisdiction.") (emphasis in original). 43

We also note that Watson and Clewis relied on several cases, most notably the 1883 case of Walker v. State, 44 apparently for the proposition that the statutory predecessors to Article 44.25 required factual-sufficiency review that permits direct-appeal courts to sit as "thirteenth jurors." Walker is cited in both Clewis and Watson as a watershed case purportedly recognizing that the statutory predecessors to Article 44.25 required such a review. 45 It is not clear that cases such as Walker were applying factual-sufficiency review that permits a direct-appeal court to sit as a "thirteenth juror" in criminal cases since Walker "was fully consistent with the Jackson standard alone." See Watson, 204 S.W.3d at 428 (Cochran, J., dissenting) ( Walker "was fully consistent with the Jackson standard alone" even though it "could be read to support the proposition that the appellate court felt that it had the authority to reverse a jury verdict even though the evidence was 'sufficient.' "). 46 We do not believe that cases such as Walker clearly support the proposition that Article 44.25 and its statutory predecessors mandate direct-appeal courts to sit as "thirteenth jurors" in criminal cases. See also Watson, 204 S.W.3d at 424-32 (Cochran, J., dissenting). 47 In addition, reading

[323 S.W.3d 912]

Walker to mandate direct-appeal courts to sit as "thirteenth jurors" would be inconsistent with the overwhelming weight of civil and criminal authority that direct-appeal courts should review a jury's verdict under deferential standards.

As the Court with final appellate jurisdiction in this State, 48 we decide that the Jackson v. Virginia standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. All other cases to the contrary, including Clewis, are overruled.

V. Disposition of This Case

We must now decide how to dispose of this case. In light of our disposition of the State's first ground for review, it is unnecessary to address the State's second ground for review. And having decided that there is no meaningful distinction between a Clewis factual-sufficiency standard and a Jackson v. Virginia legal-sufficiency standard, we could decide that the court of appeals necessarily found that the evidence is legally insufficient to support appellant's conviction when it decided that the evidence is factually insufficient to support appellant's conviction. However, primarily because the "confusing" factual-sufficiency standard may have skewed a rigorous application of the Jackson v. Virginia standard by the court of appeals, we believe that it is appropriate to dispose of this case by sending it back to the court of appeals to reconsider the sufficiency of the evidence to support appellant's conviction under a proper application of the Jackson v. Virginia standard. Cf. Tibbs, 397 So.2d at 1125-26 (abandoning reversals based on weight of the evidence and stating that "[c]ases now pending on appeal in which a court has characterized the reversal as based on evidentiary weight should be reconsidered").

The judgment of the court of appeals is vacated, and the case is remanded there for further proceedings not inconsistent with this opinion.

COCHRAN J., filed a concurring opinion in which WOMACK, J., joined.

PRICE, J., filed a dissenting opinion in which MEYERS, JOHNSON, and Holcomb, JJ., joined.

WOMACK, J., concurred.

COCHRAN, J., concurring in which WOMACK, J., joined.

I adhere to my view that the 1996 judicial creation of the " Clewis 1 factual-sufficiency review was a well-intentioned but ultimately unworkable effort to incorporate civil standards of review on elements of a crime that must be proven beyond a reasonable doubt." 2

I.

A. The Evidence in This Case Either Is or Is Not Legally Sufficient to Support a Conviction.

The evidence in this case is either sufficient to support appellant's conviction under the constitutionally-mandated Jackson 3 standard or it is not. It cannot be "semi-sufficient."

Appellant was charged with possession of cocaine with the intent to distribute it. At trial, he denied that the baggie containing 4.72 grams of cocaine and five ecstacy pills found in the pool table pocket return was his, although he admitted ownership of the baggie of marijuana that he tossed under that pool table. On appeal, he argued that the evidence was both legally and factually insufficient to prove that he possessed the cocaine with the intent to distribute it. The court of appeals found that the evidence was legally sufficient to support a finding, beyond a reasonable doubt, that appellant possessed the cocaine with the intent to distribute it. In doing so, it relied on a list of seven facts, beyond the mere amount of cocaine, that supported the jury's guilty verdict. 4 But then, in finding the evidence factually insufficient to support a finding of intent to distribute, the majority set out a totally different list of facts that the record did not show: There was no evidence that (1) appellant was in a high crime area; (2) the cocaine was packaged especially for sale; (3) he was carrying a large amount of cash; or (4) he had drug-dealing paraphernalia on him. 5 The court used positive inferences for legal sufficiency (what the evidence did show) and then negative inferences for factual sufficiency (what the evidence did not show).

I agree that this is a close call on legal sufficiency, but I do not see how "missing" facts can transform the purportedly legally sufficient evidence into factually insufficient evidence. There is no higher standard than "proof beyond a reasonable doubt." If the evidence meets that standard, how can it fall short using a lower standard? Indeed, the Waco Court of Appeals may have had second thoughts itself about this question because it held, in a subsequent (but almost identical) case,

that the evidence was factually and legally sufficient. 6 If nothing else, these two cases demonstrate that the Clewis factual sufficiency review has led to random, inconsistent results, based primarily on "the

luck of the draw." 7 This doctrine is not based on a sound logical or historical foundation, and it serves only to muddle criminal law. It should be overturned.

B. Both Parties Agree That the Proper Issue Is Legal Sufficiency of the Evidence.

Fittingly, both appellant and the State agree that the proper issue in cases such as this is whether the evidence is legally sufficient. The State argues in its Petition for Discretionary Review, "Evidence that is factually insufficient due to its inherent weakness should always be legally insufficient; either the evidence is such that a rational juror could convict upon it or it is not, regardless of the light in which it is viewed." 8 Appellant "suggests that in this situation (i.e. a question of intent), if the evidence is factually insufficient it must also be legally insufficient." 9 They are both correct: There is no "semi-sufficient" standard of review.

II.

A. Logic Requires a Single Standard of Sufficiency Review in Criminal Cases.

I have already set out my concerns about the intellectual legitimacy, historical authenticity, and appropriateness of the Clewis factual sufficiency review in Texas. 10 I now focus only upon the most important reason to overrule Clewis: Logic.

The attempt to impose Texas civil standards of a second-round factual sufficiency review is logically incompatible with the constitutionally mandated legal sufficiency review of criminal convictions that requires the State to prove all elements of a crime

[323 S.W.3d 915]

beyond a reasonable doubt. Piling a factual sufficiency standard of review that was developed for civil trials employing a preponderance-of-the-evidence standard of proof atop a legal sufficiency standard of review that was developed for criminal trials employing a beyond-a-reasonable-doubt standard of proof does not work. That is why this Court has so frequently tinkered with the Clewis formulation, and why we have always been unsuccessful.

The Clewis doctrine of re-reviewing the sufficiency of the evidence after the appellate court has already held that the evidence satisfies the highest standard of proof possible-beyond a reasonable doubt-to decide if it is nonetheless factually sufficient is internally inconsistent. If the evidence suffices

to prove guilt beyond a reasonable doubt, and it supports a rational, reasonable verdict, as required under Jackson, that evidence cannot logically be so lacking in probative value as to make the jury's verdict "manifestly unjust" under the vague and subjective civil-law factual-sufficiency standard. To declare the evidence factually insufficient necessarily turns an appellate judge, viewing only the cold written record, into a self-appointed thirteenth juror with absolute veto power over the twelve citizens who actually saw the witnesses, heard the evidence, and reached a rational, reasonable verdict. The United States Supreme Court recognized this in Tibbs v. Florida, 11 as did the Florida Supreme Court when it judicially jettisoned factual-sufficiency review in that same case. 12

B. Legally Sufficient Evidence in a Criminal Trial.

For more than 150 years, Texas appellate courts reviewed the sufficiency of the evidence in Texas criminal cases under a single standard (although the precise wording varied), taking into account both the facts that were proven at trial and the law applicable to the particular offense. 13 This Court (and the intermediate courts of appeals once they were given jurisdiction over the direct appeal of criminal cases in 1981) reviewed the facts proven in the light most favorable to the verdict, giving great deference to the jury's credibility and weight determinations. But we did not hesitate to reverse a conviction if the evidence failed to prove a defendant's guilt "with reasonable certainty," or "beyond a reasonable doubt." 14 There were never two distinct "sufficiency of the evidence" hurdles in Texas criminal appellate review. 15

[323 S.W.3d 916]

1. The constitutionally required Jackson standard.

In 1979, the United States Supreme Court delivered its opinion in Jackson v. Virginia, 16 and set the national standard for review of the sufficiency of evidence under the Due Process Clause of the federal constitution. In all criminal trials, state and federal, the government must produce "sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." 17 The Court explicitly rejected the "no evidence" standard of review that it had applied nineteen years earlier in Thompson v. Louisville. 18

In Jackson, the Court explained that the Thompson "no evidence" review "secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty[,]" 19 but that standard is inadequate for "a question of evidentiary 'sufficiency.' " 20 Instead, the correct standard must incorporate the prosecution's burden of proof-beyond a reasonable doubt-in a due-process review. The Court noted that a " 'reasonable doubt' has often been described as one 'based on reason which arises from the evidence or lack of evidence.' " 21

A reasonable doubt might arise because the verdict is manifestly against the great weight and preponderance of the credible evidence or because there is nothing more than a mere scintilla of evidence to support some element of the offense. But, of course, the reviewing court does not "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." [22] Rather, it must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." [23] Thus, " all of the evidence is to be considered in the light most favorable to the prosecution" because the reviewing court may impinge upon " 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." [24]

Therefore, after 1979, Texas courts were prohibited from applying a "no evidence"

[323 S.W.3d 917]

standard of review to a legal-sufficiency challenge because that standard affords "inadequate protection against potential misapplication of the reasonable-doubt standard" in criminal cases. [25] In 1989, we explained, "Adherence to the no evidence standard is now, and has been for the last decade, expressly forbidden by Jackson. It is no longer permissible to merely quote the Jackson standard and then to turn around and apply the Thompson no evidence standard as we have historically done." [26]

2. Legal sufficiency in criminal cases is judged by the quality, not the quantity, of evidence supporting the accuracy of the verdict.

Legal sufficiency of the evidence is a test of adequacy, not mere quantity. Sufficient evidence is "such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded." [27] In criminal cases, only that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction. There is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by Jackson. All civil burdens of proof and standards of appellate review are lesser standards than that mandated by Jackson.

Indeed, the Supreme Court explicitly held in In re Winship, [28] that a juvenile could not constitutionally be adjudicated under the civil standards of proof (or appellate review) of preponderance of the evidence. [29] The Court noted that " 'the preponderance test is susceptible to the misinterpretation that it calls on the trier of fact merely to perform an abstract weighing of the evidence

in order to determine which side has produced the greater quantum, without regard to its effect in convincing his mind of the truth of the proposition asserted.' " 30

As Justice Harlan explained in his Winship concurrence, although "the phrases 'preponderance of the evidence' and 'proof beyond a reasonable doubt' are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions." 31 Justice Harlan noted that "[t]he preponderance test has been criticized, justifiably in my view, when it is read as asking the trier of fact to weigh in some objective sense the quantity of evidence submitted by each side rather than asking him to decide what he believes most probably happened." 32 Indeed, that is precisely why the standard of proof and

[323 S.W.3d 918]

review in criminal cases has been expressed, not by the quantity of evidence produced or how it might be weighed when viewed neutrally, but rather by the quality of the evidence and the level of certainty it engenders in the factfinder's mind.

Legal sufficiency of the evidence in a criminal proceeding may be divided into two zones: evidence of such sufficient strength, character, and credibility to engender certainty beyond a reasonable doubt in the reasonable factfinder's mind and evidence that lacks that strength. 33 Appellate review of a jury's verdict of criminal conviction focuses solely on that "either-or" character of evidentiary sufficiency because a defendant is entitled to an acquittal if the evidence lacks that strength.

C. Texas Civil Standards of Review.

Texas is considered a "hold-out" state by having a two-tiered standard of appellate review for civil cases, although commentators state that "recent decisions hint that there is support for assimilation into the single standard of review used in most jurisdictions." 34 It has long been acknowledged that "[f]ew issues of Texas law have created more confusion or spawned more appellate litigation than the treatment of 'no evidence' and 'insufficient evidence' points of error" in civil cases. 35 The difficulty in distinguishing these two types of claims-which require dramatically different results-is that appellate courts have little guidance except their own intuition to guide them. 36

1. The "five zone" review for legal and factual sufficiency.

Traditionally, Texas appellate courts have employed a five-zone review of civil verdicts when the burden of proof at trial is that of "preponderance of the evidence." 37 In his much cited law review article, Justice Calvert distinguished those five zones and defined them. 38

[323 S.W.3d 919]

2. Zone 1-"no evidence."

Zone 1 is the "no evidence" zone, similar to the old legal sufficiency standard rejected by the Supreme Court in Jackson for criminal cases. A "no evidence" challenge by the party without the burden of proof in a civil case may be sustained only when:

• There is a complete lack of evidence of some element of a claim or defense;• The evidence offered at trial is inadmissible under the rules of law or of evidence and thus cannot be given any evidentiary value on appeal;• There is no more than a "mere scintilla" of evidence to prove some essential fact of either the claim or defense; 39 or• The evidence conclusively demonstrates the opposite of the essential fact. 40

If the appellate court finds "no evidence" to support the verdict, the evidence is legally insufficient, and the opponent is entitled to a judgment in his favor as a matter of law. 41

3. Zone 2-"factually insufficient evidence."

In zone 2, the party with the burden of proof has offered some evidence in support of his claim or defense and the case is allowed to go to the jury for a verdict. But the evidence supporting the jury's verdict, while more than a "mere scintilla," is slim indeed. 42 In this scenario, the appellate court may find that it is "factually

[323 S.W.3d 920]

insufficient," but it must carefully set out all of the evidence supporting the verdict and explain why the evidence is nonetheless insufficient. 43 This challenge is always brought by the party without the burden of proof. 44 The rationale for allowing the party (who prevailed at trial but was found by the appellate court to have produced insufficient evidence) to try again in a second trial is "that there is available to the appellee other evidence of the vital fact which will support a finding in his favor and it would work an injustice to cut off his right to produce it." 45 The appellate court assumes that the party who had the

burden of proof and who originally prevailed may be able to produce additional evidence at a second trial, evidence that he failed to offer at the first trial. 46

4. Zone 3-"zone of reasonable disagreement."

Zone 3, the zone of reasonable disagreement, is the great middle ground, in which a verdict will be upheld for either the party with the burden of proof or the opposing party as there is conflicting evidence or inferences on either side of the vital fact issue or issues, but the jury's verdict is reasonable and does not "shock the conscience," nor it is not so "clearly unjust" to indicate obvious bias. 47

5. Zone 4-"great weight and preponderance."

In zone 4, the party with the burden of proof has offered significant evidence to support the claim or defense; the great weight and preponderance of the credible evidence supports his position. 48 However,

[323 S.W.3d 921]

the jury has returned a verdict in favor of the opposing party-the party without the burden of proof. In this scenario, the party with the burden of proof may challenge the result, claiming that the verdict is "against the great weight and preponderance of the evidence." 49 In this "against the great weight and preponderance" scenario, all of the evidence, both pro and con, is set out, and the appellate court must explain why the verdict is against the great weight and preponderance of the evidence. 50

6. Zone 5-"conclusive evidence."

At the opposite end of the spectrum from zone 1 is zone 5-"conclusive evidence"-in which the party with the burden of proof has established conclusively, or as a matter of law, that he is entitled to a judgment in his favor because the opponent has offered no evidence in opposition and the proponent has offered sufficient evidence of the vital fact or claim.

7. The Texas Supreme Court's Reformulation of Legal Sufficiency.

Although this five-zone theory has been the traditional formulation of civil legal and factual sufficiency standards in civil cases, in 2005, the Texas Supreme Court articulated a new formulation of the test for legal sufficiency review in

[323 S.W.3d 922]

City of Keller v. Wilson: 51

The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. Whether a reviewing court begins by considering all the evidence or only the evidence supporting the verdict, legal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. 52

Thus, when reasonable jurors could resolve conflicting evidence either way, an appellate court must assume that jurors resolved all such conflicts in accord with their verdict, and when the evidence supports conflicting inferences, the court must assume that jurors made all inferences in favor of the verdict and disregard other possible inferences. 53 "If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." 54 The appellate court does not view the evidence in a neutral light, but rather "in the light favorable to the verdict," 55 just as is done in criminal cases under Jackson and in Texas civil cases under a factual sufficiency review. Under this formulation, zone 3 (the zone of "reasonable disagreement") would seem to have increased considerably in size, while zones 2 and 4 (those of "factual insufficiency" and "against the great weight and preponderance") have diminished as a verdict that is outside the zone of reasonable disagreement would seem to be within the zone of legally insufficient evidence. 56

Some commentators have noted that this new formulation of legal sufficiency has virtually merged the Texas legal sufficiency standard with that of factual sufficiency in civil cases. 57 And it has brought Texas

[323 S.W.3d 923]

civil standards "more closely in line with federal standards for legal sufficiency review." 58 These commentators argue that the language of the "reasonable juror" standard "provides a cloak for the reasoning of judges, rather than precision in reasoning." 59 They contend that the City of Keller standard "leaves considerable leeway for an appellate court to intercept a jury's verdict when it feels motivated to do so." 60 These commentators complain that the "reasonable juror" standard is too flexible and subjective, 61 apparently preferring the purportedly more objective standard of "shocks the conscience" or "manifestly unjust." One can certainly agree with their ultimate conclusion however, that appellate courts should make "a firm rededication to a jurisprudence of restraint and standards of review that recognize the fundamental right to trial by jury and a concomitant hard-minded application of standards of review." 62 Particularly in Texas, the most jury-deferential state in the nation, 63 appellate courts must defer to a "reasonable" jury verdict in both civil and criminal cases.

D. The Criminal Legal Sufficiency Standard Cannot Be Harmonized with the Civil Factual Sufficiency Standard. 1. Clewis is a chimera.

In Clewis, this Court attempted to superimpose the five-zone civil standard of review, predicated upon trials in which the burden of proof is by a preponderance of the evidence upon the two-zone criminal standard of review that requires proof beyond a reasonable doubt. 64 Visualizing the five-zone civil standard ("no evidence," "insufficient evidence," "zone of reasonable disagreement," "the great weight and preponderance of the evidence," and "conclusive evidence") as a football field with the "no evidence" zone at one end and with each zone comprised of an ever greater quantum of evidence offered by the party with the burden of proof until the "conclusive evidence" zone at the other end, reviewing courts are required to uphold as factually sufficient any verdict in favor of the party with the burden of proof that is at least within the third zone, that of reasonable disagreement. But in assessing the legal sufficiency of evidence in a criminal case, the State's evidence must be persuasive enough to almost make a touchdown; reaching the midfield is never enough to meet the "beyond a reasonable doubt" standard.

In a civil case, if the jury returns a verdict in favor of the party that did not have the burden of proof (usually the defendant), but that verdict is determined by the appellate court to be against the great weight and preponderance of the evidence offered by the party that did have the

[323 S.W.3d 924]

burden of proof (usually the plaintiff), then the appellate court may reverse the judgment and remand for a new trial. This gives the plaintiff a second opportunity to prove his case before a new jury, after the first jury had rejected his claim although he had originally produced "the great weight and preponderance of the evidence" to support its claim. That scenario would not generally arise 65 in

criminal cases because if the jury returns a verdict favoring the party without the burden of proof (the defendant), there will be no appeal because the State may not appeal an acquittal.

Similarly, if the party with the burden of proof in a civil trial (usually the plaintiff) obtains a jury verdict in its favor, but an appellate court determines that there is insufficient evidence, even when viewed in the light most favorable to the verdict, 66 to reach "the zone of reasonable disagreement," then the appellate court may reverse the jury verdict and remand for a new trial. That scenario also would not arise in criminal cases because if the State's evidence is so weak in strength, character, and credibility that it does not reach the level of "the zone of reasonable disagreement," then it most assuredly does not meet the "beyond a reasonable doubt" standard of legal sufficiency required in all criminal cases. Such a lack of evidentiary support is not merely factually insufficient, it is legally insufficient, and the defendant cannot be required to undergo a second trial.

What this Court did in Clewis was adopt the language of Texas civil factual sufficiency review without first determining whether there was a proper fit between those civil standards of review and the differing evidentiary standards of proof in civil and criminal cases. This mistake was quite understandable when Clewis was decided in 1996 because this Court had recently and properly adopted the Texas civil standards of legal and factual sufficiency for those few instances in criminal cases in which the burden of proof is a preponderance of the evidence, as occurs with affirmative defenses. 67 But as appellate courts attempted to reconcile the five-zone civil factual-sufficiency standards with the heightened burden of proof in criminal cases in which the State is required to prove every element beyond a reasonable doubt, we began to realize that this civil standard of review did not align with the criminal burden of proof. And we tinkered and tinkered with various reformulations of this "factual sufficiency" standard of review in criminal cases in a vain attempt to harmonize them. 68

[323 S.W.3d 925]

2. Clewis and Watson relied upon a false premise that evidence should be viewed in a neutral light when conducting a factual sufficiency review.

In Watson v. State, 69 we stated that the only difference between a factual-sufficiency review and a legal-sufficiency review is that, under the former, an appellate court should view the evidence in a neutral light, rather than in the light most favorable to the verdict. 70 But it is a strange distinction that ignores the quality or credibility of evidence, and it is one that has never been a part of Texas factual-sufficiency review in civil cases. 71 Instead, it was created by the Austin Court of Appeals in Stone v. State, 72 and simply imported,

[323 S.W.3d 926]

without further analysis, into this Court's decision in Clewis. Indeed, in Lancon v. State, 73 a post-Watson decision in 2008, we again rejected the "neutral" light analysis and held that it is the jury's sole prerogative to make credibility decisions. Appellate courts must defer to those credibility assessments; they may not view all conflicting witness testimony as equally credible. 74 Witnesses are not fungible, some are credible and some are not. Neither juries nor appellate courts must tally up the number of witnesses "neutrally" and then base a sufficiency decision on the greater number.

In sum, we have never been successful in our attempts to superimpose the five-zone civil standards for sufficiency review on top of the constitutionally mandated legal sufficiency review of a criminal conviction. These two standards of review depend upon their distinctly different burdens of proof. Like oil and water, they do not mix. They are not logically consistent, and they promote only confusion and conflation of two distinct concepts. We are required to follow the heightened Jackson legal sufficiency formulation; we cannot follow a lesser factual sufficiency formulation.

I agree that it is time to consign the civil-law concept of factual sufficiency review in criminal cases to the dustbin of history.

PRICE, J., dissenting in which MEYERS, JOHNSON, and HOLCOMB, JJ., joined.

By dint of persistence, a plurality of the Court purports to overrule Clewis. 1 The plurality frames the question as a policy choice, asserting that we granted discretionary review in order to determine whether "there is a need to retain" factual sufficiency review. 2 But as our opinion less than four years ago in Watson demonstrated, the authority to reverse a conviction on the basis of factual insufficiency has been recognized from the beginning to be inherent in the appellate jurisdiction of first-tier appellate courts in Texas. 3 We cannot simply decide it need not be "retained"

[323 S.W.3d 927]

any longer absent a change in the constitutional and statutory provisions that confer that jurisdiction-or else a change in our own long-standing construction of those provisions. To be sure, the plurality today would undoubtedly change those constructions too, if only it could invoke something more substantial than dissenting opinions to justify it.

I.

The plurality's primary justification for overruling Clewis is that, because the standards for factual sufficiency and legal sufficiency have essentially melded into one, there is no longer any "meaningful distinction between them that would justify retaining them both." 4 But the plurality's premise is flawed. The plurality begins its analysis with the claim that Watson itself "recognized" that the two standards were "barely distinguishable." 5 What Watson actually recognized was that the standard for factual sufficiency, as partially reformulated in Zuniga, 6 which Watson overruled in part, "seems barely distinguishable" from the legal sufficiency standard from Jackson v. Virginia. 7 The only difference is that the former views all of the evidence in a "neutral" light rather than, as in the latter, "in the light most favorable to the verdict." But we insisted in Watson-as I still do-that "the distinction is a real one[.]" 8

A holding of legally insufficient evidence-that is, that the evidence is so lacking that federal due process will not tolerate a conviction-has double jeopardy implications. 9 Under the standard established by Jackson v. Virginia for deciding whether the evidence satisfies due process, a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution." 10 But this kind of categorical deference is not required of a reviewing court in Texas when conducting a non-due-process review for factual sufficiency. For a reviewing court to view the evidence in a "neutral" light means that it need not resolve every conflict in the evidence, or draw every inference from ambiguous evidence, in favor of the defendant's guilt just because a rational jury could have. Rational juries can also choose to acquit a defendant even when presented with legally sufficient evidence. 11 Factual sufficiency review recognizes that there may be rare cases in which, though some jury might convict, and it would not be irrational for it to do

[323 S.W.3d 928]

so, most juries would almost certainly harbor a reasonable doubt given the tenuousness of the State's evidence or the weight and apparent credibility and/or reliability of the exculpatory evidence. Under these circumstances, factual sufficiency review in Texas permits a first-tier appellate court to reverse a conviction and remand for a new trial, in the interest of justice, to grant the defendant a second chance to obtain a jury acquittal. 12

The deference required of the appellate court in a factual sufficiency review is of a different kind than that required by legal sufficiency. It is not, as with legal sufficiency analysis, total deference to the jury's prerogative to resolve all conflicts and ambiguities in the record against the defendant. Instead, it is a qualified deference to the jury's apparent assessment of the weight, credibility, or reliability of the (admittedly legally sufficient) evidence. This deference is important because it respects the jury's fact-finding role at the trial court level. 13 But it is not the absolute deference that legal sufficiency review

affords to the jury's resolution of conflicts and ambiguities. It demands that, before a first-tier appellate court may reverse a conviction based upon factually insufficient evidence, it must be able to say, with some objective basis in the record, that the jury's verdict, while legally sufficient, is nevertheless against the great weight and preponderance of the evidence, and therefore "manifestly unjust." 14 This does not grant an appellate judge license to declare the evidence to be factually insufficient "simply because, on the quantum of evidence admitted, he would have voted to acquit had he been on the jury. Nor can an appellate court judge declare that a conflict in the evidence justifies a new trial simply because he disagrees with the jury's resolution of that conflict." 15

The plurality asserts that this is not a true factual sufficiency review because it:

[323 S.W.3d 929]

is inconsistent with the evidentiary-weight standard described in Tibbs (and purportedly adopted in Clewis ) and with viewing the evidence in a "neutral light," which permit the reviewing court to show no deference at all to a jury's credibility and weight determinations and to sit as a "thirteenth juror" without any limitation and to declare that a conflict in the evidence justifies a new trial simply because the reviewing court disagrees with the jury's resolution of conflicting evidence. See Tibbs, 457 U.S. at 42, 102 S.Ct. 2211. 16

This passage represents a distorted view of factual sufficiency review. I agree that the citation to Tibbs supports the proposition that when a reviewing court does overturn a jury verdict as too tenuous or against the great weight and preponderance of the evidence, it acts as a thirteenth juror and does not, ultimately, defer to the jury's resolution of weight and credibility. 17 But Tibbs does not support the assertion that factual sufficiency is not genuinely factual sufficiency unless the reviewing court sits as a thirteenth juror "without any limitation." It is true that we insist that a simple disagreement with the jury's resolution of conflicting evidence will not support a reversal under a factual sufficiency review. Not every appellate disagreement with a jury verdict signifies that the jury verdict is "manifestly unjust"-in fact, most do not. And when that is the case, a reviewing court must decline to exercise its fact jurisdiction to reverse and remand for a new trial. But this limitation does not mean that when a reviewing court does exercise its prerogative to reverse and remand a conviction for factual insufficiency, either because the State's evidence is intolerably tenuous or because the verdict is against the great weight of the evidence, it has not acted as a thirteenth juror. 18 Obviously, it has. And that is precisely why Tibbs holds that such a reversal carries no double jeopardy consequences.

As for the plurality's claim that a factual sufficiency review that pays any deference at all to the jury's verdict is not really a review of the evidence in a "neutral light," 19 this is simply inaccurate.

Deference is not an all-or-nothing proposition. A reviewing court may look to the record without the requirement of resolving conflicts and ambiguities in the light most favorable to the jury's verdict and still limit the exercise of its power to reverse and remand for a new trial in the interest of justice, out of deference to the jury's verdict, to those cases in which the State's evidence is most tenuous or the weight of the evidence greatly preponderates against conviction. The qualified deference that we have said first-tier appellate courts should pay to jury verdicts does not somehow convert factual sufficiency review into legal sufficiency review.

[323 S.W.3d 930]

Therefore, even if I agreed that we could simply jettison factual sufficiency review as a matter of policy, I would not accept the plurality's primary justification for doing so.

II.

Having declared the standards for legal and factual sufficiency review to be indistinguishable, the plurality finds it necessary to eliminate the latter because a finding of factual insufficiency might necessitate an appellate acquittal. 20 Because I do not accept the premise that the standards are indistinguishable, I do not share the plurality's concern.

III.

Next the plurality cites various policy considerations for dispensing with factual sufficiency review. First, the plurality quotes with approval a number of reasons that the Florida Supreme Court listed to explain why it would no longer entertain evidentiary-weight grounds on appellate review. 21 Insofar as I can tell, however, there was no argument to be made in the criminal appellate courts of Florida that factual review was considered to be inherent in their appellate jurisdiction, as we have said it is in ours. For this reason, the Florida Supreme Court was free to reject any attempt to raise such a claim purely on policy grounds. Next, the plurality today endorses an argument from one of the dissenting opinions in Watson, a sort of cost/benefit analysis that concludes that factual sufficiency review is simply not worth the candle. 22 Such policy considerations cannot by themselves serve to trump the constitutional and statutory authority of first-tier appellate courts in Texas to conduct factual sufficiency review, recognized in our case law long before Clewis was decided. 23

IV.

Any argument to undermine the basis for that constitutional and statutory authority, the plurality has saved for last-perhaps because it can only muster dissenting opinions to support it. The plurality in fact acknowledges that "[t]here is very little to add to what this Court has already extensively written on a direct-appeal court's constitutional and statutory authority to apply this factual sufficiency standard in

criminal cases." 24 Indeed, the arguments have been aired and rejected in this Court many times in recent years. Even so, the plurality today somehow manages to characterize the question of the jurisdiction of first-tier criminal appellate courts in Texas to conduct factual sufficiency review as one of first impression. 25 But of course this is not an issue of

[323 S.W.3d 931]

first impression; if it were, there would be no Clewis (or, for that matter, Watson ) to overrule.

And yet overrule Clewis the plurality purports to do. Along the way, the plurality fails even to pay lip service to the doctrine of stare decisis. Stare decisis dictates that "we keep in mind the strong preference for adhering to past decisions[.]" 26 It is better, we have often said, to be consistent than to be right (although I regard this as a rebuttable presumption). 27 Still, we have acknowledged that there are legitimate justifications for overruling established precedent, and we do not hesitate to do so "if the reasons ... are weighty enough." 28 I suppose that, were it to address the question head on, the plurality today might argue (judging by its policy arguments for abandoning factual sufficiency review-all of which we have rejected in the past) that factual sufficiency review has become "unworkable." 29 In keeping with the overarching theme of its opinion, the plurality might argue that because the standard for reviewing the evidence for factual sufficiency is now indistinguishable from the standard for reviewing legal sufficiency, and because this lack of distinction might create jeopardy problems, we must not construe the fact jurisdiction of first-tier criminal appellate courts to include a review for factual sufficiency. Because I reject these premises, I would reject any argument that the presumption that consistent-is-better-than-right has been rebutted. 30 The only thing that arguably makes Clewis seem unworkable is this Court's lamentable propensity to grant a State's petition for discretionary review every three or four years to revisit the question whether it is unworkable. The arguments themselves are not new.

To purporting to overrule Clewis (and the century of case law that preceded it that exercised fact review jurisdiction to reverse convictions that were built on too tenuous a foundation or were against the great weight of the evidence), 31 and remanding the cause to the court of appeals

[323 S.W.3d 932]

to revisit its legal sufficiency analysis, I dissent.

--------

Notes:

1 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

2 922 S.W.2d 126 (Tex.Cr.App.1996).

3 See Jackson, 443 U.S. at 319, 99 S.Ct. 2781.

4 See Clewis, 922 S.W.2d at 133.

5 See id.

6 See Rollerson v. State, 227 S.W.3d 718, 724 (Tex.Cr.App.2007) (factual-sufficiency review is "barely distinguishable" from legal-sufficiency review); Watson v. State, 204 S.W.3d 404, 442-48 (Tex.Cr.App.2006) (Cochran, J., dissenting) (discussing this Court's attempts to "clarify" Clewis ).

7 Appellant was also charged with and convicted of possessing more than one but less than four grams of ecstasy and sentenced to 10 years in prison in cause number 10-07-00310-CR. That conviction is not at issue in this proceeding.

8 Appellant testified at trial that he had "like $30 or $40" on him.

9 We note that appellant was charged with just possessing the six ecstasy pills that weighed 1.29 grams. The record contains no testimony on how many pills a typical user would take or a typical seller would possess with intent to deliver.

10 The question presented in this ground is whether a jury could rationally find beyond a reasonable doubt that appellant possessed with intent to deliver 4.72 grams of crack cocaine because appellant fit a profile of "most" or "typical" drug dealers.

11 See Jackson, 443 U.S. at 319, 99 S.Ct. 2781.

12 Our decision in Watson approved of this formulation of the Clewis standard. See Watson, 204 S.W.3d at 415. Stated another way, the question under the Clewis factual-sufficiency standard is whether, after viewing all of the evidence in a "neutral light," the jury's verdict is either "clearly wrong and manifestly unjust" or "against the great weight and preponderance of the [conflicting] evidence." See Watson, 204 S.W.3d at 414-15; see also Clewis, 922 S.W.2d at 129 (reviewing court views the evidence in a neutral light and sets aside the jury's verdict "if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust").

13 See Jackson, 443 U.S. at 319, 99 S.Ct. 2781 ("Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.") (emphasis in original) and at 326, 99 S.Ct. 2781 (a "court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

14 The Supreme Court in Tibbs explained the difference between reversals based on evidentiary sufficiency (i.e., Jackson v. Virginia ) and reversals based on evidentiary weight (i.e., factual-sufficiency) which "draws the appellate court into questions of credibility." See Tibbs, 457 U.S. at 38 n.11, 102 S.Ct. 2211.

15 The lead majority opinion in Clewis seems to have cited Tibbs for the proposition that "when conducting a factual sufficiency review, an appellate court cannot substitute its judgment for that of the factfinder since this would violate the defendant's right to trial by jury." See Clewis, 922 S.W.2d at 133 (citing Tibbs, 457 U.S. at 42, 102 S.Ct. 2211). Tibbs, however, stands for the opposite proposition-that the reviewing court can substitute its judgment for the factfinder's in conducting a factual-sufficiency review. See Tibbs, 457 U.S. at 42, 102 S.Ct. 2211 (reviewing court can sit as "thirteenth juror" and disagree "with the jury's resolution of conflicting testimony" and "the jurors' weighing of the evidence").

16 This requirement that the reviewing court afford "appropriate deference" to a jury's credibility and weight determinations in a factual-sufficiency review is motivated by a concern that not requiring such deference might violate the right to trial by jury set out in the Texas Constitution. See Clewis, 922 S.W.2d at 134-36 (discussing "factfinder deference and right to trial by jury"); see also Roberts v. State, 221 S.W.3d 659, 661-62 n. 7 (Tex.Cr.App.2007) (in order to safeguard Texas' constitutional right to trial by jury, the Texas Supreme Court imposed several requirements upon the reviewing court when it reverses on factual-sufficiency grounds such as requiring the reviewing court to exercise its factual-sufficiency jurisdiction with "deferential standards of review").

17 See Watson, 204 S.W.3d at 441 (Cochran, J., dissenting) ("Thus, Clewis empowered courts of appeals to act as a 'thirteenth juror' (one who was not even present to see and hear the witnesses) and disagree with the fact-finder's determination, but to be deferential to the fact-finder's judgment as it did so. This standard was ambiguous and contradictory from the beginning.") and at 445 (one "cannot view the evidence in a neutral light while at the same time giving deference to the factfinder's determinations of weight and credibility"); Johnson, 23 S.W.3d at 13-14 (McCormick, P.J., dissenting) (also discussing " Clewis' internal contradictions on the question of appellate deference to the jury's credibility and weight determinations").

18 253 S.W.3d 699 (Tex.Cr.App.2008).

19 A dissenting opinion in Lancon stated that the majority opinion "seems to say that from now on, the level of deference due a jury's decision will be total deference when the decision is based on an evaluation of credibility." See Lancon, 253 S.W.3d at 708 (Johnson, J., dissenting). We disagree. Our decision in Lancon merely recognizes that the jury is the "sole judge of a witness's credibility, and the weight to be given the testimony" thus requiring the reviewing court to defer to the jury on these determinations (i.e., view the evidence in the light most favorable to the verdict). Viewing the evidence in the light most favorable to the verdict, however, begins the Jackson v. Virginia legal-sufficiency analysis. The Jackson v. Virginia standard still requires the reviewing court to determine whether " any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See Jackson, 443 U.S. at 319, 99 S.Ct. 2781 (emphasis in original); Watson, 204 S.W.3d at 418 n. 7 (Hervey, J., dissenting). This is the portion of the Jackson v. Virginia standard that essentially incorporates a factual-sufficiency review. See Clewis v. State, 876 S.W.2d 428, 438-39 (Tex.App.-Dallas 1994) ( Jackson v. Virginia standard necessarily encompasses a factual-sufficiency review), vacated, 922 S.W.2d at 136.

20 See Jackson, 443 U.S. at 319, 99 S.Ct. 2781.

21 See Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

22 For example, in Watson, in which we recognized that factual-sufficiency review is "barely distinguishable" from legal-sufficiency review, we stated that the first ground rule for factual-sufficiency review is that "the appellate court should be mindful that a jury has already passed on the facts, and convicted, and that the court should never order a new trial simply because it disagrees with the verdict, but only where it seems to the court to represent a manifest injustice...." See Watson, 204 S.W.3d at 414. This, however, arguably describes a situation where "the prosecution has failed to produce sufficient evidence to prove its case" and "an acquittal was the only proper verdict." See Tibbs, 457 U.S.

at 41-42, 102 S.Ct. 2211. Thus described, our factual-sufficiency standard with its remedy of a new trial could violate double-jeopardy principles. See id.

23 See Watson, 204 S.W.3d at 416-17.

24 We also note that the Florida Supreme Court's 1981 decision in Tibbs examined its 1976 decision in Tibbs, other Florida state-court decisions, and the Florida Court of Appeals' decision in determining whether its 1976 decision reversing Tibbs' conviction was a reversal based on evidentiary weight or a reversal based on evidentiary sufficiency. See Tibbs, 397 So.2d at 1125-27. The United States Supreme Court examined the Florida Supreme Court's 1976 decision reversing Tibbs' conviction and the Florida Supreme Court's 1981 decision that Tibbs' retrial did not violate double-jeopardy principles in determining that the Florida Supreme Court's 1976 decision reversing Tibbs' conviction was a reversal based on evidentiary weight and not a reversal based on evidentiary sufficiency. See Tibbs, 457 U.S. at 46-47, 102 S.Ct. 2211. A single Jackson v. Virginia legal-sufficiency standard probably would have avoided all of this. See Tibbs, 397 So.2d at 1125-26 (eliminating reversals based on evidentiary weight will avoid "having to review appellate reversals based on evidentiary shortcomings to determine whether they were based on sufficiency or on weight").

25 In addition, having two evidentiary standards instead of one rigorously and properly applied standard may actually be detrimental. See Amanda Peters, Symposium: Treaties and Domestic Law After Medellin v. Texas: Article: The Meaning, Measure, and Misuse of Standards of Review, 13 Lewis & Clark L.Rev. 233, 255-56 note 3 (Spring 2009) (having two standards of sufficiency review promotes the "boilerplate" recitation of both standards and the rigorous application of neither).

26 See Watson, 204 S.W.3d at 449 (Cochran, J., dissenting) ("reviewing courts must apply the Jackson legal sufficiency standard robustly, taking into account all of the evidence, although viewed in the light most favorable to the jury's verdict. If that evidence supports a rational and reasonable finding of guilt beyond a reasonable doubt, it cannot be said that the jury's verdict is manifestly unjust or shocks the conscience of the reviewing court. The verdict is either rational and reasonable or it is not; it cannot be 'semi-rational' and still meet the Jackson standard. There is no jurisprudential value in reversing a rational, reasonable verdict and forcing the parties to go back and do it again.") (footnotes omitted and emphasis in original); Johnson, 23 S.W.3d at 15 (McCormick, P.J., dissenting) (a properly applied Jackson v. Virginia legal-sufficiency standard is much more exacting than Clewis claims and when the evidence is sufficient under a properly applied Jackson v. Virginia legal-sufficiency standard, it can never be factually insufficient) and at 16 ("when the intermediate appellate courts determine that the evidence is sufficient under Jackson v. Virginia but 'factually insufficient' under Clewis to support a conviction, and remand a case for a new trial, they either will have misapplied Clewis (in which case the conviction should have been affirmed) or they will have failed to appreciate that the evidence is also insufficient under Jackson v. Virginia (in which case the defendant should have received an acquittal.") (footnotes omitted)).

27 See Watson, 204 S.W.3d at 406-07 (acknowledging that early case law never "expressly declared that factual-sufficiency review, per se, was authorized in criminal cases") and at 412-14 (also acknowledging that "factual sufficiency went into hiding in the late Forties and early Fifties" and did not begin to reveal itself again until 1994 culminating in the 1996 Clewis decision); Watson, 204 S.W.3d at 424-32 (Cochran, J., dissenting) (discussing origins of Texas appellate review of evidentiary sufficiency and concluding, "Until Clewis in 1996, this Court had consistently used a single standard (although the precise wording varied) and reviewed the evidence in the light most favorable to the factfinder, giving great deference to the jury's credibility and weight determinations.").

28 See Watson, 204 S.W.3d at 412-14; Watson, 204 S.W.3d at 432-33 (Cochran, J., dissenting) (noting that this Court quickly adopted the Jackson v. Virginia standard "and adhered to that single, constitutionally mandated standard for seventeen years").

29 Clewis decided that a direct-appeal court's constitutional and statutory jurisdiction to review "questions of fact" in criminal cases require a direct-appeal court to apply a factual-sufficiency standard to the elements of the offense when properly requested to do so by a convicted defendant. See Clewis, 922 S.W.2d at 129 (" Jackson standard of review does not satisfy a noncapital defendant's right to an appellate review of fact questions") and at 129-31 ("When their jurisdiction to review fact questions is properly invoked, the courts of appeals cannot ignore constitutional and statutory mandates."); Stone v. State, 823 S.W.2d 375, 381 (Tex.App.-Austin 1992, pet. ref'd as untimely filed) (stating that it is "duty-bound to exercise the full extent of the constitutional grant of appellate jurisdiction when requested by the litigants").

30 See Watson, 204 S.W.3d at 406-414; Clewis, 922 S.W.2d at 129-31; Clewis, 922 S.W.2d at 136-49 (Clinton, J., concurring); Bigby v. State, 892 S.W.2d at 870-75 (Tex.Cr.App.1994); Watson, 204 S.W.3d at 417-20 (Hervey, J., dissenting); Watson, 204 S.W.3d at 424-40 (Cochran, J., dissenting); Clewis, 922 S.W.2d at 151-55 (McCormick, P.J., dissenting).

31 See Tex. Const. Article V, § 5(a) (providing Texas Court of Criminal Appeals with final appellate jurisdiction "with such exceptions and under such regulation as may be provided in this Constitution or as prescribed by law"); Tex. Const. Article V, § 6(a) (providing Courts of Appeals with appellate jurisdiction "under such restrictions and regulations as may be prescribed by law" and also providing that "the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error"); Bigby v. State, 892 S.W.2d at 871-72 (grant of general appellate jurisdiction authorizes review of "questions of fact" and "questions of law"); Clewis, 876 S.W.2d at 430 ("general grant of [appellate] jurisdiction includes the power to review questions of law and fact ") (emphasis in original).

32 See Watson, 204 S.W.3d at 407, 413-14; Clewis, 922 S.W.2d at 136-149 (Clinton, J., concurring); Bigby, 892 S.W.2d at 870-75.

33 See Article 36.13 (providing that "[u]nless otherwise provided in this Code, the jury is the exclusive judge of the facts"); Article 38.04 (providing that "jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given the testimony" subject to such exceptions not applicable here).

34 This is arguably inconsistent with Tex.R.App. Proc. 21.3(h), which permits a trial court to grant a new trial "when the verdict is contrary to the law and the evidence." Compare Tibbs, 397 So.2d at 1123 (discussing Florida criminal-procedural rule permitting trial court to grant new trial when the verdict is "contrary to law or the weight of the evidence"). In addition, in several decisions meant to "clarify" Clewis, this Court has not been consistent on whether Articles 36.13 and 38.04 apply to the appellate process. See Watson, 204 S.W.3d at 419 n. 12 (Hervey, J., dissenting) (noting that, in 1996 in Clewis, this Court stated that these provisions do not apply to the appellate process, but in 1997, in another case, this Court stated that they do apply to the appellate process, and in 2006, in Watson, this Court stated that they do not apply to the appellate process). We note that our decision in Lancon recognized that these provisions do apply to the appellate process when Lancon cited them for the proposition that in a factual-sufficiency review "the jury is the sole judge of what weight" to give the witness testimony. See Lancon, 253 S.W.3d at 705 and at 707 ("jury is the sole judge of a witness's credibility, and the weight to be given the testimony").

35 It should be noted that this Court has decided that its review of a direct-appeal court's factual-sufficiency decision is limited by the factual-conclusivity clause to determining only whether the direct-appeal court properly applied "rules of law." See Roberts, 221 S.W.3d at 662-63; Bigby, 892 S.W.2d at 872 n. 3. This Court, however, has never decided that the factual-conclusivity clause limits this Court's jurisdiction to review a direct-appeal court's decision on other "questions of fact" or that it makes a direct-appeal court's decision on these "questions of fact" conclusive on this Court. See, e.g., Carmouche v. State, 10 S.W.3d 323, 331-33 (Tex.Cr.App.2000) (this Court overturned direct-appeal court's decision on "question of fact" regarding factual circumstances under which the police claimed that the defendant consented to be searched based on a videotape which contradicted the police version of the critical events). This, of course, is consistent with the plain language of Article 44.25, which states that this Court and the courts of appeals may reverse a judgment "upon the law as upon the facts," and with Section 22.225(a), Tex. Gov't Code, which makes a direct-appeal court's judgment "conclusive on the facts" only in civil cases. See Clewis, 876 S.W.2d at 430 n. 4 (noting that Article 44.25 confers "upon the court of criminal appeals the same fact jurisdiction given to the courts of appeals" but declining to "attribute power to the court of criminal appeals that it has expressly disavowed"); Watson, 204 S.W.3d at 437 (Cochran, J., dissenting) ("It would appear that, under article 44.25 (and all of its predecessor statutes), both the courts of appeals and the Court of Criminal Appeals have co-equal jurisdiction to reverse 'on the facts' as well as the law.") and at 439 n. 118. It would appear that the Legislature did not

intend for a direct-appeal court's decision on a "question of fact" in criminal cases to be conclusive on this Court. See id.; but see Watson, 204 S.W.3d at 412; Bigby, 892 S.W.2d at 872 n. 3.

36 See Watson, 204 S.W.3d at 419-20 (Hervey, J., dissenting); Clewis, 922 S.W.2d at 153-54 (McCormick, P.J., dissenting).

37 See Watson, 204 S.W.3d at 407; Bigby, 892 S.W.2d at 874 n. 5.

38 See Bigby, 892 S.W.2d at 874 n. 5.

39 See Watson, 204 S.W.3d at 419-20 (Hervey, J., dissenting); Clewis, 922 S.W.2d at 153-54 (McCormick, P.J., dissenting).

40 See also Jacobs-Cathey Co. v. Cockrum, 947 S.W.2d 288, 295 (Tex.App.-Waco 1997, writ denied) (when reviewing court reviews factual sufficiency of the evidence in civil cases, "the reviewing court shall neither interfere with the jury's resolution of conflicts in the evidence nor pass on the weight and credibility of the witnesses' testimony" because, among other things, the trier of fact has "the opportunity to observe the demeanor of the witnesses and to weigh their testimony").

41 We further note that, since our 1996 decision in Clewis, the Texas Supreme Court, expressly relying on Jackson v. Virginia, modified its traditional appellate standards of "legal" and "factual" sufficiency in civil cases with a clear-and-convincing-evidence heightened burden of proof while also noting that the parameters of these standards "differ to some degree from those adopted by the Texas Court of Criminal Appeals." See In re J.F.C., 96 S.W.3d 256, 264-67 (Tex.2002); see also Watson, 204 S.W.3d at 445-46 n. 152 (Cochran, J., dissenting) (setting out verbatim these two standards and noting that "there is barely visible light" between these two standards and wondering "if this two-tier review will long endure in civil cases where the burden of proof is heightened"). These two standards are basically a Jackson v. Virginia standard modified to account for the clear-and-convincing-evidence heightened burden of proof. It, therefore, appears that civil appellate standards of "legal" and "factual" sufficiency are moving in the direction of essentially a Jackson v. Virginia standard as the burden of proof at trial increases. See Watson, 204 S.W.3d at 445-46 n.152 (Cochran, J., dissenting).

42 See Clewis, 876 S.W.2d at 429 n. 1 (discussing the "no evidence" and the "factually insufficient evidence" civil appellate standards of review and the confusion that can occur when "attempting to refer to 'legal sufficiency' in criminal cases") and at 438-39 ("Although characterized as a 'legal sufficiency' review and a 'question of law,' the Jackson standard necessarily encompasses a factual sufficiency review. If after reviewing the evidence, i.e., the facts, in the light most favorable to the

verdict, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt, then the sufficiency challenge must be sustained and the defendant acquitted.") (emphasis in original); see also Watson, 204 S.W.3d at 437 (Cochran, J., dissenting) ("And, of course, both this Court and the courts of appeals have the authority to review 'the facts' as well as the law. If 'the facts' do not establish every element beyond a reasonable doubt, those 'facts' require an appellate court to acquit the defendant under Jackson."); Clewis, 922 S.W.2d at 157 (McCormick, P.J., dissenting) (when conviction is reversed under Jackson, it is reversed "upon the law as upon the facts" after the reviewing court has examined all the evidence, i.e., the facts).

43 It is, therefore, unnecessary in this case to revisit the issue of whether legislative activity in 1981 was meant to insure that direct-appeal courts would defer to the jury's credibility and weight determinations and not sit as "thirteenth jurors." See Watson, 204 S.W.3d at 419-20 (Hervey, J., dissenting); Clewis, 922 S.W.2d at 153-156 (McCormick, P.J., dissenting).

44 14 Tex.Ct.App. 609 (1883).

45 See Watson, 204 S.W.3d at 407-09; Clewis, 922 S.W.2d at 138-39 (Clinton, J., concurring); Watson, 204 S.W.3d at 426-28 (Cochran, J., dissenting) ("most important case discussing sufficiency of the evidence was the court of appeals's 1883 decision in Walker ").

46 Another case cited in Watson apparently for the proposition that Article 44.25 and its statutory predecessors require a factual-sufficiency review that permits direct-appeal courts to sit as "thirteenth jurors" is Green v. State, 97 Tex.Crim. 52, 260 S.W. 195 (1924). See Watson, 204 S.W.3d at 410. Green, however, is another case that, like Walker, is ambiguous on this point and appears to be really applying a Jackson v. Virginia standard. See Green, 260 S.W. at 196 ("Though the verdict should not be lightly annulled it is our duty to set it aside and order another trial when the evidence viewed in its strongest light from the standpoint of the state, fails to make guilt reasonably certain.") (emphasis supplied).

47 To the extent that Walker can be read to support this proposition, we note that Walker was relying on that portion of the statutory predecessor to Article 44.25 that permitted a reversal "for the reason that the verdict is contrary to the weight of the evidence." See Walker, 14 Tex.Ct.App. at 629 (emphasis supplied). This, however, is the language that the Legislature deleted in 1981 when the courts of appeals acquired criminal jurisdiction. See Bigby, 892 S.W.2d at 874 n. 5 (discussing history of Article 44.25 and its statutory predecessors).

48 See Article V, § 5(a) (Court of Criminal Appeals "shall have final appellate jurisdiction coextensive with the limits of the state, and its determinations shall be final, in all criminal cases of whatever grade"); Interpretive Commentary to Article V, § 5(a) ("In defining the jurisdiction of the court of

criminal appeals, this section confines its powers to the exercise of appellate jurisdiction in criminal matters exclusively. It thus has no civil jurisdiction, but it is the court of final jurisdiction in criminal matters.").

1 Clewis v. State, 922 S.W.2d 126 (1996).

2 Watson v. State, 204 S.W.3d 404, 421 (Tex.Crim.App.2006) (Cochran, J., dissenting).

3 Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

4 Brooks v. State, No. 10-07-00309-CR, 2008 WL 4427266, at *4, 2008 Tex.App. LEXIS 7364, at *12 (Tex.App.-Waco 2008). The majority opinion in the court of appeals noted these additional facts:

(1) both the bag of marihuana and the bag of cocaine were packaged in the same manner; (2) [appellant] was not in possession of any drug paraphernalia for either use or sale; (3) [the State's DEA expert] testified that users typically carry some type of heating element, such as a crack pipe, but dealers do not; (4) at the time of his arrest, [appellant] was not under the influence of a narcotic; (5) [appellant] has a previous conviction for possession with intent to deliver; (6) [appellant] attempted to evade capture and discarded contraband in the process; and (7) [appellant] was found in possession of three different types of drugs. Id. The majority did not analyze the probative value of these facts to establish appellant's intent or discuss what legitimate inferences, if any, might be drawn from them. It did not explain why the evidence was legally sufficient when it announced its conclusion.

5 Id. at *5, 2008 Tex.App. LEXIS 7364, at *13. Chief Justice Gray dissented, noting that the majority failed to acknowledge that there was "more evidence of intent to deliver than merely the amount of cocaine." Id. at *7, 2008 Tex.App. LEXIS 7364, at *19 (Gray, C.J., dissenting). He also noted that the majority did not "detail the evidence and clearly state why the evidence that is legally sufficient is nevertheless factually insufficient." Id. at *7, 2008 Tex.App. LEXIS 7364, at *20.

6 Guyton v. State, No. 10-07-00070-CR, 2009 WL 290935, 2009 Tex.App. LEXIS 839 (Tex.App.-Waco, Feb. 6, 2009, pet.ref'd) (not designated for publication). In Guyton, the court of appeals originally reversed the conviction due to factual insufficiency, but, once the State filed a PDR, it reconsidered and held that the evidence was both legally and factually sufficient to support the defendant's conviction for possession of .40 grams of cocaine with the intent to distribute it. Id. at *3-4, 2009 Tex.App. LEXIS 839, at *9-13.

7 See Watson, 204 S.W.3d at 426 (Cochran, J., dissenting).

8 State's Petition for Discretionary Review at 9.

9 Appellant's Petition for Discretionary Review at 6. Appellant relies on several analogous federal cases in which the courts held that the evidence was legally insufficient to support a finding of "intent to distribute" a controlled substance that the defendant admittedly possessed. In these cases, the inference of intent to distribute was not a reasonable one given the paucity of circumstantial evidence.

As appellant notes, the legal sufficiency standard of review is that required by the United States Constitution as set out in Jackson v. Virginia. That same standard is applied in every state and federal jurisdiction in America. It applies to all criminal convictions regardless of the type or degree of crime. This application of a single, constitutionally-mandated standard has led to the creation of an enormous body of "sufficiency of evidence" law and precedent across America that any judge or lawyer may easily access and apply to any given conviction here in Texas. It is a coherent body of law. It is objective and intellectually rigorous. It sets out appellate presumptions, permissible inferences, and specific criteria to use when assessing the legal sufficiency of the evidence. It does not rely upon subjective notions of "shocking the conscience" of individual appellate judges, striking them as "manifestly unjust," or seeming just plain "wrong."

10 See Watson, 204 S.W.3d at 421-26.

11 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) (stating that an appellate reversal for factually insufficiency, "unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony. This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves.... [A]n appellate court's disagreement with the jurors' weighing of the evidence does not require the special deference accorded verdicts of acquittal.").

12 Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981) (rejecting its former factual sufficiency review because "the concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment. Legal sufficiency alone, as opposed to evidentiary weight, is the appropriate concern of an appellate tribunal.") (footnote omitted).

13 See Watson, 204 S.W.3d at 424-26 (Cochran, J., dissenting) (discussing the history of appellate review of sufficiency of the evidence in Texas).

14 Id.

15 Id. at 426 (collecting and discussing Texas criminal cases from 1841 forward and concluding, "Until Clewis in 1996, this Court had consistently used a single standard (although the precise phrasing varied) and reviewed the evidence in the light most favorable to the factfinder, giving great deference to the jury's credibility and weight determinations.").

16 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

17 Id. at 312-13, 99 S.Ct. 2781.

18 362 U.S. 199, 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (stating that the "ultimate question presented to us is whether the charges against petitioner were so totally devoid of evidentiary support as to render his conviction unconstitutional under the Due Process Clause of the Fourteenth Amendment. Decision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon any evidence at all.").

19 Jackson, 443 U.S. at 314, 99 S.Ct. 2781.

20 Id. The Supreme Court explained that a "no evidence" standard does not "protect against misapplications of the constitutional standard of reasonable doubt" because a "no evidence" standard is satisfied by a "mere modicum" of evidence. "But it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt." Id. at 320, 99 S.Ct. 2781. Under a "no evidence" standard, a reviewing court would affirm the judgment if any evidence supported the conviction. See Gollihar v. State, 46 S.W.3d 243, 246 n. 3 (Tex.Crim.App.2001) (citing Thompson, 362 U.S. at 199, 80 S.Ct. 624).

21 Id. at 318 n. 9, 99 S.Ct. 2781.

22 Id. at 318-19, 99 S.Ct. 2781 (citation omitted).

23 Id. at 319, 99 S.Ct. 2781.

24 Id.

25 Gollihar v. State, 46 S.W.3d 243, 246 n. 4 (Tex.Crim.App.2001).

26 Butler v. State, 769 S.W.2d 234, 239 (Tex.Crim.App.1989) (en banc), overruled on other grounds by Geesa v. State, 820 S.W.2d 154 (Tex.Crim.App.1991).

27 Black's Law Dictionary 1285 (5th ed.1979).

28 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

29 Id. at 368, 90 S.Ct. 1068.

30 Id. at 367-68, 90 S.Ct. 1068 (quoting Dorsen & Resneck, In Re Gault and the Future of Juvenile Law, 1 Fam. L. Quarterly No. 4, 26-27 (1967)) (rejecting the lower court's suggestion that there is only a " 'tenuous difference' " between the reasonable-doubt and preponderance standards).

31 Id. at 370, 90 S.Ct. 1068 (Harlan, J., concurring).

32 Id. at 371 n. 3, 90 S.Ct. 1068 (citing J. Maguire, Evidence, Common Sense and Common Law 180 (1947)).

33 That does not mean, of course, that every factfinder or every appellate judge need agree that the evidence in a particular case is legally sufficient. As the Supreme Court explained in Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972):

In our view disagreement of three jurors does not alone establish reasonable doubt, particularly when such a heavy majority of the jury, after having considered the dissenters' views, remains convinced of guilt. That rational men disagree is not in itself equivalent to a failure of proof by the State, nor does it indicate infidelity to the reasonable-doubt standard. Jury verdicts finding guilt beyond a reasonable doubt are regularly sustained even though the evidence was such that the jury would have been justified in having a reasonable doubt, even though the trial judge might not have reached the same conclusion as the jury, and even though appellate judges are closely divided on the issue whether there was sufficient evidence to support a conviction. Id. at 362-63, 92 S.Ct. 1620 (citations omitted). The United States Supreme Court trusts juries when they reach a rational verdict even though those same

justices, the individual trial judge, or appellate judges may be closely divided on the issue of whether they believe there was sufficient evidence to support a conviction.

34 W. Wendall Hall & Mark Emery, The Texas Hold Out: Trends in the Review of Civil and Criminal Jury Verdicts, 49 S. Tex. L.Rev. 539, 540 (2008).

35 William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and "Insufficient Evidence," 69 Tex. L.Rev. 515, 516 (1991).

36 Id. at 525.

37 See id. at 517-18 (discussing and using the concept of "a five zoned spectrum, with the strength of the proponent's evidence increasing in each successive zone").

38 One might visualize these five zones as laid out on an imaginary football field, starting from the left-hand goal line of the party with the burden of proof. Zone 1, the "no evidence" zone, starts at this goal line and, as the evidence supporting a vital fact or claim steadily increases, the zones march down the field until zone 5, "conclusive evidence," which is at the opposing party's goal line. The 50 yard line would roughly correspond to the line which must be crossed by the party with the burden of proof by the "preponderance of the evidence," leaving a "zone of reasonable disagreement" on either side of the midline.

39 Robert W. Calvert, " No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L.Rev. 361, 363 (1960). Justice Calvert explained the scintilla rule as follows:

[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is, in legal effect, no evidence, and will not support a verdict or judgment. The scintilla rule cannot apply when there is direct evidence of a vital fact; it applies only when the vital fact must be inferred from other relevant facts and circumstances which are proved. If the inference is not a reasonable one a "no evidence" point should be sustained. It follows that "no evidence" points based on the scintilla rule require a careful analysis of the facts proved for the purpose of determining whether the vital fact may be reasonably inferred. Id. (footnotes omitted).

40 Id. at 362-63; see also Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997); William V. Dorsaneo, III, et al., Texas Litigation Guide § 146.03[6][e][ii][A] (2007).

41 Havner, 953 S.W.2d at 730. Justice Calvert explained that, in deciding "no evidence" points, the appellate court views the evidence in the light most favorable to the verdict and considers only that evidence and inferences that support the verdict while ignoring all evidence and inferences that are contrary to the verdict. Calvert, 38 Tex. L.Rev. at 364.

42 According to Justice Calvert, "if the evidence supporting the finding is so uncertain, inconsistent, improbable, or unbelievable that, although constituting some evidence of probative force when considered in its most favorable light in support of the finding, it would nevertheless be clearly unjust to permit the judgment to stand." Calvert, 38 Tex. L.Rev. at 367. Justice Calvert appropriately viewed the evidence "in its most favorable light in support of the finding" in assessing factual sufficiency; he did not view it in a "neutral light." I have found no Texas Supreme Court case that has viewed the evidence "in a neutral light" when addressing factual sufficiency claims.

43 Justice Calvert explains that, in this zone 2 scenario, the appellate court may not find that the evidence is "against the great weight and preponderance of the evidence because there is no evidence of the nonexistence of the fact." Calvert, 38 Tex. L.Rev. at 366. That is, when reviewing an "insufficient evidence" point, the appellate court looks only to the evidence that supports the vital fact and determines that this evidence is simply too meager to support a finding of its existence by a preponderance of the evidence. Id.

44 See note 49 infra.

45 Id. at 370.

46 Id. ("By producing the evidence on retrial the party has fair assurance that a finding of the existence of the vital fact will be permitted to stand."). Strangely, this same rule does not apply for legally insufficient evidence because "[p]resumptively, at least, all of the evidence available to the appellee has been introduced." Id. Justice Calvert did not explain why a party who produced no evidence of a vital fact at the first trial is not entitled to a second bite at the apple, while a party who offered some, but factually insufficient, evidence would be able to produce more evidence and thus is entitled to a second bite at the apple.

47 Id.

48 Texas courts usually use the short-hand term "great weight of the evidence," but the Texas Supreme Court occasionally reiterates that it is, in reality, the great weight of the credible evidence that it is referring to. Quality, not mere quantity, has been its historical determining factor. See, e.g., Dawson

v. St. Louis Expanded Metal Fireproofing Co., 94 Tex. 424, 61 S.W. 118, 119 (1901) ("It was within the power of [the court of civil appeals] to disregard a finding of fact by the jury if contrary to the great weight of the credible testimony, and in effect to set aside the finding and to remand the cause, and we understand them to mean that under the facts as found by them under the evidence, there was no negligence."); McDonald v. New York Cent. Mut. Fire Ins. Co., 380 S.W.2d 545, 548 (Tex.1964) ("[T]he insured does not raise in the Court of Civil Appeals the point of 'insufficient evidence' to support the jury findings or the point that the findings are against 'the great weight and preponderance' of the credible evidence"); Darryl v. Ford Motor Co., 440 S.W.2d 630, 633 (Tex.1969) ("Nowhere in the amended motion for new trial did the respondent, Ford Motor Company, state that the evidence supporting the jury answers to any specific special issue was either insufficient or against the great weight of the credible evidence"); see also In Re G.A.T., 16 S.W.3d 818, 829 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) ("The evidence shows that the verdict was not contrary to the great weight of the credible evidence."); Town & Country Mobile Homes, Inc. v. Bilyeu, 694 S.W.2d 651, 656 (Tex.App.-Fort Worth 1985, no writ) ("In considering an 'insufficient evidence' point, we must remain cognizant of the fact that it is for the jury, as the trier of fact, to judge the credibility of the witnesses, to assign the weight to be given their testimony, and to resolve any conflicts or inconsistencies in the testimony. This Court may not substitute its judgment for that of the jury if the challenged finding is supported by some evidence of probative value and is not against the great weight and preponderance of the evidence.") (citation omitted).


49 See William Powers, Jr. & Jack Ratliff, 69 Tex. L.Rev. at 518-19 ("When the evidence falls into zone 2, the proper terminology is that there is 'insufficient evidence' or 'factually insufficient evidence' to support an affirmative finding. In zone 4, the clearest terminology is that a finding contrary to the evidence is against the 'great weight and preponderance of the evidence,' although this terminology is occasionally (and we think confusingly) used to refer to evidence in zone 2. Despite the differences between zones 2 and 4, attacks on jury findings in these zones are usually called 'factual sufficiency' points. The preferred terminology has the proponent [the party with the burden of proof] claim that an unfavorable (negative) finding should be set aside because it is 'contrary to the great weight and preponderance of the evidence,' and has the opponent [the party without the burden of proof] claim that an unfavorable (affirmative) finding was based on 'insufficient evidence.' ") (footnotes omitted); see also Dorsaneo, Texas Litigation Guide § 146.03[6][e][ii][C] ("A party who attacks the factual sufficiency of an adverse finding on an issue on which the party has the burden of proof must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.").


50 See Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex.1986) ( "In order that this court may in the future determine if a correct standard of review of factual insufficiency points has been utilized, courts of appeals, when reversing on insufficiency grounds, should, in their opinions, detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias. Further, those courts, in their opinions, should state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. It is only in this way that we

will be able to determine if the requirements of In Re King's Estate [244 S.W.2d 660 (Tex.1951)], have been satisfied.").

51 168 S.W.3d 802 (Tex.2005).

52 Id. at 827.

53 See id. at 818-21.

54 Id. at 822 (footnote omitted). In City of Keller, the Supreme Court also described three kinds of evidence that must be disregarded when conducting a legal sufficiency analysis: (1) credibility evidence; (2) conflicting evidence; and (3) conflicting inferences. Id. at 819-22. Thus, witness credibility in civil cases, as in criminal cases, is solely the prerogative of the factfinder. An appellate court may not discount a witness's testimony as being, in its view, less credible than another witness's. Furthermore, the appellate court may not choose between two conflicting inferences if the evidence would reasonably support either one. "It is widely recognized that one of the most important attributes of the right to jury trial is the ability of juries to draw, from circumstantial evidence, inferences that cannot be set aside or second-guessed by reviewing courts merely because the reviewers would have reached a different factual conclusion." William V. Dorsaneo, III, Changing the Balance of Power: Juries, the Courts, and the Legislature, Practice Before the Supreme Court 5 (State Bar of Texas 2004).

55 City of Keller, 168 S.W.3d at 807.

56 See City of Keller, 168 S.W.3d at 827-28 (" 'The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence.' ") (quoting Calvert, 38 Tex. L.Rev. at 364).

57 See W. Wendall Hall & Mark Emery, 49 S.Tex. L.Rev. at 559 ("Some may conclude that City of Keller only addresses legal sufficiency challenges, but the reasonable juror standard seems to make the distinction between legal and factual sufficiency mean little."); id. at 562 (noting that under the City of Keller "reasonable and fair-minded juror" standard, the Supreme Court may avoid the "yo-yo effect" of reversing and remanding cases for factual insufficiency review and instead render judgment because the verdict is unreasonable and therefore the evidence is legally insufficient).

58 Id. at 556.

59 Id. at 600.

60 Lonny S. Hoffman, Harmar and the Ever-Expanding Scope of Legal Sufficiency Review, 49 S. Tex. L.Rev. 611, 614 (2008).

61 Id.

62 See W. Wendall Hall & Mark Emery, 49 S. Tex. L.Rev. at 610.

63 See Watson, 204 S.W.3d at 429 n. 47 (Cochran, J., dissenting); see also William Powers, Jr., Judge and Jury in the Texas Supreme Court, 75 Tex. L.Rev. 1699, 1699 n.3 (1997) ("A hallmark of [the] entire body of law [regarding legal and factual sufficiency claims in civil cases] however, is extraordinary deference to juries.").

64 See Clewis, 922 S.W.2d at 129.

65 This situation does arise in those instances in which the defendant bears the burden of production and persuasion for affirmative defenses. See note 67 infra.

66 See note 42 supra.

67 See, e.g., Meraz v. State, 785 S.W.2d 146, 154 (Tex.Crim.App.1990) (applying the civil standards of factual review of "against the great weight and preponderance of the evidence" in a case in which the defendant appealed the jury's rejection of his plea of incompetence because the defendant had the burden to prove incompetence by a preponderance of the evidence); Bigby v. State, 892 S.W.2d 864, 875 (Tex.Crim.App.1994) (applying the civil standards of factual review because defendant had both the burden of production and persuasion for his affirmative defense of insanity).

68 See Jones v. State, 944 S.W.2d 642, 647-49 (Tex.Crim.App.1996) (deciding that a factual-sufficiency review requires the appellate court to review all of the evidence, not just the evidence that supports a verdict; rejecting capital murder defendant's factual sufficiency claim because there was conflicting evidence of whether he intended to shoot the murder victim); Cain v. State, 958 S.W.2d 404, 407-09 (Tex.Crim.App.1997) (reversing lower court's holding of factual insufficiency because that court

failed to defer to the jury's determination of witness credibility); Johnson v. State, 23 S.W.3d 1, 5-8 (Tex.Crim.App.2000) (upholding lower court's finding of factual insufficiency based on witness's express lack of certainty, but reminding appellate court that, "[u]nless the available record clearly reveals a different result is appropriate, an appellate court must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered."); Goodman v. State, 66 S.W.3d 283, 285-86 & n. 5 (Tex.Crim.App.2001) (attempting to follow Justice Calvert's five-zone analysis of factual insufficiency in civil cases and stating that, only when the evidentiary scales tip "radically" toward a negative finding on an essential element may the reviewing court exercise any "thirteenth juror" role and conclude that the jury's verdict is "clearly wrong"); Swearingen v. State, 101 S.W.3d 89, 97 (Tex.Crim.App.2003) (reiterating the importance of giving deference to the factfinder's credibility and weight determinations); Zuniga v. State, 144 S.W.3d 477, 483-84 (Tex.Crim.App.2004) (recognizing that the different civil and criminal standards of proof are an important source of confusion in any attempt to review criminal convictions for factual sufficiency; "Once again, the preponderance-of-the-evidence language creeps into a factual-sufficiency review where the burden of proof at trial was beyond a reasonable doubt. And, the Court's statement that the reviewing court must use both standards is confusing.").

69 204 S.W.3d 404 (Tex.Crim.App.2006).

70 Id. at 415.

71 I am unable to find any Texas Supreme Court case that even mentions the word "neutral" in relation to a factual sufficiency review. In In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951), the Supreme Court set out the applicable standard for reviewing "great weight and preponderance" complaints. The court of appeals must "consider and weigh all of the evidence in the case and to set aside the verdict and remand the cause for a new trial, if it thus concludes that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust-this, regardless of whether the record contains some 'evidence of probative force' in support of the verdict. The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict." Id. at 664-65 (citation omitted). There is nothing in this case, or any other Texas Supreme Court case, that suggests that all of the evidence must be viewed "neutrally," as if the sheer quantity of evidence were the only criterion for factual sufficiency. How extraordinary if the jury's verdict should be held to be "against the great weight and preponderance of the evidence" if seven gang members testified that their fellow gang-member defendant was with them the night of the murder while only two nuns testified that they saw the defendant commit the murder. Any jury is entitled to disbelieve the seven gang members and credit the two nuns.

72 823 S.W.2d 375, 381 (Tex.App.-Austin 1992, pet. ref'd). In Stone, the court of appeals stated:

When the court of appeals conducts a factual-sufficiency review, the court does not ask if any rational jury, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt. Factual-sufficiency review begins with the presumption that the evidence supporting the jury's verdict was legally sufficient, i.e., constitutionally sufficient for the purposes of the Due Process Clause of the Fourteenth Amendment. Rather, the court views all the evidence without the prism of "in the light most favorable to the prosecution." Because the court is not bound to view the evidence in the light most favorable to the prosecution, it may consider the testimony of defense witnesses and the existence of alternative hypotheses. The court should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Id. The court of appeals then cited Cain v. Bain, 709 S.W.2d 175, 176 (1986), and In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951), but neither of these cases said anything about viewing the evidence "in a neutral light" or "without the prism of 'in the light most favorable' " to the party with the burden of proof. They spoke only of reviewing all of the evidence when determining whether the verdict was "against the great weight and preponderance of the evidence." And that is precisely what is required under the Jackson legal sufficiency review: an examination of all of the evidence, but in the light most favorable to the jury's verdict because the jury, not the appellate court, was the chosen factfinder.

73 253 S.W.3d 699 (Tex.Crim.App.2008).

74 Id. at 705 (noting that factual insufficiency claim cannot be based on contradictory and inconsistent witness testimony because "the jury is the sole judge of what weight to give such testimony.... Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.").

1 Clewis v. State, 922 S.W.2d 126 (Tex.Crim.App.1996).

2 Plurality opinion, at 894.

3 Watson v. State, 204 S.W.3d 404, 406-14 (Tex.Crim.App.2006). See also Clewis, supra, at 137-44 (Clinton, J., concurring); Bigby v. State, 892 S.W.2d 864, 874-75 (Tex.Crim.App.1994).

4 Plurality opinion, at 894-95.

5 Id. at 8.

6 Zuniga v. State, 144 S.W.3d 477 (Tex.Crim.App.2004).

7 Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Brooks v. State, 323 S.W.3d 893 (Tex. Crim. App., 2010)

214 S.W.3d 9

Reginald Lamont HOOPER, Appellant

v.

The STATE of Texas.

No. PD-1352-05.

Court of Criminal Appeals of Texas.

January 31, 2007.

[214 S.W.3d 11]

Albert J. Charanza Jr., Lufkin, for Reginald Lamont Hooper.

Clyde Herrington, D.A., Lufkin, Matthew Paul, State's Attorney, Austin, for State.

OPINION

MEYERS, J., delivered the opinion of the unanimous Court.

Appellant Reginald Hooper was convicted by a jury of aggravated assault of a public servant and sentenced to 30 years' confinement in the Texas Department of Criminal Justice-Correctional Institution Division. The State presented evidence at the guilt phase of the trial that during March 2004 Appellant was the getaway driver from an aggravated robbery and that a passenger in Appellant's vehicle, one of the robbers, shot at a Parks and Wildlife game warden while trying to flee.

Appellant appealed, asserting that the evidence was legally and factually insufficient to support his conviction and that the trial court misdirected the jury about the law regarding weapons findings and parole eligibility. Addressing only the legal sufficiency claim, the court of appeals reversed the guilty verdict and rendered a judgment of acquittal after finding the evidence legally insufficient to support Appellant's conviction. The Chief Justice dissented. He argued that the verdict was not irrational because any inferences necessary to support the conviction are reasonable and supported by the record.[1]

We granted review to determine whether the court of appeals erred in holding that the evidence was legally insufficient to support Appellant's conviction. The State urges two reasons for review:

1) [T]HE COURT OF APPEALS INCORRECTLY APPLIED THE JACKSON V. VIRGINIA STANDARD OF REVIEW IN FINDING THE JURY VERDICT "IRRATIONAL."

2) [T]HE JUSTICES OF THE COURT OF APPEALS DISAGREED ON A MATERIAL QUESTION OF LAW NECESSARY TO THE COURT'S DECISION, TO WIT: THE APPLICATION OF THE JACKSON V. VIRGINIA STANDARD OF REVIEW FOR LEGAL SUFFICIENCY AND THE COURT'S RELIANCE ON "INFERENCE STACKING" TO REACH ITS DECISION.

[214 S.W.3d 12]

Because we find that the court of appeals applied the legal sufficiency test incorrectly, we remand the case to the court of appeals to reconsider the legal sufficiency of the evidence supporting Appellant's conviction.

The Evidence

On March 17, 2004, two men robbed the clerk at a Cash 2 U store in Woodville. The clerk did not see them pull up to the store in a car. The two men held the clerk at gunpoint and demanded money. They then took her to the back of the store and tied her hands and feet with duct tape. There was no money in the store, so the robbers took her personal items. The clerk knew Appellant, and he was not one of the robbers. After the robbers left, the clerk freed herself and ran to the front of the store just as a customer came in. She told him she had just been robbed and asked if he had seen anyone coming out of the store. He had not. Police quickly arrived and took a statement from the clerk.

Across the street, in a grocery store parking lot, another witness was almost hit by a red, four-door Dodge speeding across the parking lot. A man ran by her car, jumped in the red vehicle, and lay down in the back seat. The red vehicle then sped out of the parking lot. The witness did not see the driver of the vehicle or the direction the vehicle turned out of the parking lot. When the witness saw police at the Cash 2 U store, she stopped to ask if there had been a robbery. She gave the police a description of the red vehicle and of the man who she had seen jump in the car. That description was broadcast to officers.

A game warden heading toward Woodville heard the broadcast and soon spotted a small red vehicle heading out of town. As the warden turned around to follow it, the vehicle seemed to accelerate. The warden was driving his Parks and Wildlife Department patrol truck with the Parks Department logo and name on both doors and red and blue lights on the front and rear of the truck. It took the warden a few minutes of driving over 100 m.p.h. to catch up. Wanting to get a better look, the warden followed the red vehicle for another 4 or 5 minutes at 60 or 70 m.p.h. without activating his siren or lights. The game warden could see only one occupant, the driver, in the vehicle. He radioed the license plate to the dispatcher and learned that this was the type of vehicle the witness had described. During this time, the vehicle slowed down and moved to the shoulder as if to let him pass. The game warden had not activated his lights. The game warden stayed behind the vehicle, and the vehicle continued to slow. The vehicle then pulled over and quickly came to a complete stop. The game warden activated his emergency lights and almost immediately the heads of two additional occupants became visible, one in the front passenger seat and one in the backseat. As the game warden exited his truck, the front seat passenger opened his car door and started exiting the red vehicle. The warden yelled at him to get back in, but the passenger continued moving toward the front of the vehicle. At the same time, the back seat passenger exited the vehicle. As the game warden reached for his radio and gun, the front seat passenger, who was about 25 feet away, fired a shot at him, but missed. The game warden returned fire, and the passengers fled into the woods.

Appellant, who was the driver of the vehicle, remained in the vehicle when the others exited. But when the game warden returned fire at the front seat passenger, Appellant opened the door and jumped onto the ground, yelling at the game warden not to shoot or kill him. Appellant

[214 S.W.3d 13]

never tried to run, had no weapons on his person, followed all the warden's instructions, and never gave any of the officers who later arrived any trouble. The two suspects who had fled were eventually captured after a long manhunt. A pistol was recovered from the floorboard in the backseat of the vehicle where one of the suspects had been hiding, and another pistol was found near where one of the suspects surrendered. Tape matching that used in the robbery and the stolen keys from the Cash 2 U store were recovered in the woods.

Legal Sufficiency of the Evidence

In assessing the legal sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Powell v. State, 194 S.W.3d 503, 506 (Tex.Crim.App.2006); Guevara v. State, 152 S.W.3d 45,

49 (Tex.Crim.App. 2004). The reviewing court must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 318-19, 99 S.Ct. 2781. In reviewing the sufficiency of the evidence, we should look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." Cordova v. State, 698 S.W.2d 107, 111 (Tex.Crim.App.1985). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. See Johnson v. State, 871 S.W.2d 183, 186 (Tex.Crim.App. 1993) ("[i]t is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances."); Barnes v. State, 876 S.W.2d 316, 321 (Tex.Crim.App.1994); Alexander v. State, 740 S.W.2d 749, 758 (Tex. Crim.App.1987). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. Guevara, 152 S.W.3d at 49. On appeal, the same standard of review is used for both circumstantial and direct evidence cases. Id.

Ordinarily, to sustain a conviction for aggravated assault of a public servant the evidence must demonstrate that: 1) the person intentionally or knowingly threatened another with imminent bodily injury, 2) the person used or exhibited a deadly weapon during the commission of the assault, and 3) the offense was committed against a person the actor knew was a public servant while the public servant was lawfully discharging an official duty. TEX. PENAL CODE §§ 22.01(a)(2), 22.02(a)(2), (b)(2)(B). Additionally, pursuant to Texas Penal Code sections 7.01 and 7.02, an individual can be convicted as a party to an offense if that offense was committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. TEX. PENAL CODE § 7.01. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE § 7.02(a)(2). Further, if in the attempt to carry out a conspiracy to commit one felony another felony is committed by one of the conspirators, all conspirators

[214 S.W.3d 14]

are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy. TEX. PENAL CODE § 7.02(b).

To find Appellant guilty of aggravated assault, the jury must have found every essential element of the offense charged beyond a reasonable doubt. In a sufficiency review, the essential elements of the offense are those of a hypothetically correct jury charge for the case; one that accurately sets out the law and adequately describes the offense for which the defendant was tried without increasing the State's burden of proof or restricting the State's theories of liability. Malik v. State, 953 S.W.2d 234

(Tex.Crim.App. 1997). When the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilt will be upheld if the evidence is sufficient on any of the theories. Guevara, 152 S.W.3d at 49 (citing Rabbani v. State, 847 S.W.2d 555, 558 (Tex.Crim. App.1992)). To find Appellant guilty of aggravated assault of a public servant, the jury must have determined beyond a reasonable doubt that either2: 1) Appellant intended to promote or assist in the aggravated assault of the warden,3 or 2) the aggravated assault was committed by one of the conspirators in furtherance of carrying out the conspiracy to commit the aggravated robbery or another felony and that Appellant should have anticipated that aggravated assault of a public servant could result from carrying out the conspiracy.4

The court of appeals, however, held that the evidence was insufficient because "there was no direct evidence to establish Hooper's knowledge of [the shooter's] violent propensity or of [either co-conspirator's] intent to evade arrest by shooting at [the game warden]." The court further stated that, to reach the guilty verdict, the jury would have had to infer that Appellant was the driver of the getaway vehicle and that he "knew or was on notice — and thus should have anticipated" that his co-conspirator would shoot at a public servant. We disagree with this reasoning. Knowledge of a co-conspirator's violent propensity or intent to commit aggravated assault is not an element of the offense under either theory of party liability, so the lack of evidence of such knowledge is not dispositive of sufficiency. Also, direct evidence of the elements of the offense is not required. Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of

[214 S.W.3d 15]

an actor. Circumstantial evidence alone can be sufficient to establish guilt. Guevara, 152 S.W.3d at 49.

Inference Stacking

Based on the disagreement between the majority and dissent in the court of appeals' opinions in this case, the State requested that we address the proper use, if any, of the "stacking inference upon inference" test in criminal legal sufficiency review. We will do so.

Some courts of appeals, in their criminal law opinions, have cited a rule that when conducting a legal sufficiency review a vital fact may not be established by stacking inference upon inference. E.g., Reedy v. State, No. 03-03-00399-CR, ___ S.W.3d ___, ___, 2006 Tex.App. LEXIS 10484 at *49 (Tex.App.-Austin, Dec. 8, 2006, pet. filed); Tippitt v. State, 41 S.W.3d 316, 327 (Tex.App.-Fort Worth, 2001, no pet.); Richardson v. State, 834 S.W.2d 535, 537 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd). However, inference stacking has not been used in this Court's sufficiency of the evidence jurisprudence in over 50

years. In the distant past, this Court reversed numerous convictions because they were based upon stacking inferences, unsupported presumptions, or building presumptions upon presumptions. See, e.g., Stallings v. State, 158 Tex.Crim. 74, 77, 252 S.W.2d 939, 940 (1952); Williamson v. State, 156 Tex.Crim. 520, 522, 244 S.W.2d 202, 204 (1951); Lee v. State, 152 Tex. Crim. 401, 405, 214 S.W.2d 619, 622 (1948). However, that practice was discontinued and is not a part of our modern sufficiency review. We have used the Jackson v. Virginia test for legal sufficiency review since it was enunciated by the U.S. Supreme Court in 1979. Jackson, 443 U.S. 307, 99 S.Ct. 2781. The only time that such language appears in a recent opinion from this Court is in a recitation of the grounds for review as stated by a party. See Guevara, 152 S.W.3d at 48. In that case, we overturned the court of appeal's reversal for legal insufficiency and held that the jury verdict was based on reasonable inferences from the evidence. Id. at 52.

The rule against inference stacking as used by the courts of appeals might have evolved from their civil cases. See, e.g., Lozano v. Lozano, 983 S.W.2d 787, 789 (Tex.App.-Houston [14th Dist.] 1998) ("[A] vital fact may not be established by stacking inference upon inference. See Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp., 435 S.W.2d 854, 858 (Tex. 1968); Engstrom v. First Nat. Bank, 936 S.W.2d 438, 445 (Tex.App.-Houston [14th Dist.] 1996, writ. denied)."). Since the courts of appeals consider both civil and criminal cases, perhaps that is how the rule has made its way into their criminal law opinions. Our appellate law, however, contains no such rule, and we will not take this opportunity to import it into our criminal jurisprudence.

In the context of modern criminal law, a rule against inference stacking is unnecessary. Under Jackson v. Virginia, courts of appeals assessing legal sufficiency are to consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 318-19, 99 S.Ct. 2781; Powell, 194 S.W.3d at 506; Guevara, 152 S.W.3d at 49.

Under the Jackson test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.

[214 S.W.3d 16]

To correctly apply the Jackson standard, it is vital that courts of appeal understand the difference between a reasonable inference supported by the evidence at trial, speculation, and a presumption.5 A presumption is a legal inference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt. See TEX. PENAL CODE § 2.05. For example, the Penal Code states that a person who purchases or receives a used or secondhand motor vehicle is presumed to know on receipt that the vehicle has been previously stolen, if certain basic facts are established regarding his conduct

after receiving the vehicle. TEX. PENAL CODE § 31.03(c)(7). A jury may find that the element of the offense sought to be presumed exists, but it is not bound to find so. TEX. PENAL CODE § 2.05. In contrast, an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

As stated above, juries are permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation. Without concrete examples, it can be difficult to differentiate between inferences and speculation, and between drawing multiple reasonable inferences versus drawing a series of factually unsupported speculations. This hypothetical might help clarify the difference. A woman is seen standing in an office holding a smoking gun. There is a body with a gunshot wound on the floor near her. Based on these two facts, it is reasonable to infer that the woman shot the gun (she is holding the gun, and it is still smoking). Is it also reasonable to infer that she shot the person on the floor? To make that determination, other factors must be taken into consideration. If she is the only person in the room with a smoking gun, then it is reasonable to infer that she shot the person on the floor. But, if there are other people with smoking guns in the room, absent other evidence of her guilt, it is not reasonable to infer that she was the shooter. No rational juror should find beyond a reasonable doubt that she was the shooter, rather than any of the other people with smoking guns. To do so would require impermissible speculation. But, what if there is also evidence that the other guns in the room are toy guns and cannot shoot bullets? Then, it would be reasonable to infer that no one with a toy gun was the shooter. It would also be reasonable to infer that the woman holding the smoking gun was the shooter. This would require multiple inferences based upon the same set of facts, but they are reasonable inferences when looking at the evidence. We first have to infer that she shot the gun. This is a reasonable inference because she is holding the gun, and it is still smoking. Next, we have to infer that she shot the person on the floor. This inference is based in part on the original inference that she shot the gun, but is also a reasonable inference drawn from the circumstances.

Inference stacking is not an improper reasoning process; it just adds unnecessary confusion to the legal sufficiency review without adding any substance. Rather than using the language of inference stacking, courts of appeals should adhere to the Jackson standard and determine

[214 S.W.3d 17]

whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.

Conclusion

Because the court of appeals applied the legal sufficiency standard incorrectly, we remand this case to the court of appeals to reconsider the legal sufficiency of the evidence supporting Appellant's conviction and for any further proceedings consistent with this opinion.

--------------

Notes:

1. The dissenting opinion cited the following facts as those from which a jury could rationally find Appellant guilty: Appellant was driving the getaway car. His driving was erratic while he was being followed by law enforcement. He stopped before the officer pulled him over. Two other people were in the vehicle, concealed from view, and the front seat passenger exited with gun in hand and shot at the officer.

2. The evidence at trial established that the front seat passenger was the shooter, and the State acknowledged that Appellant was not the shooter. At trial, the State's theory of the case was based on party liability.

3. To find Appellant guilty under the first theory of party liability, the jury must have found beyond a reasonable doubt that: 1) acting with intent to promote or assist the commission of the aggravated assault, 2) Appellant solicited, encouraged, directed, aided, or attempted to aid the other person to commit the aggravated assault.

4. To find Appellant guilty under the second theory of party liability, the jury must have found beyond a reasonable doubt: 1) Appellant and the co-conspirators engaged in an attempt to carry out a conspiracy to commit aggravated robbery or another felony, 2) in that attempt, one of the co-conspirators committed aggravated assault of a public servant, 3) the aggravated assault was committed in furtherance of the aggravated robbery or other felony conspiracy, and 4) was an offense that should have been anticipated as a result of carrying out the conspiracy.

5. We mention presumption in addition to inference and speculation because courts have used the terms presumption and inference interchangeably.

--------------

Hooper v. State, 214 S.W.3d 9 (Tex. Crim. App., 2007)

# In re M.S

TEX. APP.

COURT OF APPEALS SECOND DISTRICT OF TEXAS FORT WORTH

NO. 02-11-00041-CV

02-02-2012

IN THE MATTER OF M.S.
LEE GABRIEL

LEE GABRIEL

# FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

# MEMORANDUM OPINION[1]

Appellant M.S., a child, appeals the trial court's judgment adjudicating him delinquent and ordering one year's probation. We affirm.

# BACKGROUND FACTS

Appellant enrolled at Timber Creek High School on Friday, October 15, 2010. On that date, principal Todd Tunnell spoke with Appellant and his mother about Appellant's prior placement in an alternative school through Alternative Education and Placement (AEP). During that conversation, Appellant told *22 Tunnell that he had completed his time in AEP. Appellant was scheduled to start

regular classes on Monday, October 18, 2010. Before Appellant arrived on Monday, Tunnell learned that Appellant had not in fact completed his time in AEP. Upon his arrival at Timber Creek, Appellant was called to the principal's office where they discussed the discrepancies in what Appellant had told Tunnell.

During the meeting, Tunnell noticed that Appellant had a "defensive and surly" attitude. He also noticed that Appellant had "Pretty Boy" written on his backpack, that he was dressed totally in blue, and that he had a tattoo of three dots on his hand. Tunnell discussed the tattoo with the school resource officer and asked if it had any gang implications.

Tunnell told Appellant that he could not attend Timber Creek until he served the rest of his AEP time in Keller. Tunnell instructed Appellant to wait in the front office for his mother to pick him up. Appellant left the area he was instructed to wait in, and Tunnell found him in the hallway talking to students. Tunnell directed Appellant back to the office. Tunnell recalled walking through the front office again "close to noon" and noticing that Appellant had left.

Shortly after Appellant left, Tunnell received a report of graffiti on a toilet paper dispenser in one of the boys' restrooms. Officer Michael Shunk, a Fort Worth policeman assigned to Timber Creek, took pictures of the graffiti, which included "Pretty Boy Prince" written in blue ink and stars and "Fresh" written in black ink. "Fresh" was written in a different style than "Pretty Boy Prince." Tunnell thought the graffiti was written with a permanent marker, and Shunk was *33 not able to remove or smear the graffiti with his finger. The graffiti was cleaned off by the custodial staff, and the markers used to write the graffiti were not recovered.

Shunk reviewed tape from the school's video surveillance system. A person fitting Appellant's description was seen on the video entering the restroom at 12:07 and leaving approximately three minutes later. Shunk showed the video to Tunnell, who identified the person as Appellant.

Shunk had over twenty-four years' experience with the Fort Worth Police Department, had been a school resource officer for nine years, and was working his second year at Timber Creek when this event occurred. He had experience with graffiti both as a school resource officer and while working in the gang unit. He was not aware of any graffiti on the dispenser prior to that day. Based on Shunk's visual observations of the graffiti on the toilet paper dispenser, as well as his efforts to remove or smear it, he determined that the markings were made with a "permanent indelible marker."

At his adjudication hearing, Appellant admitted to writing "Pretty Boy Prince" on the dispenser but claimed that he used a blue, washable marker. He denied writing "Fresh" or drawing the stars, although he admitted to having a black marker in his backpack the morning of the incident. Appellant's mother testified that she had first learned of the graffiti incident approximately a week after it occurred and had searched Appellant's backpack at that time. She found *44 a washable marker. The judge found Appellant delinquent and placed him on felony probation for one year. This appeal followed.

# DISCUSSION

## Factual and Legal Insufficiency

In his first issue, Appellant claims that the evidence is factually insufficient to support the adjudication of delinquency. Although appeals from juvenile court orders are generally treated as civil cases, we apply a criminal sufficiency standard of review to sufficiency of the evidence challenges regarding the adjudication phase of juvenile proceedings. *In re M.C.S., Jr.,* 327 S.W.3d 802, 805 (Tex. App.—Fort Worth 2010, no pet.). Because factual sufficiency claims in criminal cases are no longer viable in Texas, *see Brooks v. State,* 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (holding that the legal sufficiency standard articulated in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979), is the only standard that a reviewing court should apply in determining whether evidence is sufficient), we overrule Appellant's first issue.

In his second issue, Appellant claims that the evidence is legally insufficient to support the adjudication of delinquency. He argues that no rational trier of fact could have found that the marker used for the graffiti was an "indelible marker" as defined in the Texas Penal Code.

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential *55 elements of the crime beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi v. State,* 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson,* 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi,* 330 S.W.3d at 638. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State,* 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied,* 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State,* 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson,* 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi,* 330 S.W.3d at 638.

A person commits an offense under penal code section 28.08(a)(2) "if, without the effective consent of the owner, the person intentionally or knowingly makes markings, including inscriptions, slogans, drawings, or paintings, on the tangible property of the owner with an indelible marker." Tex. Penal Code Ann. *66 § 28.08(a)(2) (West 2011). An indelible marker is a "device that makes a mark with a paint or ink product that is specifically formulated to be more difficult to erase, wash out, or remove than ordinary paint or ink products." *Id.* § 28.08(e)(3).

Principal Tunnell testified that he believed that the graffiti was made with a permanent marker and that it did not come off nor smear when Officer Shunk tried to remove it with his finger. Officer Shunk likewise clearly testified that the markings were made by a "permanent indelible marker." A picture of the graffiti was admitted into evidence. Appellant testified that he made only the "Pretty Boy Prince"

markings using a blue, washable marker and that the black "Fresh" was already there. Even where the actual marker used for the graffiti is not recovered, as is the case here, circumstantial evidence and witness testimony can support a finding that a marker is indelible. *See Harvey v. State,* 116 S.W.3d 816, 820-21 (Tex. App.—Fort Worth 2003, no pet.) (upholding finding that a marker was indelible without the marker being submitted into evidence when two witnesses testified that the graffiti was made with a "permanent ink marker"). The trial court weighed the conflicting evidence and the credibility of the witnesses. By its judgment, it resolved the conflict by finding the testimony of the principal and the police officer to be credible. We shall not re-evaluate that decision. *See Williams,* 235 S.W.3d at 750. Viewing the evidence in the light most favorable to the verdict, we hold that a rational factfinder could have found that Appellant wrote the graffiti with a permanent marker. The evidence is legally *77 sufficient to support the trial court's finding that Appellant used an indelible marker as defined by the statute. We overrule Appellant's second issue. **Rule of Lenity**

In his third issue, Appellant argues that the offense should not have been found to be a state jail felony because the graffiti was not made "on a school." *See* Tex. Penal Code Ann. § 28.08(d)(1). He contends that the rule of lenity would dictate that the statute be strictly construed in his favor.

The rule of lenity requires that when a criminal statute is ambiguous and the intent of the legislature cannot be determined by employing statutory construction cannons, the ambiguity should be resolved "in favor of lenity." *Ex parte Forward,* 258 S.W.3d 151, 157 (Tex. Crim. App. 2008) (Johnson, J., dissenting) (quoting*Ladner v. United States,* 358 U.S. 169, 178, 79 S. Ct. 209 (1958)). It is rarely necessary for Texas courts to rely on the rule of lenity because most of the Texas Penal Code has been drafted "with clarity, precision, and straightforward, well-defined language." *Cuellar v. State,* 70 S.W.3d 815, 822 (Tex. Crim. App. 2002) (Cochran, J., concurring). The graffiti statute is no exception. The phrase "on a school" encompasses both the actual walls of the facility and those attachments that are incorporated as part of the school. *See In re A.F.,* No. 08-01-00441-CV, 2002 WL 1767567, at *1 (Tex. App.—El Paso Aug. 1, 2002, no pet.) (not designated for publication) (holding that graffiti written on a cubicle "affixed to the wall" of a school classroom was written "on a school"); *see also In re C.M.L.,* No. 08-99-00210-CV, 2000 WL 678845, at *1 (Tex. App.— *88 El Paso May 25, 2000, no pet.) (not designated for publication) (considering graffiti written on a paper towel dispenser as part of the graffiti that was done "on a community center"). The statute is unambiguous, thus the rule of lenity is inapplicable. We overrule appellant's third issue.

# CONCLUSION

Having overruled each of Appellant's issues, we affirm the judgment of the trial court.

LEE GABRIEL

JUSTICE PANEL: GARDNER, McCOY, and GABRIEL, JJ.

373 S.W.3d 730

In the Matter of R.R.

No. 14–10–01233–CV.

Court of Appeals of Texas,

Houston (14th Dist.).

May 24, 2012.

Rehearing Overruled June 20, 2012.

[373 S.W.3d 732]

William M. Thursland, Houston, for appellant.

Lisa G. Porter, Houston, for appellees.

Panel consists of Justices BROWN, BOYCE, and McCALLY.

OPINION

JEFFREY V. BROWN, Justice.

Appellant, R.R., was charged with the aggravated sexual assault of a child under the age of 14. After a bench trial, the trial court found R.R. engaged in delinquent conduct and assessed punishment at five years' confinement in the Texas Youth

Commission with a possible transfer to the Texas Department of Criminal Justice. On appeal, R.R. asserts that the trial court erred by (1) proceeding to a bench trial without obtaining a waiver of jury trial by R.R.'s trial counsel, (2) excluding witness testimony attacking the complainant's credibility, and (3) finding the evidence presented to be legally and factually sufficient to support adjudicating R.R. as a delinquent. We affirm.

I

The State alleges that R.R. sexually assaulted C.C. on January 11, 2009, while C.C. was at her friend S.K.'s house. C.C. was twelve years old at the time. C.C. testified that R.R. grabbed her, pushed her onto a bed, and held her down with his arm while he took off both of their clothes. C.C. testified that while this was happening, she "was squirming around and crying. Screaming." She said that R.R. then "stuck his penis in my vagina."

On October 11, 2010, an agreed-setting form resetting the case for "Court Trial" was signed by R.R.'s parent/guardian, his attorney, and the prosecutor. A bench trial was held three days later after the following exchange in open court among the trial judge, the prosecutor (Sarah Bruchmiller), and R.R.'s attorney (Fred Dahr):

THE COURT: Okay. [R.R.], you are charged with first degree felony offense of aggravated sexual assault of a child under the age of 14. That is said to have occurred on January 11th, 2009. You had a right to have a trial in front of a jury, but it appears that you have given up that right; is that true?

RESPONDENT: Yes, sir.

THE COURT: Okay. All right then. And I'm going to enter a plea of not true to the allegation that you're charged with. All right then. You may proceed.

MS. BRUCHMILLER: Your Honor, at this time State offers Petitioner's Exhibit 1 which is a signed stipulation of the date of birth of the respondent.

(Whereupon Petitioner's Exhibit 1 is offered into evidence.)

MR. DAHR: No objection, Judge.

THE COURT: All right. It's admitted.

During the bench trial, R.R. called S.K. to the stand, and the following exchange occurred:

MR. DAHR: About how long did you know [the complainant] for?

A: Since beginning of eighth grade.

MR. DAHR: What's your opinion of her, her truthfulness?

A: She don't have—

MS. BRUCHMILLER: Objection. Improper question.

THE COURT: That's sustained.

MR. DAHR: Have you talked to people in your community about whether [the complainant] tells the truth?

MS. BRUCHMILLER: Objection. Improper question regarding to character. [sic]

THE COURT: That's sustained.

MR. DAHR: Pass the witness, Judge.

At the conclusion of the bench trial, the trial court found that R.R. engaged in delinquent conduct and assessed punishment at five years' confinement in the Texas Youth Commission with a possible

transfer to the Texas Department of Criminal Justice. The same afternoon, the trial court issued a judgment providing, in relevant part:

BE IT REMEMBERED that this cause being called for trial, came on to be heard before the above Court with the above numbered and entitled cause and came the State of Texas by her Assistant District Attorney, SARA BRUCHMILLER, and came in person the

[373 S.W.3d 734]

Respondent, [R.R.], with his/her defense attorney, DAHR, FRED, and the Respondent's parent(s), guardian(s), or custodian(s), [sic] and pursuant to the Texas Family Code all parties waived a jury, waived/had prior access to all reports to be considered by the courts and announced ready for a hearing; and there upon the Court, after hearing the pleading of all the parties and hearing the evidence and argument of counsel, finds beyond a reasonable doubt that said child committed the offense(s) alleged in the petition and/or established by the evidence.

R.R. timely moved for a new trial, alleging the same issues alleged in this appeal. The trial court denied that motion, and this appeal followed.

II

We must address challenges to legal and factual sufficiency regardless of our disposition of the other issues in a case. See Graham v. State, 643 S.W.2d 920, 924 (Tex.Crim.App.1981); Banks v. State, 158 S.W.3d 649, 650 n. 1 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd). This is because a successful challenge to the sufficiency of the evidence bars retrial and requires the entry of a judgment of acquittal. Graham, 643 S.W.2d at 924;Banks, 158 S.W.3d at 650 n. 1. Accordingly, we begin our discussion by examining R.R.'s third issue.

Although juvenile proceedings are civil matters, the standard applicable in criminal matters is used to assess the sufficiency of the evidence underlying a finding the juvenile engaged in delinquent conduct. In re A.O., 342 S.W.3d 236, 239 (Tex.App.-Amarillo 2011, pet. denied); see also In re I.A.G., 297 S.W.3d 505, 507 (Tex.App.-Beaumont 2009, no pet.). A majority of judges on the Court of Criminal Appeals has concluded that the Jackson v. Virginia[1] legal-sufficiency standard is the only standard a court reviewing a criminal case should apply in determining whether the evidence is sufficient to support each element that the State is required to prove beyond a reasonable doubt. Brooks v. State, 323 S.W.3d 893, 895 (Tex.Crim.App.2010) (plurality op.) (Hervey, J., joined by Keller, P.J., Keasler, and Cochran, J.J.); id. at 926 (Cochran, J., concurring, joined by Womack, J.) (agreeing with the plurality conclusion). Accordingly, we ask only if the evidence is legally sufficient to sustain a verdict of guilty

beyond a reasonable doubt.2See id. at 912 (plurality op.); see also Orsag v. State, 312 S.W.3d 105, 115 (Tex.App.-Houston [14th Dist.] 2010, pet. ref'd).

In a legal-sufficiency case, we examine all the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

[373 S.W.3d 735]

Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).3 This standard of review applies to cases involving both direct and circumstantial evidence. Clayton v. State, 235 S.W.3d 772, 778 (Tex.Crim.App.2007). Although we consider everything presented at trial, we do not substitute our judgment regarding the weight and credibility of the evidence for that of the fact finder. Williams v. State, 235 S.W.3d 742, 750 (Tex.Crim.App.2007). We presume the factfinder resolved conflicting inferences in favor of the verdict, and defer to that determination. Clayton, 235 S.W.3d at 778. We also determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. Id.

To prevail in a case of aggravated sexual assault, the State must prove beyond a reasonable doubt that the defendant intentionally or knowingly caused the penetration of a child's sexual organ. Tex. Penal Code § 22.021. The testimony of the child victim alone can be enough to support a conviction. Tex.Code Crim. Proc. 38.07; Tran v. State, 221 S.W.3d 79, 88 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd).

R.R. argues that the evidence was insufficient because C.C. was an unreliable witness and "[t]here was no physical evidence and scant testimonial evidence in the record to corroborate her trial testimony." Though this may be true, it has no bearing on our sufficiency analysis. See Williams, 235 S.W.3d at 750 (noting that "reviewing courts give deference to the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). C.C. testified at trial that R.R. "stuck his penis in my vagina." On that statement alone, a rational factfinder could find that R.R. intentionally or knowingly caused the penetration of a child's sexual organ. SeeTex. Penal Code § 22.021; Tran, 221 S.W.3d at 88. Thus, we conclude that the evidence the State presented was sufficient to support an adjudication of R.R. as delinquent.

III

We turn to R.R.'s jury-trial waiver issue, and we note in passing that it is properly before us even without an objection in the trial court. Under the Family Code, jury trials are the default course of action, and a trial court has a duty to commence a trial by jury unless and until both the juvenile and his attorney release the trial court from that duty. Tex. Fam.Code §§ 51.09, 54.03(c). When a statute directs a juvenile court to take certain action, the failure of the juvenile court to do so may be raised for the first time on appeal unless the juvenile defendant expressly waived the statutory requirement. In re C.O.S., 988 S.W.2d 760, 767 (Tex.1999). Because R.R. argues that he did not waive his right to a jury trial, the issue is properly before us without an objection below.

A more difficult question is whether the trial court reversibly erred when it found

[373 S.W.3d 736]

that R.R. validly waived his right to a jury trial despite the absence of a written or recorded waiver by R.R.'s attorney. The State concedes that the record does not contain a written or oral waiver by R.R.'s attorney but argues the error is harmless. Initially, then, we must determine whether the error below is subject to harmless-error analysis.

Except for certain federal constitutional errors the U.S. Supreme Court has labeled as structural, no error—even if it relates to jurisdiction, voluntariness of a plea, or some other mandatory requirement—is categorically immune to a harmless-error analysis. Cain v. State, 947 S.W.2d 262, 264 (Tex.Crim.App.1997) (superseded by statute on other grounds). Denial of an adult defendant's right to a jury trial is a structural error not subject to harmless-error analysis. Green v. State, 36 S.W.3d 211, 216 (Tex.App.Houston [14th Dist.] 2001, no pet.). However, a court's failure to follow statutory procedures for waiving a defendant's right to a jury trial is not structural error. See Johnson v. State, 72 S.W.3d 346, 348 (Tex.Crim.App.2002); Ex parte Sadberry, 864 S.W.2d 541, 543 (Tex.Crim.App.1993) ("Neither the federal nor the state constitution require that a trial by jury be waived in writing. Rather, the legislature has chosen to observe careful regulation of that constitutional right by specifying how that right may be waived."). Such a failure must somehow harm a defendant to be reversible error. Johnson, 72 S.W.3d at 348.

For adults, trial by jury is a fundamental right guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution and article I, section 15, of the Texas Constitution. Hall v. State, 843 S.W.2d 190, 193 (Tex.App.-Houston [14th Dist.] 1992, no writ). Few jurisdictions afford the right to juvenile defendants, but Texas does.4Section 54.03 of the Family Code sets out the procedure for juvenile adjudication hearings and plainly provides: "Trial shall be by jury unless jury is waived in accordance with Section 51.09." Tex. Fam.Code § 54.03(c). The State relies on the supreme court's decision in In re D.I.B. to argue that the requirements of section 54.03—and by extension, section 51.09—are statutory

in nature and that failure to comply with those procedures is subject to harmless-error analysis. See988 S.W.2d 753, 754 (Tex.1999). But the holding there was explicitly limited:

We note that our holding today regarding the explanations required by section 54.03(b) of the Family Code is limited. The only issue before us is whether an appellate court should conduct a harm analysis when a trial court fails to explain

[373 S.W.3d 737]

the potential use of the record from a juvenile proceeding in a future criminal case. We are not called upon to decide, and do not decide, whether the failure to give one or more of the other explanations required by section 54.03(b) of the Family Code might be a "structural defect[ ] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards."

D.I.B., 988 S.W.2d at 759 (citing Arizona v. Fulminante, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

We must decide the source of a juvenile's right to a jury trial. See Miles v. State, 154 S.W.3d 679, 680 (Tex.App.-Houston [14th Dist.] 2004), aff'd,204 S.W.3d 822 (Tex.Crim.App.2006). Only those errors that directly offend the U.S. Constitution or the Texas Constitution are structural errors immune from harmless-error analysis. Id.;Fox v. State, 115 S.W.3d 550, 563 (Tex.App.-Houston [ 14th Dist.] 2002, pet. ref'd). It is clear that the federal constitution does not guarantee a juvenile the right to a jury trial. McKeiver v. Pennsylvania, 403 U.S. 528, 545, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971). This, of course, does not prevent the Texas Constitution from guaranteeing that right. Hous. Chronicle Publ'g Co. v. Crapitto, 907 S.W.2d 99, 106 (Tex.App.-Houston [14th Dist.] 1995, no writ) ("The federal constitution sets the floor for individual rights; state constitutions establish the ceiling.").

If the Texas Constitution guarantees the right to a jury trial to juveniles, section 54.03 of the Family Code merely recognizes that right. In that case, any error denying a jury trial to a juvenile is structural and not subject to harmless-error analysis. See Green, 36 S.W.3d at 216. On the other hand, if the right to jury trial provided in the Texas Constitution applies only to adults, section 54.03 creates a statutory right to jury trial in juvenile proceedings, and violations are subject to harmless-error analysis. See Johnson, 72 S.W.3d at 348.

Although this appears to be a matter of first impression in Texas, this court has previously chosen not to distinguish the federal and state constitutions on this issue. Strange v. State, 616 S.W.2d 951, 953 (Tex.Civ.App.-Houston [14th Dist.] 1981, no writ) ("[A] jury trial is not a constitutional requirement in the adjudicative stage of a juvenile proceeding.") (citing McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct.

1976, 29 L.Ed.2d 647 (1971)). The supreme court cited Strange approvingly to support the proposition that "[a]lthough minors have constitutional rights, they do not have the same constitutional rights as adults." See Barber v. Colo. Indep. Sch. Dist., 901 S.W.2d 447, 451 (Tex.1995). We see no reason to alter our previous assessment. Though Texas does more than most jurisdictions to preserve the right to a jury trial for juveniles, it does not go so far as to constitutionally require jury trials in juvenile proceedings. See Strange, 616 S.W.2d at 953. The Family Code—not the Texas constitution—creates a juvenile's right to a jury trial.

Because a jury trial is not constitutionally required, a juvenile must demonstrate that his substantial rights were affected in order to obtain reversal based on the erroneous denial of a jury trial under section 54.03. See Tex.R.App. P. 44.2(b); See Johnson, 72 S.W.3d at 348. In a non-jury case, an error does not affect substantial rights if the error does not deprive the complaining party of some right to which he was legally entitled. Johnson, 72 S.W.3d at 348;Smith v. State, 290 S.W.3d 368, 375 (Tex.App.-Houston [14th Dist.] 2009, pet. ref'd). In determining

[373 S.W.3d 738]

harm, we consider the entire record. Smith, 290 S.W.3d at 375.

Here, R.R. does not assert any harm, and the judgment indicates that "all parties waived a jury." That recitation is binding in the absence of direct proof of its falsity. Johnson, 72 S.W.3d at 349;Breazeale v. State, 683 S.W.2d 446, 450 (Tex.Crim.App.1985) (op. on reh'g). There is no such proof in the record, and in fact, R.R. makes no challenge at all to the judgment itself. Instead, R.R. portrays the record as completely silent on any waiver from his attorney and relies on the well-settled rule that waiver cannot be inferred from a silent record. See, e.g., Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962).

We do not agree that the record is silent. R.R. orally waived his right to a jury in open court on the record with his attorney present. Additionally, R.R.'s attorney signed a form agreeing to a "Court Trial." Although neither the oral waiver nor the trial-setting form are sufficient to satisfy the requirements of section 54.03, they both weigh against any suggestion that a trial to the bench harmed R.R. Because the record reflects that R.R. opted for a bench trial, we conclude that any failure by the trial court to adhere to the requirements of section 54.03 was harmless. See Johnson, 72 S.W.3d at 349. We overrule R.R.'s second issue.

IV

Finally, we examine R.R.'s assertion that the trial court erred by excluding S.K.'s testimony attacking complainant's credibility. We conclude that R.R. failed to preserve this error, and we overrule it.

The Texas Rules of Appellate Procedure require a party to preserve error for appellate review by demonstrating the error on the record. Tex.R.App. P. 33.1(a); Clark v. State, 305 S.W.3d 351, 354 (Tex.App.-Houston [14th Dist.] 2010), aff'd,365 S.W.3d 333 (Tex.Crim.App.2012). The party must make the complaint in a timely manner and state the grounds for the ruling that the complaining party seeks from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. Tex.R.App. P. 33.1(a)(1)(A). There is nothing in the record showing that R.R. ever told the trial court precisely why S.K.'s testimony was admissible until he filed his motion for new trial. Thus, without deciding whether the trial court erred in excluding this evidence, we conclude that R.R. has not preserved the alleged error for appellate review. See Estate of Veale v. Teledyne Indus., Inc., 899 S.W.2d 239, 243 (Tex.App.-Houston [14th Dist.] 1995, writ denied). We overrule R.R.'s second issue.

For the foregoing reasons, we affirm the trial court's judgment.

--------

Notes:

1.443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

2. R.R. argues that Brooks should not apply here for the sole reason that Brooks is a criminal case and this is a civil proceeding: "Until the Texas Supreme Court holds otherwise, it is appropriate for [courts of appeals] to continue to apply the appropriate and separate [legal- and factual-sufficiency] standards." He can point to no relevant authority for this assertion, and several courts of appeals have already applied Brooks to juvenile proceedings. See A.O., 342 S.W.3d at 239–40 (Tex.App.-Amarillo 2011); In re R.D., 342 S.W.3d 123, 125 (Tex.App.-El Paso 2011, no pet.); In re K.D.P., No. 11–09–00045–CV, 2010 WL 5257644, at *2 (Tex.App.-Eastland December 16, 2010, no pet.) (mem. op., not designated for publication); In re M.C.S., 327 S.W.3d 802, 805 n. 3 (Tex.App.-Fort Worth 2010, no pet.). We also conclude that Brooks is applicable to juvenile proceedings and reject R.R.'s arguments to the contrary.

3. Because Brooks holds that Jackson v. Virginia provides the sole standard for reviewing sufficiency of the evidence in criminal cases, we need not attempt to reconcile any conflict in our prior precedent. See In re G.M.P., 909 S.W.2d 198, 202 (Tex.App.-Houston [14th Dist.] 1995, no writ) (rejecting Jackson v. Virginia in a juvenile case in favor of a review of "the evidence as a whole"); In re G.A.T., 16 S.W.3d 818, 828 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (applying Jackson v. Virginia in a juvenile case). Brooks and Jackson v. Virginia require this court to "consider[ ] all of the evidence." See Brooks, 323 S.W.3d at 899 (citing Jackson v. Virginia, 443 U.S. at 319, 99 S.Ct. 2781).

4. The majority of states and the federal government do not guarantee juveniles the right to a jury trial. Tina Chen, Comment, The Sixth Amendment Right to a Jury Trial: Why Is It A Fundamental Right For Adults and Not Juveniles?, 28 J. Juv. L. 1, 6 (2007). Texas has historically granted juvenile defendants broad legal protections unavailable to them in many states. See McKeiver v. Pennsylvania, 403 U.S. 528, 549 n. 9, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (naming Texas as one of ten states to provide a juvenile's right to a jury trial in some situations); see also Tamar R. Birckhead, Toward a Theory of Procedural Justice for Juveniles, 57 Buff. L.Rev. 1447, 1489 n. 166 (2009) (naming Texas as one of only two states to completely prohibit the waiver of counsel by juveniles); Mark Ells, A Brief Analysis of Some Elements of a Proposed Model Juvenile Code, 28 Hamline J. Pub.L. & Pol'y 199, 206 (2006) (naming Texas as one of five states to provide heightened statutory guidelines for interrogations of juveniles); Tory J. Caeti et al., Juvenile Right to Counsel: A National Comparison of State Legal Codes, 23 Am. J. Crim. L. 611, 625 (1996) (listing Texas among seven states offering the most comprehensive protections for juvenile defendants).

In re R.R., 373 S.W.3d 730 (Tex. App., 2012)

# Jackson v. Virginia
# 443 U.S. 307 (1979)

**Annotate this Case**

- Syllabus
- Case

## U.S. Supreme Court

**Jackson v. Virginia, 443 U.S. 307 (1979)**

**Jackson v. Virginia**

**No. 78-5283**

**Argued March 21, 1979**

**Decided June 28, 1979**

**443 U.S. 307**

*CERTIORARI TO THE UNITED STATES COURT OF APPEALS*

*FOR THE FOURTH CIRCUIT*

*Syllabus*

Petitioner was convicted of first-degree murder after a bench trial in a Virginia court, and his motion and petition in the state courts to set aside the conviction on the ground that there was insufficient evidence of premeditation, a necessary element of first-degree murder, were denied. He then brought a habeas corpus proceeding in Federal District Court, which, applying the "no evidence" criterion of *Thompson v. Louisville,*362 U. S. 199, found the record devoid of evidence of premeditation and granted the writ. Applying the same criterion, the Court of Appeals reversed, holding that there was some evidence that petitioner had intended to kill the victim.

*Held:*

1. A federal habeas corpus court must consider not whether there was any evidence to support a state court conviction, but whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a reasonable doubt. *In re Winship,*397 U. S. 358. Pp.443 U. S. 313-324.

(a) *In re Winship* presupposes, as an essential of the due process guaranteed by the Fourteenth Amendment, that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense. Pp. 443 U. S. 313-316.

(b) After *In re Winship,* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed on reasonable doubt, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The *Thompson* "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt. Pp. 443 U. S. 316-320.

(c) In a challenge to a state conviction brought under 28 U.S.C. § 2254, which requires a federal court to entertain a state prisoner's claim that he is being held in "custody in violation of the Constitution

Page 443 U. S. 308

or laws or treaties of the United States," the applicant is entitled to habeas corpus relief if it is found that, upon the evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Pp. 443 U. S. 320-324.

2. A review of the record in this case in the light most favorable to the prosecution shows that a rational factfinder could have found petitioner guilty beyond a reasonable doubt of first-degree murder under Virginia Law. Pp. 443 U. S. 324-326.

580 F.2d 1048, affirmed.

STEWART, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, in which BURGER, C.J., and REHNQUIST, J., joined, *post* p 443 U. S. 326. POWELL, J., took no part in the consideration or decision of the case.

Page 443 U. S. 309

MR. JUSTICE STEWART delivered the opinion of the Court.

The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship,*397 U. S. 358. The question in this case is what standard is to be applied in a federal habeas corpus proceeding when the claim is made that a person has been convicted in a state court upon insufficient evidence.

# I

The petitioner was convicted after a bench trial in the Circuit Court of Chesterfield County, Va., of the first-degree murder of a woman named Mary Houston Cole. [Footnote 1] Under Virginia law, murder is defined as "the unlawful killing of another with malice aforethought." *Stapleton v. Commonwealth,* 123 Va. 825, 96 S.E. 801. Premeditation, or specific intent to kill, distinguishes murder in the first from murder in the second degree; proof of this element is essential to conviction of the former offense, and the burden of proving it clearly rests with the prosecution. *Shiflett v. Commonwealth,* 143 Va. 609, 130 S.E. 777; *Jefferson v. Commonwealth,* 214 Va. 432, 201 S.E.2d 749.

That the petitioner had shot and killed Mrs. Cole was not in dispute at the trial. The State's evidence established that

Page 443 U. S. 310

she had been a member of the staff at the local county jail, that she had befriended him while he was imprisoned there on a disorderly conduct charge, and that, when he was released, she had arranged for him to live in the home of her son and daughter-in-law. Testimony by her relatives indicated that, on the day of the killing, the petitioner had been drinking and had spent a great deal of time shooting at targets with his revolver. Late in the afternoon, according to their testimony, he had unsuccessfully attempted to talk the victim into driving him to North Carolina. She did drive the petitioner to a local

diner. There the two were observed by several police officers, who testified that both the petitioner and the victim had been drinking. The two were observed by a deputy sheriff as they were preparing to leave the diner in her car. The petitioner was then in possession of his revolver, and the sheriff also observed a kitchen knife in the automobile. The sheriff testified that he had offered to keep the revolver until the petitioner sobered up, but that the latter had indicated that this would be unnecessary, since he and the victim were about to engage in sexual activity.

Her body was found in a secluded church parking lot a day and a half later, naked from the waist down, her slacks beneath her body. Uncontradicted medical and expert evidence established that she had been shot twice at close range with the petitioner's gun. She appeared not to have been sexually molested. Six cartridge cases identified as having been fired from the petitioner's gun were found near the body.

After shooting Mrs. Cole, the petitioner drove her car to North Carolina, where, after a short trip to Florida, he was arrested several days later. In a post-arrest statement, introduced in evidence by the prosecution, the petitioner admitted that he had shot the victim. He contended, however, that the shooting had been accidental. When asked to describe his condition at the time of the shooting, he indicated that he had not been drunk, but had been "pretty high." His

[Page 443 U. S. 311](#)

story was that the victim had attacked him with a knife when he resisted her sexual advances. He said that he had defended himself by firing a number of warning shots into the ground, and had then reloaded his revolver. The victim, he said, then attempted to take the gun from him, and the gun "went off" in the ensuing struggle. He said that he fled without seeking help for the victim because he was afraid. At the trial, his position was that he had acted in self-defense. Alternatively, he claimed that, in any event, the State's own evidence showed that he had been too intoxicated to form the specific intent necessary under Virginia law to sustain a conviction of murder in the first degree. [[Footnote 2](#)]

The trial judge, declaring himself convinced beyond a reasonable doubt that the petitioner had committed first-degree murder, found him guilty of that offense. [[Footnote 3](#)] The petitioner's motion to set aside the judgment as contrary to the evidence was denied, and he was sentenced to serve a term of 30 years in the Virginia state

penitentiary. A petition for writ of error to the Virginia Supreme Court on the ground that the evidence was insufficient to support the conviction was denied. [Footnote 4]

Page 443 U. S. 312

The petitioner then commenced this habeas corpus proceeding in the United States District Court for the Eastern District of Virginia, raising the same basic claim. [Footnote 5] Applying the "no evidence" criterion of *Thompson v. Louisville,*362 U. S. 199, the District Court found the record devoid of evidence of premeditation, and granted the writ. The Court of Appeals for the Fourth Circuit reversed the judgment. [Footnote 6] The court noted that a dissent from the denial of certiorari in a case in this Court had exposed the question whether the constitutional rule of *In re Winship,*397 U. S. 358, might compel a new criterion by which the validity of a state criminal conviction must be tested in a federal habeas corpus proceeding. *See Freeman v. Zahradnick,* 429 U.S. 1111 (dissent from denial of certiorari). But the appellate court held that, in the absence of further guidance from this Court, it would apply the same "no evidence" criterion of *Thompson v. Louisville* that the District Court had adopted. The court was of the view that some evidence that the petitioner had intended to kill the victim could be found in the facts that the petitioner had reloaded his gun after firing warning shots, that he had had time to do so, and that the victim was then shot not once, but twice. The court also concluded that the state trial judge could have found that the petitioner was not so intoxicated as to be incapable of premeditation.

We granted certiorari to consider the petitioner's claim that, under *In re Winship, supra,* a federal habeas corpus court must

Page 443 U. S. 313

consider not whether there was any evidence to support a state court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt. 439 U.S. 1001.

## II

Our inquiry in this case is narrow. The petitioner has not seriously questioned any aspect of Virginia law governing the allocation of the burden of production or persuasion in a murder trial. *See Mullaney v. Wilbur,*421 U. S. 684; *Patterson v. New York,*432 U. S. 197. As the record demonstrates, the judge, sitting as factfinder in the petitioner's

trial, was aware that the State bore the burden of establishing the element of premeditation, and stated that he was applying the reasonable doubt standard in his appraisal of the State's evidence. The petitioner, moreover, does not contest the conclusion of the Court of Appeals that, under the "no evidence" rule of *Thompson v. Louisville, supra,* his conviction of first-degree murder is sustainable. And he has not attacked the sufficiency of the evidence to support a conviction of second-degree murder. His sole constitutional claim, based squarely upon *Winship,* is that the District Court and the Court of Appeals were in error in not recognizing that the question to be decided in this case is whether any rational factfinder could have concluded beyond a reasonable doubt that the killing for which the petitioner was convicted was premeditated. The question thus raised goes to the basic nature of the constitutional right recognized in the *Winship* opinion.

## III

### A

This is the first of our cases to expressly consider the question whether the due process standard recognized in *Winship* constitutionally protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion

Page 443 U. S. 314

that every element of the crime has been established beyond a reasonable doubt. Upon examination of the fundamental differences between the constitutional underpinnings of *Thompson v. Louisville, supra,* and of *In re Winship, supra,* the answer to that question, we think, is clear.

It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process. *Cole v. Arkansas,* 333 U. S. 196, 333 U. S. 201; *Presnell v. Georgia,* 439 U. S. 14. These standards no more than reflect a broader premise that has never been doubted in our constitutional system: that a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend. *E.g., Hovey v. Elliott,* 167 U. S. 409, 167 U. S. 416-420. *Cf. Boddie v. Connecticut,* 401 U. S. 371, 401 U. S. 377-379. A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, we held in

the *Thompson* case that a conviction based upon a record wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally infirm. *See also Vachon v. New Hampshire,* 414 U. S. 478; *Adderley v. Florida,* 385 U. S. 39; *Gregory v. Chicago,* 394 U. S. 111; *Douglas v. Buder,* 412 U. S. 430. The "no evidence" doctrine of *Thompson v. Louisville* thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty.

The Court in *Thompson* explicitly stated that the due process right at issue did not concern a question of evidentiary "sufficiency." 362 U.S. at 362 U. S. 199. The right established in *In re Winship,* however, clearly stands on a different footing. *Winship* involved an adjudication of juvenile delinquency made by a judge under a state statute providing that the prosecution must prove the conduct charged as delinquent -- which in *Winship* would have been a criminal offense if engaged in by an adult -- by a preponderance of the evidence.

Page 443 U. S. 315

Applying that standard, the judge was satisfied that the juvenile was "guilty," but he noted that the result might well have been different under a standard of proof beyond a reasonable doubt. In short, the record in *Winship* was not totally devoid of evidence of guilt.

The constitutional problem addressed in *Winship* was thus distinct from the stark problem of arbitrariness presented in *Thompson v. Louisville.* In *Winship,* the Court held for the first time that the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 397 U. S. 364. In so holding, the Court emphasized that proof beyond a reasonable doubt has traditionally been regarded as the decisive difference between criminal culpability and civil liability. *Id.* at 397 U. S. 358-362. *See Davis v. United States,* 160 U. S. 469; *Brinegar v. United States,* 338 U. S. 160, 338 U. S. 174; *Leland v. Oregon,* 343 U. S. 790; 9 J. Wigmore, Evidence § 2495, pp. 307-308 (3d ed.1940). *Cf. Woodby v. INS,* 385 U. S. 276, 385 U. S. 285. The standard of proof beyond a reasonable doubt, said the Court, "plays a vital role in the American scheme of criminal procedure," because it operates to give "concrete substance" to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding. 397 U.S. at 397 U. S. 363. At the same time, by impressing upon

the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction, and thus to liberty itself. *Id.* at [397 U. S. 372](#) (Harlan, J., concurring).

The constitutional standard recognized in the *Winship* case was expressly phrased as one that protects an accused against a conviction except on "proof beyond a reasonable doubt. . . ." In subsequent cases discussing the reasonable doubt standard, we have never departed from this definition of the rule, or from

Page 443 U. S. 316

the *Winship* understanding of the central purposes it serves. *See, e.g., Ivan v. v. City of New York,*[407 U. S. 203](#), [407 U. S. 204](#); *Lego v. Twomey,*[404 U. S. 477](#), [404 U. S. 486](#)-487; *Mullaney v. Wilbur,*[421 U. S. 684](#); *Patterson v. New York,*[432 U. S. 197](#); *Cool v. United States,*[409 U. S. 100](#), [409 U. S. 104](#). In short, *Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.

*B*

Although several of our cases have intimated that the factfinder's application of the reasonable doubt standard to the evidence may present a federal question when a state conviction is challenged, *Lego v. Twomey, supra* at [404 U. S. 487](#); *Johnson v. Louisiana,*[406 U. S. 356](#), [406 U. S. 360](#), the Federal Courts of Appeals have generally assumed that, so long as the reasonable doubt instruction has been given at trial, the no-evidence doctrine of *Thompson v. Louisville* remains the appropriate guide for a federal habeas corpus court to apply in assessing a state prisoner's challenge to his conviction as founded upon insufficient evidence. *See, e.g., Cunha v. Brewer,*511 F.2d 894 (CA8). [[Footnote 7](#)] We cannot agree.

The *Winship* doctrine requires more than simply a trial

Page 443 U. S. 317

ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence.

[Footnote 8] A "reasonable doubt," at a minimum, is one based upon "reason." [Footnote 9] Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury. In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction. *Glasser v. United States,* 315 U. S. 60, 315 U. S. 80; *Bronston v. United States,* 409 U. S. 352. *See also, e.g., Curley v. United States,* 81 U.S.App.D.C. 389, 392-393, 160 F.2d 229, 232-233. [Footnote 10] Under *Winship,* which established

Page 443 U. S. 318

proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that, when such a conviction occurs in a state trial, it cannot constitutionally stand.

A federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court. For example, on direct review of a state court conviction, where the claim is made that an involuntary confession was used against the defendant, this Court reviews the facts to determine whether the confession was wrongly admitted in evidence. *Blackburn v. Alabama,* 361 U. S. 199, 361 U. S. 205-210. *Cf. Drope v. Missouri,* 420 U. S. 162, 420 U. S. 174-175, and n. 10. The same duty obtains in federal habeas corpus proceedings. *See Townsend v. Sain,* 372 U. S. 293, 372 U. S. 318; *Brown v. Allen,* 344 U. S. 443, 344 U. S. 506-507 (opinion of Frankfurter, J.).

After *Winship,* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. [Footnote 11] But this inquiry does not require a court to "ask

Page 443 U. S. 319

itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS,* 385 U.S. at 385 U. S. 282 (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Johnson v. Louisiana,* 406 U.S.

at [406 U. S. 362](). This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that, upon judicial review, *all of the evidence* is to be considered in the light most favorable to the prosecution. [[Footnote 12]]() The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law. [[Footnote 13]]()

[Page 443 U. S. 320]()

That the *Thompson* "no evidence" rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt is readily apparent. "[A] mere modicum of evidence may satisfy a *no evidence' standard. . . ."* Jacobellis v. Ohio,[378 U. S. 184](), [378 U. S. 202]() (Warren, C.J., dissenting). *Any evidence that is relevant -- that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence, cf. Fed.Rule Evid. 401 -- could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could, by itself, rationally support a conviction beyond a reasonable doubt. The Thompson doctrine simply fails to supply a workable or even a predictable standard for determining whether the due process command of Winship has been honored.* [[Footnote 14]]()

*C*

Under 28 U.S.C. § 2254, a federal court must entertain a claim by a state prisoner that he or she is being held in "custody in violation of the Constitution or laws or treaties of the

[Page 443 U. S. 321]()

United States." Under the *Winship* decision, it is clear that a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim. Thus, assuming that state remedies have been exhausted, *see* 28 U.S.C. § 2254(b), and that no independent and adequate state ground stands as a bar, *see Estelle v. Williams,*[425 U. S. 501](); *Francis v. Henderson,*[425 U. S. 536]();*Wainwright v. Sykes,*[433 U. S. 72](); *Fay v. Noia,*[372 U. S.

391, 372 U. S. 438, it follows that such a claim is cognizable in a federal habeas corpus proceeding. The respondents have argued, nonetheless, that a challenge to the constitutional sufficiency of the evidence should not be entertained by a federal district court under 28 U.S.C. § 2254.

In addition to the argument that a *Winship* standard invites replication of state criminal trials in the guise of § 2254 proceedings -- an argument that simply fails to recognize that courts can and regularly do gauge the sufficiency of the evidence without intruding into any legitimate domain of the trier of fact -- the respondents have urged that any departure from the *Thompson* test in federal habeas corpus proceedings will expand the number of meritless claims brought to the federal courts, will duplicate the work of the state appellate courts, will disserve the societal interest in the finality of state criminal proceedings, and will increase friction between the federal and state judiciaries. In sum, counsel for the State urges that this type of constitutional claim should be deemed to fall within the limit on federal habeas corpus jurisdiction identified in *Stone v. Powell,*428 U. S. 465, with respect to Fourth Amendment claims. We disagree.

First, the burden that is likely to follow from acceptance of the *Winship* standard has, we think, been exaggerated. Federal court challenges to the evidentiary support for state convictions have, since *Thompson,* been dealt with under § 2254. *E.g., Freeman v. Stone,* 444 F.2d 113 (CA9); *Grieco v.*

Page 443 U. S. 322

*Meachum,* 533 F.2d 713 (CA1); *Williams v. Peyton,* 414 F.2d 776 (CA4). A more stringent standard will expand the contours of this type of claim, but will not create an entirely new class of cases cognizable on federal habeas corpus. Furthermore, most meritorious challenges to constitutional sufficiency of the evidence undoubtedly will be recognized in the state courts, and, if the state courts have fully considered the issue of sufficiency, the task of a federal habeas court should not be difficult. *Cf. Brown v. Allen,* 344 U.S. at 344 U. S. 463. [Footnote 15] And this type of claim can almost always be judged on the written record, without need for an evidentiary hearing in the federal court.

Second, the problems of finality and federal-state comity arise whenever a state prisoner invokes the jurisdiction of a federal court to redress an alleged constitutional violation. A challenge to a state conviction brought on the ground that the evidence

cannot fairly be deemed sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim. Although state appellate review undoubtedly will serve in the vast majority of cases to vindicate the due process protection that follows from *Winship,* the same could also be said of the vast majority of other federal constitutional rights that may be implicated in a state criminal trial. It is the occasional abuse that the federal writ of habeas corpus stands ready to correct. *Brown v. Allen, supra* at 344 U. S. 498-501 (opinion of Frankfurter, J.).

Page 443 U. S. 323

The respondents have argued nonetheless that, whenever a person convicted in a state court has been given a "full and fair hearing" in the state system -- meaning in this instance state appellate review of the sufficiency of the evidence -- further federal inquiry -- apart from the possibility of discretionary review by this Court -- should be foreclosed. This argument would prove far too much. A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is, of course, entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress, in § 2254, has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. *See* 28 U.S.C. §§ 2254(b), (d). What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur -- reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right is not one that can be so lightly abjured.

The constitutional issue presented in this case is far different from the kind of issue that was the subject of the Court's decision in *Stone v. Powell, supra.* The question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence. The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless. *E.g., Mullaney v. Wilbur,* 421 U.S. at 421 U. S. 697-698 (requirement of proof beyond a reasonable doubt is not "limit[ed] to those facts which, if not proved, would wholly exonerate" the accused). Under our system of criminal justice, even a thief

Page 443 U. S. 324

is entitled to complain that he has been unconstitutionally convicted and imprisoned as a burglar.

We hold that, in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 -- if the settled procedural prerequisites for such a claim have otherwise been satisfied -- the applicant is entitled to habeas corpus relief if it is found that, upon the record evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. [Footnote 16]

## IV

Turning finally to the specific facts of this case, we reject the petitioner's claim that, under the constitutional standard dictated by *Winship,* his conviction of first-degree murder cannot stand. A review of the record in the light most favorable to the prosecution convinces us that a rational factfinder could readily have found the petitioner guilty beyond a reasonable doubt of first-degree murder under Virginia law.

There was no question at the trial that the petitioner had fatally shot Mary Cole. The crucial factual dispute went to the sufficiency of the evidence to support a finding that he had specifically intended to kill her. This question, as the Court of Appeals recognized, must be gauged in the light of applicable Virginia law defining the element of premeditation. Under that law, it is well settled that premeditation need not exist for any particular length of time, and that an intent to kill may be formed at the moment of the commission of the unlawful act. *Commonwealth v. Brown,* 90 Va. 671, 19 S.E. 447. From the circumstantial evidence in the record, it is

Page 443 U. S. 325

clear that the trial judge could reasonably have found beyond a reasonable doubt that the petitioner did possess the necessary intent at or before the time of the killing.

The prosecution's uncontradicted evidence established that the petitioner shot the victim not once, but twice. The petitioner himself admitted that the fatal shooting had occurred only after he had first fired several shots into the ground and then reloaded his gun. The evidence was clear that the two shots that killed the victim were fired at close, and thus predictably fatal, range by a person who was experienced in the use of the murder

weapon. Immediately after the shooting, the petitioner drove without mishap from Virginia to North Carolina, a fact quite at odds with his story of extreme intoxication. Shortly before the fatal episode, he had publicly expressed an intention to have sexual relations with the victim. Her body was found partially unclothed. From these uncontradicted circumstances, a rational factfinder readily could have inferred beyond a reasonable doubt that the petitioner, notwithstanding evidence that he had been drinking on the day of the killing, did have the capacity to form and had in fact formed an intent to kill the victim.

The petitioner's calculated behavior both before and after the killing demonstrated that he was fully capable of committing premeditated murder. His claim of self-defense would have required the trial judge to draw a series of improbable inferences from the basic facts, prime among them the inference that he was wholly uninterested in sexual activity with the victim, but that she was so interested as to have willingly removed part of her clothing and then attacked him with a knife when he resisted her advances, even though he was armed with a loaded revolver that he had just demonstrated he knew how to use. It is evident from the record that the trial judge found this story, including the petitioner's belated contention that he had been so intoxicated as to be incapable of premeditation, incredible.

Page 443 U. S. 326

Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. That theory the Court has rejected in the past. *Holland v. United States,* 348 U. S. 121, 348 U. S. 140. We decline to adopt it today. Under the standard established in this opinion as necessary to preserve the due process protection recognized in *Winship,* a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. Applying these criteria, we hold that a rational trier of fact could reasonably have found that the petitioner committed murder in the first degree under Virginia law.

For these reasons, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

[Footnote 1]

The degrees of murder in Virginia are specified in Va.Code § 18.2-32 (1975) as follows:

"Murder, other than capital murder, by poison, lying in wait, imprisonment, starving, or by any willful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery, burglary or abduction . . . is murder of the first degree, punishable as a Class 2 felony."

"All murder other than capital murder and murder in the first degree is murder of the second degree and is punishable as a Class 3 felony."

Class 2 felonies carry a term of 20 years to life. § 18.2-10(b) (1975). The sentence for Class 3 felonies can range from 5 to 20 years, § 18.2-10(c). Murder itself takes its definition in Virginia from the common law. *Stapleton v. Commonwealth,* 123 Va. 825, 96 S.E. 801.

[Footnote 2]

Under Virginia law, voluntary intoxication -- although not an affirmative defense to second-degree murder -- is material to the element of premeditation, and may be found to have negated it. *Hatcher v. Commonwealth,* 218 Va. 811, 241 S.E.2d 756.

[Footnote 3]

When trial without a jury is had on a not guilty plea in Virginia, the court is to "have and exercise all the powers, privileges and duties given to juries. . . ." Va.Code § 19.2-257 (1975).

[Footnote 4]

There is no appeal as of right from a criminal conviction in Virginia. *Saunders v. Reynolds,* 214 Va. 697, 204 S.E.2d 421. Each petition for writ of error under Va.Code § 19.2-317 (1975) is reviewed on the merits, however, and the effect of a denial is to affirm the judgment of conviction on the merits. *Saunders v. Reynolds, supra.*

The petition for writ of error alleged that

"the trial Court erred in finding the Petitioner guilty of first-degree murder in light of the evidence introduced on behalf of the Commonwealth, and on unwarranted inferences drawn from this evidence."

The petitioner contended that an affirmance would violate the Due Process Clause of the Fourteenth Amendment. In its order denying Jackson's petition, the Virginia Supreme Court stated it was "of [the] opinion that there is no reversible error in the judgment complained of. . . ." Virginia law requires sufficiency claims to be raised on direct appeal; such a claim may not be raised in a state habeas corpus proceeding. *Pettus v. Peyton,* 207 Va. 906, 153 S.E.2d 278.

[Footnote 5]

The District Court correctly found that the petitioner had exhausted his state remedies on this issue. *See*n 4, *supra.*

[Footnote 6]

The opinions of the District Court and the Court of Appeals are not reported. The Court of Appeals' judgment order is reported at 580 F.2d 1048.

[Footnote 7]

The Court of Appeals in the present case, of course, recognized that *Winship* may have changed the constitutional standard in federal habeas corpus. And the Court of Appeals for the Sixth Circuit recently recognized the possible impact of *Winship* on federal habeas corpus in a case in which it held that "a rational trier of fact could have found the defendant . . . guilty beyond a reasonable doubt."*Spruytte v. Koehler, affirmance order,* 590 F.2d 335. An even more recent case in that court provoked a lively debate among three of its members regarding the effect of *Winship* upon federal habeas corpus. The writ was granted in that case, even though the trial record concededly contained "some evidence" of the applicant's guilt. *See Speigner v. Jago,* 603 F.2d 1208.

[Footnote 8]

The trier of fact in this case was a judge, and not a jury. But this is of no constitutional significance. The record makes clear that the judge deemed himself "properly instructed."

[Footnote 9]

A "reasonable doubt" has often been described as one "based on reason which arises from the evidence or lack of evidence." *Johnson v. Louisiana,*406 U. S. 356, 406 U. S. 360 (citing cases). For a discussion of variations in the definition used in jury instructions, *see Holland v. United States,*348 U. S. 121, 348 U. S. 140 (rejecting contention that circumstantial evidence must exclude every hypothesis but that of guilt).

[Footnote 10]

This, of course, does not mean that convictions are frequently reversed upon this ground. The practice in the federal courts of entertaining properly preserved challenges to evidentiary sufficiency, *see* Fed.Rule Crim.Proc. 29, serves only to highlight the traditional understanding in our system that the application of the "beyond a reasonable doubt" standard to the evidence is not irretrievably committed to jury discretion. To be sure, the factfinder in a criminal case has traditionally been permitted to enter an unassailable but unreasonable verdict of "not guilty." This is the logical corollary of the rule that there can be no appeal from a judgment of acquittal, even if the evidence of guilt is overwhelming. The power of the factfinder to err upon the side of mercy, however, has never been thought to include a power to enter an unreasonable verdict of guilty. *Carpenters & Joiners v. United States,*330 U. S. 395, 330 U. S. 408. *Cf. Capital Traction Co. v. Hof,*174 U. S. 1, 174 U. S. 13-14. Any such premise is wholly belied by the settled practice of testing evidentiary sufficiency through a motion for judgment of acquittal and a post-verdict appeal from the denial of such a motion.*See generally* 4 L. Orfield, Criminal Procedure Under the Federal Rules §§ 29:1-29:29 (1967 and Supp. 1978).

[Footnote 11]

Until 1972, the Court of Appeals for the Second Circuit took the position advanced today by the opinion concurring in the judgment that the "beyond a reasonable doubt" standard is merely descriptive of the state of mind required of the factfinder in a criminal case, and not of the actual quantum and quality of proof necessary to support a criminal conviction. Thus, that court held that, in a jury trial, the judge need not distinguish between criminal and civil cases for the purpose of ruling on a motion for judgment of acquittal. *United States v. Feinberg,* 140 F.2d 592, 594. In *United States v. Taylor,* 464 F.2d 240 (CA2), *Feinberg* was overruled, partly on the strength

of *Winship.* The *Taylor* court adopted the directed verdict criterion articulated in *Curley v. United States,* 81 U.S.App.D.C. 389, 392-393, 160 F.2d 229, 232-233 (If "reasonable" jurors "must necessarily have . . . a reasonable doubt" as to guilt, the judge "must require acquittal, because no other result is permissible within the fixed bounds of jury consideration"). This is now the prevailing criterion for judging motions for acquittal in federal criminal trials. *See generally* 2 C. Wright, Federal Practice and Procedure § 467 (1969 and Supp. 1978).

[Footnote 12]

Contrary to the suggestion in the opinion concurring in the judgment, the criterion announced today as the constitutional minimum required to enforce the due process right established in *Winship* is not novel. *See, e.g., United States v. Amato,* 495 F.2d 545, 549 (CA5) ("whether, taking the view [of the evidence] most favorable to the Government, a *reasonably minded jury* could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt") (emphasis added); *United States v. Jorgenson,* 451 F.2d 516, 521 (CA10) (whether, "considering the evidence in the light most favorable to the government, there is substantial evidence from which a jury might *reasonably find* that an accused is guilty beyond a reasonable doubt") (emphasis added). *Glasser v. United States,* 315 U. S. 60, 315 U. S. 80, has universally been understood as a case applying this criterion. *See, e.g., Harding v. United States,* 337 F.2d 254, 256 (CA8). *See generally* 4 Orfield, *supra,* n 10, § 29.28.

[Footnote 13]

The question whether the evidence is constitutionally sufficient is, of course, wholly unrelated to the question of how rationally the verdict was actually reached. Just as the standard announced today does not permit a court to make its own subjective determination of guilt or innocence, it does not require scrutiny of the reasoning process actually used by the factfinder -- if known. *See generally* 3 F. Wharton, Criminal Procedure § 520 (12th ed.1975 and Supp. 1978).

[Footnote 14]

Application of the *Thompson* standard to assess the validity of a criminal conviction after *Winship* could lead to absurdly unjust results. Our cases have indicated that failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never

be harmless error. *See Cool v. United States,*409 U. S. 100. *Cf. Taylor v. Kentucky,*436 U. S. 478. Thus, a defendant whose guilt was actually proved by overwhelming evidence would be denied due process if the jury was instructed that he could be found guilty on a mere preponderance of the evidence. Yet a defendant against whom there was but one slender bit of evidence would not be denied due process so long as the jury has been properly instructed on the prosecution's burden of proof beyond a reasonable doubt. Such results would be wholly faithless to the constitutional rationale of *Winship.*

[Footnote 15]

The Virginia Supreme Court's order denying Jackson's petition for writ of error does not make clear what criterion was applied to the petitioner's claim that the evidence in support of his first-degree murder conviction was insufficient. *See*n 4, *supra.* At oral argument, counsel for the petitioner contended that the Virginia sufficiency standard is not keyed to *Winship.* Counsel for the State disagreed. Under these circumstances, we decline to speculate as to the criterion that the state court applied. The fact that a state appellate court invoked the proper standard, however, although entitled to great weight, does not totally bar a properly presented claim of this type under § 2254.

[Footnote 16]

The respondents have suggested that this constitutional standard will invite intrusions upon the power of the States to define criminal offenses. Quite to the contrary, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Whether the State could constitutionally make the conduct at issue criminal at all is, of course, a distinct question. *See Papachristou v. Jacksonville,*405 U. S. 156; *Robinson v. California,*370 U. S. 660.

MR. JUSTICE STEVENS, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in the judgment.

The Constitution prohibits the criminal conviction of any person except upon proof *sufficient to convince the trier of fact* of guilt beyond a reasonable doubt. *Cf. ante* at 443 U. S. 309. This rule has prevailed in our courts "at least from our early years as a Nation." *In re Winship,*397 U. S. 358, 397 U. S. 361.

Today the Court creates a new rule of law -- one that has never prevailed in our jurisprudence. According to the Court, the Constitution now prohibits the criminal conviction of any person -- including, apparently, a person against whom the facts have already been found beyond a reasonable doubt by a jury, a trial judge, and one or more levels of state appellate judges -- except upon proof sufficient to convince a *federal*

Page 443 U. S. 327

*judge* that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Ante* at 443 U. S. 319.

The adoption of this novel constitutional rule is not necessary to the decision of this case. Moreover, I believe it is an unwise act of lawmaking. Despite its chimerical appeal as a new counterpart to the venerable principle recognized in *Winship,* I am persuaded that its precipitous adoption will adversely affect the quality of justice administered by federal judges. For that reason, I shall analyze this new brainchild with some care.

I shall begin by explaining why neither the record in this case nor general experience with challenges to the sufficiency of the evidence supporting criminal convictions supports, much less compels, the conclusion that there is *any* need for this new constitutional precept. I shall next show that it is not logically compelled by either the holding or the analysis in *In re Winship, supra.* Finally, I shall try to demonstrate why the Court's new rule -- if it is not just a meaningless shibboleth -- threatens serious harm to the quality of our judicial system.

# I

It is, of course, part of this Court's tradition that new rules of law emerge from the process of case-by-case adjudication of constitutional issues. Widespread concern that existing constitutional doctrine is unjust often provides the occasion, and is sometimes even relied upon as a justification, for the exercise of such lawmaking authority by the Court. Without entering the debate over the legitimacy of this justification for judicial action, it is at least certain that it should not be the basis for dramatic -- indeed, for *any* -- constitutional lawmaking efforts unless (1) those efforts are necessary to the decision of the case at hand and (2) powerful reasons favor a change in the law. *See Ashwander v. TVA,* 297 U. S. 288, 297 U. S. 345-348 (Brandeis, J., concurring).

Page 443 U. S. 328

In this case, the Court's analysis fails on both counts. It has accordingly formulated a new constitutional principle under the most dangerous possible circumstances -- *i.e.,* where the exercise of judicial authority is neither necessitated nor capable of being limited by "the precise facts to which [the rule is originally] to be applied," *Liverpool, N.Y. & P. S.S. Co. v. Emigration Comm'rs,* 113 U. S. 33, 113 U. S. 39, nor even by some broader set of identifiable experiences with the evil supposedly involved.

Most significantly, the Court has announced its new constitutional edict in a case in which it has absolutely no bearing on the outcome. The only factual issue at stake is whether petitioner intended to kill his victim. If the evidence is viewed "in the light most favorable to the prosecution," ante, at 443 U. S. 319 -- and, indeed, we may view it through the eyes of the actual factfinder, whose observations about the evidence are recorded in the trial transcript -- there can be only one answer to that question no matter *what* standard of appellate review is applied. In 443 U. S. the Court accepts this conclusion. There is, therefore, no need to fashion a broad new rule of constitutional law to dispose of this squalid but rather routine murder case. Under any view, the evidence is sufficient.

The Court's new rule is adopted simply to forestall some hypothetical evil that has not been demonstrated and, in my view, is not fairly demonstrable. Although the Judiciary has received its share of criticism -- principally because of the delays and costs associated with litigation -- I am aware of no general dissatisfaction with the accuracy of the factfinding process or the adequacy of the rules applied by state appellate courts when reviewing claims of insufficiency.

What little evidence the Court marshals in favor of a contrary conclusion is unconvincing. *See ante* at 443 U. S. 317-318 n. 10. The Court is simply incorrect in implying that there are a significant number of occasions when federal convictions are

Page 443 U. S. 329

overturned on appeal because no rational trier of fact could have found guilt beyond a reasonable doubt. The two opinions of this Court cited *ante* at 443 U. S. 317 stand for no such proposition. In neither was a conviction reversed for insufficiency. *See Glasser v. United States,* 315 U. S. 60; *Bronston v. United States,* 409 U. S. 352.

Moreover, a study of the 127 federal criminal convictions that were reviewed by the various Courts of Appeals and reported in the most recent hardbound volume of the Federal Reporter, Second Series, Volume 589, reveals that only 3 were overturned on sufficiency grounds. And of those, one was overturned under a "no evidence" standard, while the other two, in which a total of only 3 out of 36 counts were actually reversed, arguably involved legal issues masquerading as sufficiency questions. [Footnote 2/1] It is difficult to believe that the federal courts will turn up more sufficiency problems than this on habeas review when, instead of acting as the first level of

Page 443 U. S. 330

review, as in the cases studied, they will be acting as the second, third, or even fourth level of appellate review. In short, there is simply no reason to tinker with an elaborate mechanism that is now functioning well.

## II

There is nothing in the facts of this case or, so far as the Court has demonstrated, in those of cases like it to warrant today's excursion into constitutional rulemaking. The Court instead portrays its rule as the logical corollary of the principle recognized in *Winship* regarding the subjective state of mind that persons charged with the responsibility of evaluating the credibility of evidence must possess before they find the defendant guilty in a criminal case. But an examination of *Winship* reveals that it has nothing to do with appellate, much less habeas corpus, review standards; that the reasoning used in that case to reach its conclusion with respect to the trier of fact does not support, and indeed counsels against, the Court's conclusion with respect to federal habeas judges; and that there is no necessary connection between the rule recognized in *Winship* and the rule invented by the Court today.

In distinct contrast to the circumstances of this case, the facts of *Winship* presented

"a case where the choice of the standard of proof has made a difference: the [trial] judge below forthrightly acknowledged that he believed by a preponderance of the evidence [in], but was not convinced beyond a reasonable doubt"

of, the juvenile's guilt. 397 U.S. at 397 U. S. 369 (Harlan, J., concurring). Because the trier of fact entertained such a doubt, this Court held that the juvenile was constitutionally entitled to the same verdict that an adult defendant in a criminal case

would receive. In so holding, the Court merely extended to juveniles a protection that had traditionally been available to defendants in criminal trials in this Nation. *Id.* at 397 U. S. 361.

But nothing in the *Winship* opinion suggests that it also

Page 443 U. S. 331

bore on appellate or habeas corpus procedures. Although it repeatedly emphasized the function of the reasonable doubt standard as describing the requisite "subjective state of certitude" of the "*factfinder,*" [Footnote 2/2] it never mentioned the question of how appellate judges are to know whether the trier of fact really was convinced beyond a reasonable doubt, or, indeed, whether the factfinder was a "rational" person or group of persons.

Moreover, the mode of analysis employed in *Winship* finds no counterpart in the Court's opinion in this case. For example, in *Winship,*the Court pointed out the breadth of both the historical and the current acceptance of the reasonable doubt *trial* standard. [Footnote 2/3] In this case, by contrast, the Court

Page 443 U. S. 332

candidly recognizes that the Federal Courts of Appeals have "generally" *rejected* the habeas standard that it adopts today. *Ante* at 443 U. S. 316. [Footnote 2/4]

The *Winship* court relied on nine prior opinions of this Court that bore directly on the issue presented. 397 U.S. at 397 U. S. 362. Here, the Court purportedly relies on two prior decisions, but as is pointed out *supra* at 443 U. S. 329, neither of these cases itself applied a "reasonable doubt" appellate standard to overturn a conviction, neither purported to be interpreting the Constitution, and neither expressed any view whatsoever on the appropriate standard in collateral proceedings such as are involved in this case. [Footnote 2/5] As the Court itself notes, we have instead repeatedly endorsed the "no evidence" test, and have continued to do so after *Winship* was decided. *Vachon v.*

Page 443 U. S. 333

*New Hampshire,*414 U. S. 478; *Douglas v. Buder,*412 U. S. 430; *Gregory v. Chicago,*394 U. S. 111; *Adderley v. Florida,*385 U. S. 39; *Thompson v. Louisville,*362 U. S. 199. *See also Clyatt v. United States,*197 U. S. 207, 197 U. S. 222.

The primary reasoning of the Court in *Winship* is also inapplicable here. The Court noted in that case that the reasonable doubt standard has the desirable effect of significantly reducing the risk of an inaccurate factfinding, and thus of erroneous convictions, as well as of instilling confidence in the criminal justice system. 397 U.S. at 397 U. S. 363-364. *See also id.* at 397 U. S. 370-372 (Harlan, J., concurring). In this case, however, it would be impossible (and the Court does not even try) to demonstrate that there is an appreciable risk that a factfinding made by a jury beyond a reasonable doubt, and twice reviewed by a trial judge in ruling on directed verdict and post-trial acquittal motions and by one or more levels of appellate courts on direct appeal, as well as by two federal habeas courts under the *Thompson* "no evidence" rule, is likely to be erroneous. [Footnote 2/6] Indeed, the very premise of *Winship* is that properly selected judges and properly instructed juries act rationally, that the former will tell the truth when they declare that they are convinced beyond a reasonable doubt, and the latter will conscientiously obey and understand the reasonable doubt instructions they receive before retiring to reach a verdict, and therefore that either factfinder will itself provide the necessary bulwark against erroneous factual determinations. To presume otherwise is to make light of *Winship.* [Footnote 2/7]

Page 443 U. S. 334

Having failed to identify the evil against which the rule is directed, and having failed to demonstrate how it follows from the analysis typically used in due process cases of this character, the Court places all of its reliance on a dry, and in my view incorrect, syllogism: if *Winship* requires the factfinder to apply a reasonable doubt standard, then logic requires a reviewing judge to apply a like standard.

But, taken to its ultimate conclusion, this "logic" would require the reviewing court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Woodby v. INS,*385 U. S. 276, 385 U. S. 282 (emphasis added). The Court, however, rejects this standard, as well as others that might be considered consistent with *Winship.* For example, it does not require the reviewing court to view just the evidence most favorable to the prosecution, and then to decide whether that evidence convinced it beyond a reasonable doubt, nor whether, based on the entire

record, rational triers of fact could be convinced of guilt beyond a reasonable doubt. Instead, and without explanation, it chooses a still narrower standard that merely asks whether,

"after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Ante* at 443 U. S. 319. [Footnote 2/8] It seems to me that, if "logic" allows

Page 443 U. S. 335

this choice after *Winship,* it should also allow the presumption that the Court has rejected -- that trial judges and juries will act rationally and honestly in applying the reasonable doubt standard, at least so long as the trial is free of procedural error and the record contains evidence tending to prove each of the elements of the offense.

Time may prove that the rule the Court has adopted today is the wisest compromise between one extreme that maximizes the protection against the risk that innocent persons will be erroneously convicted and the other extreme that places the greatest faith in the ability of fair procedures to produce just verdicts. But the Court's opinion should not obscure the fact that its new rule is not logically compelled by the analysis or the holding in *Winship* or in any other precedent, or the fact that the rule reflects a new policy choice, rather than the application of a preexisting rule of law.

## III

The Court cautions against exaggerating the significance of its new rule. *Ante* at 443 U. S. 321. It is true that, in practice, there may be little or no difference between a record that does not contain at least some evidence tending to prove every element of an offense and a record containing so little evidence that no rational factfinder could be persuaded of guilt beyond a reasonable doubt. Moreover, I think the Court is quite correct when it acknowledges that "most meritorious challenges to constitutional sufficiency of the evidence undoubtedly will be recognized in the state courts." *Ante* at 443 U. S. 322. But this only means that the new rule will seldom, if ever, provide a convicted state prisoner with any tangible benefits. It does not mean that the rule will have no impact on the administration of justice. On the contrary, I am persuaded that it will be seriously harmful both to the state and federal judiciaries.

Page 443 U. S. 336

The Court indicates that the new standard to be applied by federal judges in habeas corpus proceedings may be substantially the same as the standard most state reviewing courts are already applying. *Ante* at 443 U. S. 322. The federal district courts are therefore being directed simply to duplicate the reviewing function that is now being performed adequately by state appellate courts. In my view, this task may well be inconsistent with the prohibition -- added by Congress to the federal habeas statute in order to forestall undue federal interference with state proceedings, *see Wainwright v. Sykes,*433 U. S. 72, 433 U. S. 80 -- against overturning "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction." 28 U.S.C. 2254(d). *See LaVallee v. Delle Rose,*410 U. S. 690. In any case, to assign a single federal district judge the responsibility of directly reviewing, and inevitably supervising, the most routine work of the highest courts of a State can only undermine the morale and the esteem of the state judiciary -- particularly when the stated purpose of the additional layer of review is to determine whether the State's factfinder is "rational." [Footnote 2/9] Such consequences are intangible, but nonetheless significant.

Page 443 U. S. 337

The potential effect on federal judges is even more serious. Their burdens are already so heavy that they are delegating to staff assistants more and more work that we once expected judges to perform. [Footnote 2/10] The new standard will invite an unknown number of state prisoners to make sufficiency challenges that they would not have made under the old rule. Moreover, because the "rational trier of fact" must certainly base its decisions on all of the evidence, the Court's broader standard may well require that the entire transcript of the state trial be read whenever the factfinders' rationality is challenged under the Court's rule. [Footnote 2/11] Because this task will confront the courts of appeals as well as district courts, it will surely impose countless additional hours of unproductive labor on federal judges and their assistants. [Footnote 2/12] The increasing volume

Page 443 U. S. 338

of work of this character has already led some of our most distinguished lawyers to discontinue or reject service on the federal bench. [Footnote 2/13] The addition of a significant volume

of pointless labor can only impair the quality of justice administered by federal judges, and thereby undermine "the respect and confidence of the community in applications of the . . . law." *In re Winship,* 397 U.S. at 397 U. S. 364.

For these reasons, I am unable to join the Court's gratuitous directive to our colleagues on the federal bench.

[Footnote 2/1]

In *United States v. Tarr,* 589 F.2d 55 (CA1 1978), the court overturned one of two counts of which appellant was convicted because there was insufficient evidence to prove that he had the intent to aid and abet the unauthorized transfer of a machinegun in violation of 26 U.S.C. § 5861(e) and 18 U.S.C. § 2. The court found "no evidence" that appellant had the requisite knowledge. 589 F.2d at 60.

In *United States v. Whetzel,* 191 U.S.App.D.C. 184, 589 F.2d 707 (1978), the court overturned 2 of the 35 counts of appellant's conviction because

"the Government failed to offer proof that would permit a jury to reasonably infer that the merchandise [appellant] transported had a value of $5,000."

*Id.* at 188, 589 F.2d at 711. However, the basis for this determination was that the Government's valuation method, which the trial court allowed the jury to consider, was legally erroneous. Similarly, in *United States v. Fearn,* 589 F.2d 1316 (CA7 1978), the court overturned the conviction based on a federal nonconstitutional rule, which surely would not apply in habeas review of state convictions, "that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Id.* at 1321. The court did not independently analyze whether the uncorroborated confession involved in that case could itself have allowed a rational trier of fact to find guilt beyond a reasonable doubt.

[Footnote 2/2]

In *In re Winship,* 397 U.S. at 397 U. S. 364, the Court stated:

"As we said in *Speiser v. Randall,* [357 U.S. 513,] 357 U. S. 525-526:"

"There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value -- as a criminal defendant his liberty -- this margin of error is reduced as to him by the process of placing on the other party the burden of . . . *persuading the factfinder* at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . .*convincing the factfinder* of his guilt."

"To this end, the reasonable doubt standard is indispensable, for it '*impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue.*' Dorsen & Rezneck, *In Re Gault* and the Future of Juvenile Law, 1 Family Law Quarterly, No. 4, pp. 1, 26 (1967)."

(Emphasis added.)

Later on the same page, the Court added:

"It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense *without convincing a proper factfinder of his guilt with utmost certainty.*"

*Ibid.* (emphasis added). *See also id.* at [397 U. S. 370](#) (Harlan, J., concurring) ("[A] standard of proof represents an attempt to instruct*the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions* for a particular type of adjudication") (emphasis added).

[[Footnote 2/3](#)]

The Court, relying on treatises that analyzed the law in all 50 States as well as in the federal system, determined both that the reasonable doubt standard has prevailed at the *trial* level "at least from our early years as a Nation," and that it

"is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the *trier* of all the essential elements of guilt."

*Id.* at [397 U. S. 361](#) (emphasis added). *See also id.* at [397 U. S. 372](#) (Harlan, J., concurring) ("It is only because of the nearly complete and longstanding acceptance of the reasonable doubt standard by the States in criminal *trials* that the Court has not before today had to hold explicitly that due process, as an expression of fundamental

procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation") (emphasis added).

[Footnote 2/4]

The Court has undertaken no systematic analysis of the standards for reviewing the sufficiency of the evidence that prevail either in state habeas corpus and other collateral proceedings or in state appellate courts. What sources I have discovered suggest that "varied standards" are in use, and that each is "subject to shifting and elastic definitions." Winningham, The Dilemma of the Directed Acquittal, 15 Vand.L.Rev. 699, 705-706 (1962). *See* ALI Code of Criminal Procedure, Commentary on § 321, pp. 961-962 (1930); Rules of Criminal Procedure 481(c), 522(a) and commentary, 10 U.L.A. (1974).

[Footnote 2/5]

It hardly bears repeating that habeas corpus is not intended as a substitute for appeal, nor as a device for reviewing the merits of guilt determinations at criminal trials. *See generally Stone v. Powell,*428 U. S. 465. Instead, it is designed to guard against extreme malfunctions in the state criminal justice systems.

[Footnote 2/6]

As I discuss earlier, *see supra* at 443 U. S. 329, the incidence of factual error at the trial level in federal courts appears to be exceedingly low, even when measured by the relatively strict appellate standard used by the Federal Courts of Appeals. Presumably the incidence of errors that survive that first level of review is even smaller.

[Footnote 2/7]

Indeed, the Court makes light of *Winship* by suggesting that, in the absence of its new habeas procedure, the result of that case is simply "a trial ritual." *Ante* at 443 U. S. 316-317. Far more likely, in my view, is that the Court's difficult-to-apply but largely unnecessary rule will itself result in a "collateral-attack ritual" that will undermine the integrity of both the state and federal judiciaries. *See infra* at 443 U. S. 336-339.

[Footnote 2/8]

So far as I can determine, this standard first appeared in our jurisprudence in MR. JUSTICE STEWART's opinion dissenting from the Court's denial of certiorari in *Freeman v. Zahradnick,* 429 U.S. 1111, 1112, 1113, 1114, 1116. At that time, it gave the impression of being somewhat narrower than -- if only because it was stated quite differently from -- the test used by the Courts of Appeals in reviewing federal convictions on direct appeal. *See Curley v. United States,* 81 U.S.App.D.C. 389, 392393, 160 F.2d 229, 232-233 (1947). Although the Court twice repeats the *Freeman* test, *see ante* at 443 U. S. 313, 443 U. S. 319, it now appears either to equate that standard with the -- in my view -- broader federal direct review standard, or to endorse both standards despite their differences.*See ante* at 443 U. S. 318, and nn. 11, 12.

[Footnote 2/9]

In the past, collateral review of state proceedings has been justified largely on the grounds (1) that federal judges have special expertise in the federal issues that regularly arise in habeas corpus proceeding, and (2) that they are less susceptible than state judges to political pressures against applying constitutional rules to overturn convictions. *See, e.g.,* Bartels, Avoiding a Comity of Errors, 29 Stan.L.Rev. 27, 30 n. 9 (1976). *Cf. Steffel v. Thompson,*415 U. S. 452, 415 U. S. 464; *Mitchum v. Foster,*407 U. S. 225, 407 U. S. 242. But neither of these justifications has any force in the present context. State judges are more familiar with the elements of state offenses than are federal judges, and should be better able to evaluate sufficiency claims. Moreover, of all decisions overturning convictions, the least likely to be unpopular, and thus to distort state decisionmaking processes, are ones based on the inadequacy of the evidence. Indeed, once federal courts were divested of authority to second-guess state courts on Fourth Amendment issues, which are far more likely to generate politically motivated state court decisions, *see Stone v. Powell,*428 U. S. 465, a like result in this case would seem to be *a fortiori.*

[Footnote 2/10]

For example, the heavy federal workload has required the 13 regular and 7 senior judges on the Ninth Circuit to hire 30 staff attorneys and 33 law clerks to assist them in their labors.

[Footnote 2/11]

Additional burdens will also be imposed if the Court's rule is extended to federal habeas proceedings reviewing federal criminal trials, as well as to ones reviewing state civil commitment proceedings in which we have recently required at least the "clear and convincing" test to be applied as a matter of federal constitutional law. *Addington v. Texas,* 441 U. S. 418.

This Court's workload will also increase, of course, when its certiorari docket expands to accommodate the challenges generated by the Court's new rule. The effect will be even greater if the Court's opinion is read to require state appellate courts to apply the reasonable doubt test on direct review and to require this Court to apply it when reviewing the decisions of those courts on certiorari.

[Footnote 2/12]

Professor Bator has persuasively explained how the law of diminishing returns inevitably makes it unwise to have duplicative review processes on the "merits" in criminal cases:

"*[I]f* a criminal judgment is ever to be final, the notion of legality must at some point include the assignment of final competences to determine legality. But, it may be asked, why should we seek a point at which such a judgment becomes final? Conceding that no process can assure ultimate truth, will not repetition of inquiry stand a better chance of approximating it? In view of the awesomeness of the consequences of conviction, shouldn't we allow redetermination of the merits in an attempt to make sure that no error has occurred?"

"Surely the answer runs, in the first place, in terms of conservation of resources -- and I mean not only simple economic resources, but all of the intellectual, moral, and political resources involved in the legal system. The presumption must be, it seems to me, that, if a job can be well done once, it should not be done twice. If one set of institutions is as capable of performing the task at hand as another, we should not ask both to do it. The challenge really runs the other way: if a proceeding is held to determine the facts and law in a case, and the processes used in that proceeding are fitted to the task in a manner not inferior to those which would be used in a second proceeding, so that one cannot demonstrate that relitigation would not merely consist of repetition and second-guessing, why should not the first proceeding 'count'? Why should we duplicate effort? After all, it is the very purpose of the first go-around to decide the case. Neither it nor

any subsequent go-around can assure ultimate truth. If, then, the previous determination is to be ignored, we must have some reasoned institutional justification why this should be so."

"Mere iteration of process can do other kinds of damage. I could imagine nothing more subversive of a judge's sense of responsibility, of the inner subjective conscientiousness which is so essential a part of the difficult and subtle art of judging well, than an indiscriminate acceptance of the notion that all the shots will always be called by someone else. Of course this does not mean that we should not have appeals. As we shall see, important functional and ethical purposes are served by allowing recourse to an appellate court in a unitary system, and to a federal supreme court in a federal system. The acute question is the effect it will have on a trial judge if we then allow still further recourse where these purposes may no longer be relevant. What seems so objectionable is second-guessing merely for the sake of second-guessing, in the service of the illusory notion that, if we only try hard enough, we will find the 'truth.'"

Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv.L.Rev. 441, 450-451 (1963). *See also* F. James, Civil Procedure 518 (1965).

[Footnote 2/13]

The testimony of Griffin Bell at his confirmation hearings for Attorney General is particularly relevant. When asked by Senator Scott of Virginia why he had earlier resigned from his seat on the Court of Appeals for the Fifth Circuit, Judge Bell responded:

"I found it not to be a rewarding experience any longer. Whether it was because there was no more excitement after the 1906's, or whether it was because the case load changed, but the work load was oppressive. I would not have minded the work load, but the character of the cases changed. It was almost like serving on a criminal court. I did not want to do that any longer."

Hearings on the Prospective Nomination of Griffin B. Bell, of Georgia, to be Attorney General, before the Senate Committee on the Judiciary, 95th Cong., 1st Sess., 27 (1977).

**Disclaimer:** Official Supreme Court case law is only found in the print version of the United States Reports. Justia case law is provided for general informational purposes

only, and may not reflect current legal developments, verdicts or settlements. We make no warranties or guarantees about the accuracy, completeness, or adequacy of the information contained on this site or information linked to from this site. Please check official sources.

364 S.W.3d 900

Jeffrey Shane WISE, Appellant,

v.

The STATE of Texas.

No. PD–0473–11.

Court of Criminal Appeals of Texas.

April 25, 2012.

Summaries:Source: Justia

Defendant was convicted of ten counts of possession of child pornography. The ten counts were for ten images of unknown children discovered in the "free space" of defendant's computer. In this petition for discretionary review, the State contended that the court of appeals erred in finding the evidence insufficient to support convictions against defendant. The court concluded that the majority misapplied the standard of review for sufficiency by focusing on the possible alternative explanations, rather than determining whether the jury's inference was reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. Therefore, the court reversed the judgment of the court of appeals and rendered a judgment affirming the trial court.

[364 S.W.3d 902]

Rick Mahler and Todd Greenwood, Wichita Falls, for Appellant.

John W. Brasher, Asst.Crim. D.A., Wichita Falls, Lisa C. McMinn, State's Attorney, Austin, for State.

OPINION

ALCALA, J., delivered the opinion of the Court in which KELLER, P.J., and PRICE, WOMACK, JOHNSON, KEASLER, HERVEY, and COCHRAN, JJ., joined. MEYERS, J., not participating.

In this petition for discretionary review, the State contends the court of appeals erred in finding the evidence insufficient to support convictions against appellant, Jeffrey Shane Wise, for ten counts of possession of child pornography. See Wise v. State, 340 S.W.3d 818 (Tex.App.-Fort Worth 2011). The ten counts were for ten images of unknown children discovered in the "free space" 1 of appellant's computer. SeeTex. Penal Code § 43.26 (possession or promotion of child pornography).2 The majority opinion held that the State failed to prove that appellant knowingly or intentionally possessed the images because the images could possibly have gotten on the hard drive innocently without appellant having ever seen or accessed them. See Wise, 340 S.W.3d at 826. Chief Justice Livingston dissented. See id. at 827–30 (Livingston, C.J., dissenting). The State's petition for discretionary review challenges the majority opinion by asserting that the "Court of Appeals failed to properly apply the Jackson v. Virginia standard of review, and thereby erred in holding that the evidence was legally insufficient to prove that the appellant knowingly possessed the child pornography images found in 'free space' on the hard drive of his computer." See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The State contends that the majority opinion erroneously applied the "reasonable hypothesis analytical construct" rejected in Geesa v. State, 820 S.W.2d 154, 156 (Tex.Crim.App.1991). We conclude the majority opinion misapplied the standard of review for sufficiency by focusing on the possible alternative explanations, rather than determining whether the jury's inference was reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the

[364 S.W.3d 903]

verdict. See Brooks v. State, 323 S.W.3d 893, 895 (Tex.Crim.App.2010); Hooper v. State, 214 S.W.3d 9, 13 (Tex.Crim.App.2007). We reverse the judgment of the court of appeals and render a judgment affirming the trial court.

I. Applicable Law for Sufficiency of Evidence of Possession of Child Pornography

In determining whether the evidence is sufficient, a reviewing court views all the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson, 443 U.S. at 318, 99 S.Ct. 2781;Brooks, 323 S.W.3d at 895. When the record supports conflicting inferences, a reviewing court must "presume that the factfinder resolved the conflicts in favor of the prosecution" and defer to that determination. Jackson, 443 U.S. at 326, 99 S.Ct. 2781. The factfinder exclusively determines the weight and credibility of evidence. See id. at 319, 99 S.Ct. 2781;Wirth v. State, 361 S.W.3d 694, 697–98 (Tex.Crim.App.2012) (not yet reported).

The evidence-sufficiency standard of review is the same for both direct and circumstantial evidence. Hooper, 214 S.W.3d at 13. For the evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with the defendant's guilt. See Geesa, 820 S.W.2d at 156;Wilson v. State, 7 S.W.3d 136, 141 (Tex.Crim.App.1999); Brown v. State, 911 S.W.2d 744, 746 (Tex.Crim.App.1995). Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. Hooper, 214 S.W.3d at 13.

A person commits possession of child pornography if he "knowingly or intentionally possesses visual material that visually depicts a child younger than 18 years of age at the time the image of the child was made who is engaging in sexual conduct" and he "knows that the material depicts the child" in this manner. Tex. Penal Code § 43.26(a). A person acts "intentionally" or with intent "with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Id. § 6.03(a). A person acts knowingly or with knowledge of the nature of his conduct or circumstances "when he is aware of the nature of his conduct or that the circumstances exist." Id. § 6.03(b). The Texas Penal Code defines "possession" of contraband as "actual care, custody, control, or management." Id. § 1.07(a)(39).

This Court has never addressed whether a person can knowingly or intentionally possess child pornography that exists only in the free space of that individual's computer hard drive. This subject has rarely been discussed in intermediate courts in Texas, which have only briefly mentioned the subject. See Lancaster v. State, 319 S.W.3d 168, 173 (Tex.App.-Waco 2010) ("[Appellant's] attempted deletion did not dispossess him of the recording."); Carter v. State, No. 05–05–01424–CR, 2006 WL 3628889, *3–5, 2006 Tex.App. LEXIS 10687, *7–12 (Tex.App.-Dallas 2006, pet ref'd) (not designated for publication) (discussing whether pornographic images at issue were accidentally downloaded); Assousa v. State, No. 05–08–00007–CR, 2009 WL 1416759, *4 n. 3, 2009 Tex.App. LEXIS 3500, *12 n. 3 (Tex.App.-Dallas 2009, pet. ref'd) (not designated for publication) (noting appellant's extensive knowledge of computer technology when discrediting his claim that he was unaware of images' existence on his hard drive).

[364 S.W.3d 904]

Although courts in Texas have rarely addressed criminal intent in computer pornography, courts throughout the nation have discussed the peculiarities of determining knowing or intentional possession of computer pornography. Courts generally take two approaches to framing sufficiency analysis in cases involving child-pornography images discovered in a computer's cache or free space.3See Ty E. Howard, Don't Cache Out Your Case: Prosecuting Child Pornography Possession Laws Based on Images Located in Temporary Internet Files,19 Berkeley Tech. L.J. 1227, 1253–54 (2004). Under the first approach, termed a present-possession approach, a court will analyze the sufficiency of the evidence to determine

whether a defendant had the knowledge and ability to access the files in their present format. Id. at 1254–55. In the context of deleted files, if an ordinary computer could not access files that have been deleted by a user or an automatic computer program, then the defendant could not presently have care, custody, control, or management of the images. See Deanna M. Rice, Note: Child Pornography, the Internet, and the Challenge of Updating Statutory Terms, 122 Harv. L.Rev.. 2206, 2215–16 (2009).4 Although images in a computer's cache without other supporting evidence have been determined to be insufficient in some cases, courts following this first approach note that the evidence would be sufficient when there is other evidence establishing that the images were presently knowingly or intentionally possessed.5

[364 S.W.3d 905]

Under a second general approach, used by courts nationally, evidence of pornography found in a computer cache could be sufficient to support a conviction because the presence of the images in the cache is evidence that, at some earlier point, a defendant knowingly or intentionally possessed the images by viewing them online. See Howard, supra, at 1255. Under this framework, a defendant need not be aware that the image continued to exist on the computer, and the present accessibility of the image is not pertinent. See id. at 1259 (stating that, under "evidence of" approach, "the deletion of a temporary internet file has no bearing on the legal analysis of knowing possession"). Instead, the pertinent inquiry is whether a defendant had knowingly or intentionally possessed a pornographic image at a prior point in time. See id. Part of the difficulty using the second approach is that files lose some of their information upon deletion, such as when the image was created or how it came to be. See Moreland, 665 F.3d at 142 n. 2. A forensic expert might not be able to tell whether the image, for example, was saved from an email attachment or perhaps was only a temporary internet file or the result of a virus on the computer. See id. ("Files found in the disk slack space are sometimes called 'orphan files,' as it is difficult or impossible to trace their origin or date of download.").

Although these two general approaches are instructive in explaining the difficulties of establishing criminal intent in the possession of computer pornography, we conclude that each case must be analyzed on its own facts. For computer-pornography cases, like all criminal cases, a court must assess whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence considered in the light most favorable to the verdict. See Hooper, 214 S.W.3d at 13.

II. Analysis

As accurately observed by the Second Court of Appeals's majority opinion, the evidence in the record shows that appellant, who did not have technical skills in computer programming, was presently unable to access the deleted files that were in the free space of the computer. As the computer expert explained at trial, the deletion of the file made them inaccessible to anyone but a highly skilled computer specialist. Because appellant was not presently able to access the images, the jury would have

had to determine that, before the images were deleted, appellant knowingly or intentionally had care, custody, control, or management of the images. SeeTex. Penal Code §§ 1.07(a)(39) & 43.26(a).

The State correctly observes that the court of appeals erroneously focused on two alternative hypotheses that the images could have been placed on the computer without appellant's knowledge either through (1) a virus or (2) a previous owner of the computer. First, the court of appeals credited appellant's suggestion that viruses on his computer could have placed the images there, but the jury could reasonably have disregarded that evidence. See Wise, 340 S.W.3d at 826. Trippel did acknowledge in her testimony that there were several viruses on the appellant's computer and that some viruses are capable

[364 S.W.3d 906]

of placing images on a computer without a user's knowledge. She, however, also testified that it was unlikely that the presence of viruses would explain the presence of the images in the free space of a computer. Her testimony was as follows:

[State]: Okay. Hypothetically, let's say a bad guy wants to store child porn on your computer to view later on, okay? And if he puts it in your free space, he would have no way of retrieving those images of child porn to view because they're not linked to a specific number, code or other identifying number or code; is that correct?

[Witness]: Well, there would be no file location to—

[State]: That's correct?

[Witness]:—to show where the pointer was to where that file was.

[State]: Okay. So if I'm a bad guy and I put porn on your computer, the last place I would put it would be on your free space, because I couldn't retrieve it to view it?

[Witness]: I don't see how you could.

[State]: Okay. Because it could go anywhere on your computer, you don't know?

[Witness]: Yes.

[State]: Because it's in free space—I mean, anywhere in free space?

[Witness]: Right.

Because the placement of a pornographic image on the free space of a computer would be inconsistent with the purpose for placing a virus on a computer, the jury could have reasonably disregarded that explanation for the presence of the images. See Wirth, 361 S.W.3d at 697–98.

Second, the court of appeals erred by crediting appellant's suggestion that the images could have been placed on the computer by a prior owner of the computer and finding that to be an alternative hypothesis inconsistent with guilt. See Wise, 340 S.W.3d at 827. Suggesting that a prior owner of the computer could have placed the images on it, appellant's brother testified that appellant had purchased the computer at a flea market in 2006. Although the evidence was uncontroverted, the jury implicitly disregarded that suggestion. The jury could have reasonably determined that appellant's brother's testimony was biased in light of his relationship with appellant. Furthermore, the brother provided few details about the purchase; he did not explain from what vendor the computer was purchased, how it was paid for, or whether any receipt confirmed this claim. The jury could have reasonably determined that appellant's brother's generic description of a sale by an unidentified vendor at an unknown flea market was not the type of information that could be readily controverted by the State or reliable evidence. Uncontroverted evidence does not necessarily equate to credible evidence, particularly when the State could not readily controvert the evidence because of the lack of detail. See Evans v. State, 202 S.W.3d 158, 163 (Tex.Crim.App.2006).

By focusing on the alternative hypotheses premised on the possibility of viruses or a prior owner placing the images on the free space of the computer, the court of appeals used a sufficiency standard that has been abrogated by our Court. See Geesa, 820 S.W.2d at 156. Furthermore, the majority opinion erroneously failed to defer to the jury's exclusive determination of the weight and credibility of evidence. See Wirth, 361 S.W.3d at 697–98.

The majority opinion also erred by implicitly examining the evidence in the light favorable to appellant, focusing on the fact that he could not access the images in the free space of the computer

and the absence of computer evidence to establish exactly when the images were placed on, accessed, or deleted from the computer.

[364 S.W.3d 907]

See Wise, 340 S.W.3d at 827. The evidence, however, should have been viewed in the light favorable to the State's verdict, as urged by Chief Justice Livingston's dissenting opinion that extensively detailed the evidence. See id. at 827–28 (Livingston, C.J., dissenting). Viewing the evidence in that light, the evidence shows that appellant's computer was seized after a search warrant was executed at his home. After the police seized appellant's computer, they discovered the ten images of child pornography in the free space of his computer. These images were of unknown female children.

The jury could have reasonably determined from the extensive evidence, which showed that appellant had a proclivity for child pornography and a prurient interest in children, that he knowingly and intentionally possessed the images that were in the free space of his computer before the images were deleted. The evidence showed that he had an improper sexual relationship with a 16–year–old girl who was formerly his employee at a fast-food restaurant and that she gave him pornographic images of herself, which he kept on a digital memory card. Furthermore, the former employee was not the only child appellant had sexually assaulted. His stepdaughter testified that in 1999, when she was under 10 years old, appellant performed sexual acts on her.

In addition to these sexual assaults, evidence showed that appellant had used his computer to pursue his sexual interest in children. Aside from the image of the former employee, appellant's computer contained adult pornography and "child erotica." 6 These child erotica images were found in a folder labeled "childmodelsites.com" within the "My Documents" folder. Appellant acknowledged that he visited pornographic websites and had seen pictures of "all different" ages of girls, although he denied that any were underage. But appellant's disclaimer of visiting pornographic websites of children is discredited by temporary internet files suggesting visits to websites with child pornography. The State's expert testified to finding on appellant's computer a folder called "young porn and teen sex@ young zilla. com" and another file relating to a "hickey preteen model." These files were either viewed or created in 2007 or 2008 after he purportedly purchased the computer from the flea market. The jury could have reasonably inferred from appellant's possession of temporary internet files referring to "young porn" and "teen sex" that appellant knowingly and intentionally had possession of the other child pornography in the free space of his computer. See Carter, 2006 WL 3628889, at *2–3, 2006 Tex.App. LEXIS 10687, at *5–6 (rejecting appellant's argument that images were accidentally placed on his computer based, in part, on evidence that he had searched the internet with the term "pedophile" and had renamed files at some point before deleting them).

Although the court of appeals focused on the absence of any evidence to show when or by whom the images in the free space of the computer were created or moved there, the record does contain evidence of appellant's recent interest in photos depicting the sexualization of children as well as a history of sexually assaulting children. A jury could have reasonably rejected appellant's claims that the images were due to a virus or former computer owner and instead determined that appellant had a history of and present sexual attraction to children and that he intended to possess

[364 S.W.3d 908]

the pornographic images of the children that were in the free space of his computer. We hold that, viewing the totality of the evidence and inferences in a light most favorable to the verdict, the jury could have reasonably inferred that appellant knowingly had care, custody, control, or management of the ten pornographic images of unknown children found on the free space of his computer. See Hooper, 214 S.W.3d at 13.

III. Conclusion

We reverse the judgment of the court of appeals and render a judgment affirming the trial court.

--------

Notes:

1. When a file is deleted by a user, it is not completely wiped from the computer's hard drive. See United States v. Moreland, 665 F.3d 137, 142–43 (5th Cir.2011). It is, however, inaccessible to an ordinary user. Id. According to the State's expert, Amy Trippel, a digital forensics examiner, when a file is deleted, it isn't simply removed from the computer. The image or file still exists in the free space of the computer's hard drive, where it will remain until the files are written over. Trippel compared deleting a file to removing a card from a card catalog in a library: "If I take the card out of the card catalog and throw it away, the library book is still there, but I just don't know where to go get it. And that's the same concept. If I delete a file, the file is still there, the operating system just doesn't know where to get it." Appellant's images were "deleted" images contained in his computer's free space.

2. The ten counts of possession of child pornography were tried together along with other offenses. In addition to these convictions, appellant was convicted of four counts of sexual assault for his sexual acts with a former employee, one count of possession of child pornography for possessing a photo of the former employee on a digital camera, and one count of indecency with a child for sexual acts with his stepdaughter. SeeTex. Penal Code §§ 22.011(a)(2) (sexual assault of a child), 43.26 (possession or promotion of child pornography), & 22.11(a) (indecency with a child).

3. The majority of these cases involve a situation in which images are stored in a browser's cache. "A cache (pronounced 'cash') is a storage mechanism designed to speed up the loading of Internet displays. When a computer user views a webpage, the web browser stores a copy of the page on the computer's hard drive in a folder or directory. That folder is known as the cache, and the individual files within the cache are known as temporary Internet files. When the user later returns to a previously visited webpage, the browser retrieves the cached file to display the webpage instead of retrieving the file from the Internet." Ty E. Howard, Don't Cache Out Your Case: Prosecuting Child Pornography Possession Laws Based on Images Located in Temporary Internet Files, 19 Berkeley Tech. L.J. 1227, 1229–30 (2004). The images at issue here were not found in the cache but rather were deleted images. Deleted images are more difficult to access than images in a computer cache. See Moreland, 665 F.3d at 143 (noting that "sophisticated expertise and special software [is required] to restore a deleted file"); United States v. Tucker, 305 F.3d 1193, 1204–05 (10th Cir.2002) (noting that defendant could, if aware of files' existence, access cache files and use or view them like any other file), cert. denied, 537 U.S. 1223, 123 S.Ct. 1335, 154 L.Ed.2d 1082 (2003).

4.See Moreland, 665 F.3d at 148 (finding evidence insufficient to establish that defendant had requisite knowledge and ability to access images in computer cache and to exercise dominion or control over them); United States v. Kuchinski, 469 F.3d 853, 863 (9th Cir.2006) (same); United States v. Miller, 527 F.3d 54, 67 (3d Cir.2008) (considering "defendant's knowledge of and ability to access the storage area for the images" as a factor to determine whether the defendant "knowingly" possessed images); United States v. Dobbs, 629 F.3d 1199, 1209 (10th Cir.2011) (rejecting argument that affirmatively seeking out child pornography is sufficient circumstantial evidence to sustain conviction for images found in browser cache).

5.See, e.g., Tucker, 305 F.3d at 1204 (stating that appellant acknowledged he "purposefully visited Web sites containing child pornography knowing that the images would be stored on his computer's hard drive" in the cache folder); Moreland, 665 F.3d at 148 (noting that "in exclusive possession cases in which convictions have been upheld, the government has presented additional evidence of the defendant's knowledge, access and control of the child pornographic images."); Kuchinski, 469 F.3d at

863 (noting that evidence must show "some other indication of dominion and control over the images" when defendant lacks access to and control over files); United States v. Romm, 455 F.3d 990, 1001 (9th Cir.2006) (noting defendant's admitted knowledge and ability to access cache files), cert. denied, 549 U.S. 1150, 127 S.Ct. 1024, 166 L.Ed.2d 772 (2007); Assousa v. State, No. 05–08–00007–CR, 2009 WL 1416759, *4 n. 3, 2009 Tex.App. LEXIS 3500, *12 n. 3 (Tex.App.-Dallas 2009, pet. ref'd) (not designated for publication) (arguing appellant's "thirteen years of experience as a software engineer and manager in the computer industry" provided sufficient evidence for a jury to find that appellant was aware of the existence of images in his computer's cache and free space).

6. State's Expert Amy Trippel defined child erotica as "a picture of a child either partially clothed or nude" that is not illegal.

Wise v. State , 364 S.W.3d 900 (Tex. Crim. App., 2012)